IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| NIDIA HESTON and ADRIAN | § | |
| HESTON IV, Natural Parents and | § | |
| Next Friends of A.H., | § | |
| *Plaintiffs,* | § | |
| | § | |
| V. | § | CIVIL ACTION NO.:   1:18-cv-0018-RP |
| | § | |
| THE SCHOOL BOARD OF AUSTIN | § | |
| INDEPENDENT SCHOOL DISTRICT | § | |
| and JENNIFER HARDISON, | § | |
| *Defendants.* | § | |

**DEFENDANT AUSTIN INDEPENDENT SCHOOL DISTRICT'S MOTION TO DISMISS
PLAINTIFF'S SECOND AMENDED COMPLAINT**

Defendant Austin Independent School District ("AISD" or "the District") respectfully

presents its Motion to Dismiss Plaintiffs' Second Amended Complaint for lack of subject matter

jurisdiction under Fed. R. Civ. P. 12(b)(1), and for failure to state a claim upon which relief can

be granted pursuant to Fed. R. Civ. P. 12(b)(6), and in support thereof would show the following:

## I.       INTRODUCTION

Plaintiffs sued AISD under various theories related to A.H.'s educational opportunities at

the District, including for recovery of an alleged assault against A.H. by Defendant Jennifer

Hardison in her role as a special education teacher's aide.  After realizing that the District is not

liable in tort, and not wishing to exhaust administrative remedies under the Individuals with

Disabilities Education Act ("IDEA"), Plaintiffs attempted to artfully plead their claims as

discrimination claims under Section 504 of the Rehabilitation Act of 1973 ("Section 504") and

the Americans with Disabilities Act ("ADA"), and as claims for violation of the United States

Constitution, pursuant to 42 U.S.C. § 1983 ("Section 1983"). (*See* Plaintiffs' Original Complaint,

Doc. #1).

AISD responded by filing a Motion to Dismiss (Doc. #8), pointing out that Plaintiffs' claims should be dismissed for failure to exhaust administrative remedies, waiver, and/or failure to plead a plausible claim for relief. Rather than respond to the legal arguments made by AISD, Plaintiffs filed a First Amended Complaint ("FAC") (Doc. # 11). Although Plaintiffs revised their claims somewhat, they still had not cured the deficiencies in their pleadings, and AISD sought dismissal of Plaintiffs' claims as repleaded. (Doc. # 13). Plaintiffs again repleaded, filing a Second Amended Complaint ("SAC")(Doc. # 21). Plaintiffs made more dramatic changes to the pleadings; however, their SAC still is not adequate to invoke this court's jurisdiction and/or to state a claim.

## II.    STATEMENT OF UNDISPUTED JURISDICTIONAL FACTS

On March 30, 2016, Hardison was a teacher's aide who worked with A.H. as part of his Individualized Education Plan ("IEP") under the Individuals with Disabilities Education Act ("IDEA"). On that date Hardison threw a trash can, which led to A.H. being injured.

Thereafter, the District received a Notice of Filing of Request for a Special Education Due Process Hearing on August 16, 2016, which was later amended on November 3, 2016. (Exhibit 1).[1] On December 12, 2016, Plaintiffs and AISD signed a Compromise Settlement Agreement ("Agreement"). (Exhibit 2).

On December 14, 2016, an Order of Dismissal with Prejudice was signed by the Special Education Hearing Officer for the Texas Education Agency ("TEA"). (Exhibit 3). The Order stated: "Because it appears that all matters in controversy have been resolved between the parties

---

[1] The Court may take judicial notice of Exhibits 1, 2, and 3 as they are governmental records. Fed. R. Evid. 201(b); *Funk v. Stryker Corp.,* 631 F.3d 777, 783 (5th Cir. 2011) (holding that a "district court took appropriate judicial notice of publicly-available documents and transcripts produced by [an administrative agency], which were matters of public record directly relevant to the issue at hand") (citation omitted); *accord, Crosby v. Philip Holdings, LLC,* No. CIV.A. H-12-01749, 2012 WL 5456360, at *2 n.5 (S.D. Tex. Nov. 7, 2012); *Hawkins v. AT & T,* No. 3:12-CV-1173-L, 2013 WL 4505154, at *3 (N.D. Tex. Aug. 23, 2013).

through informal settlement and mediation and that Petitioner no longer wishes to pursue his request for a due process hearing it is therefore ORDERED that this cause is hereby DISMISSED WITH PREJUDICE." (*Id.*).

In the Agreement resulting in the dismissal, Plaintiffs agreed to the following:

C.1. In consideration for the amounts stated in paragraph A and subject to the explicit reservations noted below, Claimants and Claimants' representative hereby release, acquit, and forever discharge AISD, its past, present, and future agents, employees, representatives, attorneys, insurers, and Trustees, of and from any and all claims, demands, damages, causes of action, liabilities or controversies of any kind whatsoever, whether known or unknown, now existing or that might arise hereafter, which arise out of, or in any manner pertain to claims based upon violations of the Individuals with Disabilities Education Act (IDEA); Chapter 34 of the Code of Federal Regulations; Chapter 29 of the Texas Education Code; and Chapter 19 of the Texas Administrative Code, Sections 89.001 *et seq.*

C.2. Claimants reserve the right to file federal, state, and local claims against the District that are not identified in C.1., including claims that have arisen under Texas Education Code §22.0511, including the right to exhaust the pending local grievance filed pursuant to District policy FNG(LOCAL), and claims pursuant to 42 U.S.C. Section 1983, Section 504 of the 1973 Rehabilitation Act (as amended) and its regulations, and the Americans with Disabilities Act (as amended) and its regulations.   Also reserved is any requirement to file a complaint with TEA pursuant Education Code 22.0511. The Parents agree to dispose of all disputes related to the appropriateness of educational services and resources for Student, but the Parents are reserving their right to pursue personal injury claims related to an alleged incident involving a prior District employee, Jennifer Hardison, that occurred on March 30, 2016, at Small Middle School.

(Exhibit 2, p. 4). This lawsuit followed.

### III.    LEGAL STANDARDS

**A.    Rule 12(b)(1) – Lack of Subject Matter Jurisdiction**

A party may file a motion to dismiss under Fed. R. Civ. P. 12(b)(1) at any time during the course of litigation, and the court must dismiss the action if it determines at any time that it lacks subject-matter jurisdiction. *King v. Life Sch.*, 809 F.Supp.2d 572, 576 (N.D. Tex. 2011). "[T]he burden of establishing federal jurisdiction rests on the party seeking the federal forum." *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001).

**B.    Rule 12(b)(6) – Failure to State a Claim**

If a complaint fails to state a claim upon which relief can be granted, a court should dismiss the complaint as a matter of law. *See* Fed. R. Civ. P. 12(b)(6). To survive a 12(b)(6) motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). Dismissal is appropriate when the plaintiff has not alleged enough facts to state a claim to relief that is plausible on its face or has failed to raise his right to relief above the speculative level. *Bass v. Stryker Corp.*, 669 F.3d 501, 506 (5th Cir. 2012) (citing *Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 744 (5th Cir. 2010)). Plaintiffs must have "nudged their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

"A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). "Where a complaint pleads facts that are

merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted). It is also important to note that the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Id.*; *accord Twombly*, 550 U.S. at 555.

## IV.   LEGAL ARGUMENT

As demonstrated below, Plaintiffs have failed to state sufficient factual allegations to avoid dismissal of claims made pursuant to Section 504, the ADA, and the Constitution.

**A.   Plaintiffs have failed to exhaust administrative remedies under IDEA, all their claims relate to the provision of a FAPE, and should be dismissed.**

Although Plaintiffs have removed all references to a "free appropriate public education" ("FAPE"), other than in one paragraph about exhaustion (SAC ¶ 4), the lack of direct references to an alleged denial of FAPE and/or to alleged failures under the IDEA, does not change the nature of the claims. And, although Plaintiffs attempted to carve out claims under Section 504 and the ADA, under paragraph C.2 of Exhibit 2, such a carveout was only for claims unrelated to the appropriateness of educational services and resources for Student.  Each of Plaintiffs' complaints has clearly been seeking to hold AISD liable for failures related to educational services; therefore, AISD continues to argue that the claims are barred by failure to exhaust and, though not briefed at this stage, that they are also barred by waiver. Once again, Plaintiffs' claims, including those brought pursuant to Section 504, the ADA, and the Constitution, should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1)[2] or 12(b)(6) based on Plaintiffs' failure to

---

[2] Although the Fifth Circuit has noted a split of authorities, this district court has found exhaustion of administrative remedies under the IDEA to be jurisdictional. *See Crawford v. San Marcos Consol. Indep. Sch. Dist.*, A-13-CV-206 LY, 2015 WL 236653, at *3 (W.D. Tex. Jan. 15, 2015), *subsequently aff'd*, 637 Fed. Appx. 808 (5th Cir. 2016); *E.G. v. Northside Indep. Sch. Dist.*, CV SA-12-CA-949-FB, 2014 WL 12537177, at *24 n. 7 (W.D. Tex. Mar. 31, 2014). The Northern District of Texas also so holds. *See Reed v. Kerens Indep. Sch. Dist.*, 3:16-CV-1228-BH, 2017

exhaust administrative remedies. Because Plaintiffs have been given ample opportunity to replead, the Court should dismiss the claims with prejudice without the opportunity to further amend.

### 1.     Plaintiffs did not exhaust.

By moving to dismiss their IDEA claims and "all disputes related to the appropriateness of educational services and resources" without a due process hearing (Exhibits 2, 3), Plaintiffs failed to exhaust administrative remedies. *See Reyes v. Manor Indep. Sch. Dist.*, A-14-CA-00469-SS, 2016 WL 1601219, at *3 (W.D. Tex. Apr. 20, 2016), *aff'd*, 850 F.3d 251 (5th Cir. 2017) ("To prove exhaustion . . .  the SEHO must have made 'findings and [a] decision' to satisfy the exhaustion requirement.") (citing 20 U.S.C. § 1415(g); *Houston v. Encinitas Union Sch. Dist.*, No. 00cv2475, 2008 WL 2220414, at *3 (S.D. Ca1. May 27, 2008) (concluding the plaintiffs had not exhausted their administrative remedies because the SEHO explicitly stated he would make a final decision at a later date)). Plaintiffs do not deny that they did not exhaust; they simply claim they were not required to. (SAC, ¶ 117).

### 2.     Exhaustion is required.

It is well established that the IDEA requires a plaintiff to exhaust administrative remedies prior to asserting IDEA-based claims in federal court. 20 U.S.C. §§ 1400-1482.  The statute mandates administrative procedures for addressing claims based on "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child." 20 U.S.C. § 1415(b)(6)(A).

---

WL 2463275, at *5 (N.D. Tex. June 6, 2017)(citing *Dabney v. Highland Park Indep. Sch. Dist.*, No. 3:15-CV-2122-L, 2016 WL 1273467, at *6 n.2 (N.D. Tex. Mar. 31, 2016) (noting "[t]he IDEA's exhaustion requirement has been interpreted as jurisdictional")(citations omitted); *Hooker v. Dallas Indep. Sch. Dist*, No. 3:09-CV-1289-D, 2010 WL 4025877, at *6 (N.D. Tex. Oct. 13, 2010) (noting "the court holds that the exhaustion requirement of the IDEA is jurisdictional").

A plaintiff is required to exhaust these administrative procedures before bringing a federal lawsuit to assert a denial of FAPE or to challenge a school district's violation of the IDEA. *Id.* at § 1415(l); *Gardner v. Sch. Bd. Caddo Parish*, 958 F.2d 108, 111 (5th Cir. 1992) (holding that where a plaintiff is asserting claims that could have, or properly should have, been brought under the IDEA, the plaintiff is required to first exhaust his administrative remedies by having the issues heard and ruled on by the State educational agency as provided for in 20 U.S.C. §§ 1415(b)-(f)). Further, the exhaustion requirement extends to all claims "seeking relief that is also available under [the IDEA]," and "a plaintiff cannot avoid the exhaustion requirements of the IDEA by 'repackaging' the 'claims under some other statute.'" *Ripple v. Marble Falls Indep. Sch. Dist.*, 99 F.Supp.3d 662, 685 (W.D. Tex. 2015) (quoting *Marc V. v. N.E. Indep. Sch. Dist.*, 455 F.Supp.2d 577, 592 (W.D. Tex. 2006)).

### 3.    The Supreme Court has provided recent guidance in *Fry.*

The U.S. Supreme Court recently addressed the proper analysis for a claim where a plaintiff tries to use other federal statutes to avoid the requirement to exhaust the administrative remedies set forth in IDEA. *See Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743 (2017). In *Fry*, as in this case, the plaintiff had asserted claims pursuant to Title II of the ADA and Section 504, alleging discrimination based on a failure to accommodate by the school's denying a request to allow the student to use a service dog while attending school.  In addition, like the Plaintiffs in this case, the plaintiff in *Fry* also brought a Constitutional claim. *Id.* at 750. The Court made no determination as to whether the plaintiff under the specific facts of the case was required to exhaust administrative remedies, but instead vacated and remanded the case for purposes of conducting an analysis consistent with the Court's opinion. *Id.* at 759.

The IDEA allows a plaintiff to seek redress under other federal laws that provide rights to children with disabilities. 20 U.S.C. §1415(l).   However, the statute provides that IDEA administrative exhaustion is not required *only* where "the gravamen of the plaintiff's suit is something other than the denial of the IDEA's core guarantee – what the Act calls a "[FAPE]." *Id.* at 748.  Where the plaintiff seeks relief for denial of a FAPE, the statutory requirement for exhaustion is applicable.  *Id.*  Plaintiffs in this case have repleaded twice to avoid referencing a "denial of FAPE," or to claim violation of IDEA. Is the Court, therefore, bound to presume a denial of FAPE is not involved? The *Fry* Court rejected such a farcical conclusion:

> What matters is the crux—or, in legal-speak, the gravamen—of the plaintiff's complaint, setting aside any attempts at artful pleading. . . .The statutory language asks whether a lawsuit in fact 'seeks' relief available under the IDEA—not, as a stricter exhaustion statute might, whether the suit 'could have sought' relief available under the IDEA (or, what is much the same, whether any remedies 'are' available under that law) . . . .A court deciding whether § 1415(l) applies must therefore examine whether a plaintiff's complaint—the principal instrument by which she describes her case—seeks relief for the denial of an appropriate education.

*Fry*, 137 S. Ct. at 755.

The court accomplishes this by analyzing the substance, not surface, of the complaint to determine whether the plaintiff, regardless of the labels and terms used, is in essence contesting the adequacy of a student's special education program and therefore seeking redress for a school's failure to provide a FAPE, even if not phrased or framed precisely that way. *Id.*

The Supreme Court recognized attorneys would try to avoid exhaustion prerequisites, noting "a 'magic words' approach would make § 1415(l)'s exhaustion rule too easy to bypass." *Id.* The Supreme Court counseled that, in addressing whether the gravamen of a complaint seeks redress for a school's failure to provide a FAPE, one should keep in mind the "diverse means and ends of the statutes" involved. *Id.* The Court noted: "[IDEA's] goal is to provide each child with meaningful access to education by offering individualized instruction and related services

appropriate to her 'unique needs.'" *Id.* (citations omitted). "[T]he IDEA guarantees individually tailored educational services, while Title II and § 504 promise non-discriminatory access to public institutions." *Id.* at 756.

The *Fry* Court provided courts a set of hypothetical questions to determine whether or not a plaintiff is required to first exhaust under IDEA:

> First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school—say, a public theater or library? And second, could an adult at the school—say, an employee or visitor—have pressed essentially the same grievance?

*Id.*; *accord Reyes*, 850 F.3d at 256-57 (considering *Fry's* two questions and holding plaintiff's § 504 claims overlapped with IDEA claims and thus required exhaustion).

The Court concluded that "when the answer is no, then the complaint probably does concern a FAPE, even if it does not explicitly say so; for the FAPE requirement is all that explains why only a child in the school setting (not an adult in that setting or a child in some other) has a viable claim." *Id.* at 756. It is critical to also recognize the Court's conclusion that these two questions are not posed simply to the *nature* of the claim being asserted, be it Title II of the ADA, or Section 504, as the Court has already stated that claims such as these can always be made by anyone in or out of a school setting.  Accordingly, if the analysis was simply "can someone other than a child in a school setting bring a claim pursuant to Title II ADA or Section 504," the answer would always be yes to both questions, and there would be no requirement of exhaustion under any circumstances for such claims.  That basic type of analysis is not what the Court mandates in *Fry*.  Rather, the Court is stating the court must look to the bases, substance, and facts alleged by the plaintiffs in support of their particular claims, and then apply the two questions presented to determine whether only a child in a school setting could bring that specific *type* of ADA Title II, Section 504, or other claim.

Additionally, the *Fry* Court determined that "a further sign that the gravamen of a suit is the denial of a FAPE can emerge from the history of the proceedings.  In particular, a court may consider that a plaintiff has previously invoked the IDEA's formal procedures to handle the dispute—thus starting to exhaust the Act's remedies before switching midstream." *Id.* at 757. Continuing, the Court opined that a "plaintiff's initial choice to pursue that [IDEA] process may suggest that she is indeed seeking relief for the denial of a FAPE—with the shift to judicial proceedings prior to full exhaustion reflecting only strategic calculations about how to maximize the prospects of such a remedy." *Id.* "[P]rior pursuit of the IDEA's administrative remedies will often provide strong evidence that the substance of a plaintiff's claim concerns the denial of a FAPE, even if the complaint never explicitly uses that term." *Id.*

### 4.     Application of the *Fry* analysis to Plaintiff's claims

#### a.     Previous procedural history

Here, Plaintiffs filed an amended petition requesting a due process hearing before a Texas Education Agency Special Education Hearing Officer, a true and correct copy of which is attached hereto and fully incorporated by reference. (Exhibit 1). Plaintiff's special education due process complaint includes the same facts (including the Hardison incident[3]), the same allegations (including lack of supervision and training[4]), and the same causes of action (Section 504, ADA[5]) as Plaintiff's SAC *except* her special education due process request additionally sought relief under the IDEA alleging a denial of a FAPE. (*See* Exhibit 1, generally). Plaintiffs abandoned the administrative process prior to hearing and have elected to sue. However, the same facts and allegations still involve a denial of FAPE, even though Plaintiffs would prefer them not to. Just as the Court in *Fry* discussed, Plaintiffs' strategic ploy to abort the due process

---

[3] Exhibit 1, ¶¶ I.1, II. 20, III. 12, 13, 15, VII.5.
[4] *Id.* at ¶¶ I.1, II. 15, 17, 19, 20, VI.3, 10, 11, 17.
[5] *Id*. at § VIII.

proceedings and shift to judicial proceedings prior to full exhaustion, is strong evidence that Plaintiffs' claim concerns a denial of a FAPE "even if the complaint never explicitly uses that term." *See Fry*, 137 S. Ct. at 757.

Plaintiffs attempt to paint their strategic ploy as simply engaging in favored conduct. It is true, as Plaintiffs point out in their SAC, that alternative dispute resolution of IDEA claims is favored. However, if plaintiffs do not believe they are being made whole as to the adequacy of a student's special education program or the alleged denial of meaningful access to education by offering individualized instruction and related services appropriate to the student's unique needs, they should not agree to a settlement and then continue to press such claims under other statutes. Even though the hearing officer in the administrative proceeding may not have jurisdiction to *award relief* under Section 504 or the ADA, following exhaustion, the same claims can be brought under Section 504 or the ADA, with compensatory damages sought. *See S.D. by A.D. v. Haddon Heights Bd. of Educ.*, 15-1804, 2018 WL 636653, at *7 (3d Cir. Jan. 31, 2018)(quoting *Batchelor v. Rose Tree Media Sch. Dist*, 759 F.3d 266, 278 n.15 (3d Cir. 2014)("This is not to say that Appellants will not be entitled to compensatory damages for their retaliation claims *after* they exhaust the IDEA administrative process.... Appellants may very well file a complaint containing virtually identical claims as asserted in the Complaint before us today.")).

In addition, in the IDEA due process hearing, the hearing officer would make findings of fact and conclusions of law related to FAPE, which would impact such subsequent Section 504 or ADA claims. The findings and conclusions of the hearing officer are a key aspect of the exhaustion process. The Commissioner of Education's rules regarding hearing procedures state that "[a] final decision must be in writing and must include findings of fact and conclusions of

law separately stated." 19 Tex. Admin. Code § 89.1185(l). Federal courts have long recognized the important role of hearing officers in administrative proceedings: "Federal courts reviewing administrative decisions must give 'due weight' to these proceedings, mindful that the judiciary generally 'lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Mr. P v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 748 (2d Cir. 2018) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206, 208, (1982) (other citation omitted) (cleaned up)). The Supreme Court recently reinforced this notion, stating that "deference is based on the application of expertise and the exercise of judgment by school authorities." *Endrew F. ex rel. Joseph F. v. Douglas County Sch. Dist. RE-1*, 137 S. Ct. 988, 1001 (2017). The Court noted that the "Act vests these officials with responsibility for decisions of critical importance. . . .[T]he nature of the IEP process, from the initial consultation *through state administrative proceedings*, ensures that parents and school representatives will fully air their respective opinions…." *Id.* (addressing the standard for FAPE) (citing *Rowley*, 458 U.S. at 208-209(emphasis added). Finally, the Court stated: "By the time any dispute reaches court, school authorities will have had a complete opportunity to bring their expertise and judgment to bear on areas of disagreement." *Id.* Aborting the administrative process in favor of litigation deprives the school district (and the Court) of this important function of exhaustion.

### b.    The nature of Plaintiff's SAC

A substantive review of the SAC demonstrates that Plaintiffs still are asserting a denial of a FAPE and seeking remedies for that denial—relief available under the IDEA.  Accordingly, Plaintiffs were required to administratively exhaust their claims.

Plaintiffs' SAC is replete with allegations related to the denial of FAPE and failure to address A.H.'s unique and individualized educational needs (many of the allegations – denoted

with asterisks – are exactly the same as in the FAC and the corresponding motion to dismiss but

without the reference to "FAPE" or "IDEA"):

- "In order to assure that A.H. has his civil rights protected, the School District is required to hire qualified staff so as to serve the unique and individualized needs of the student." (SAC, ¶ 29).*
- "Such qualified staff act as a Reasonable Accommodation for A.H. as contemplated by Section 504, the ADA or both."  (SAC, ¶ 30).
- "Additionally, the School District is required to assure staff receive relevant training on these topics [the unique and individualized needs of the students]." (SAC, ¶ 31).*
- "Such training of staff also act (sic) as a Reasonable Accommodation for A.H. as contemplated by Section 504, the ADA or both." (SAC, ¶ 32).
- "Furthermore, to assure that the staff receiving such training adhere to the required precepts, the School District is required to assure that staff who have received such training receive continuing supervision on these and related topics."  (SAC, ¶ 33). Such supervision of staff also act (sic) as a Reasonable Accommodation for A.H. as contemplated by Section 504, the ADA or both." (SAC, ¶ 34).
- "One such required manner of supervision is to take appropriate action against a staff person who has failed to adhere to and fulfill the duties delineated in all necessary training."  (SAC ¶ 35).*
- "The need for timely and appropriate action with staff, also acts as a Reasonable Accommodation for A.H. as contemplated by Section 504, the ADA or both." (SAC ¶ 36).
- "As a student with significant disabilities, A.H. started receiving Reasonable Accommodations in the educational environment, early on. *The main accommodation A.H. received is called Special Education services.*" (SAC, ¶¶ 45-46) (emphasis added).
- "A.H.'s intelligence is within the average range, but as noted above, he struggles with emotional and behavioral issues at school." (SAC ¶ 47).*
- "Yet during the 2015-2016 School Year, Ms. Heston repeatedly expressed her concern with AISD staff members that her son be provided his necessary accommodations by persons who are adequately trained. She made such complaints to Rhonda Cuellar, the initial Autism Unit Case Manager, Natalie Hulsey and the subsequent Autism Unit Case Manager."  (SAC ¶¶ 50-51).
- "On or about October 22, 2014 Ms. Heston had a meeting with then Principal, Amy Taylor, Cuellar, Art Mendez, Counselor, and a Parent Support Specialist. Ms. Heston reported that A.H. had three suicide ideations during the school year and requested an aide, as an additional accommodation and support for. Ms. Heston was told by Dr. Bonita Homer, District Representative, Aides that A.H. (sic) could not be provided one until the following year." (SAC ¶¶ 57-59).*
- "At a meeting on or about January 23, 2015, Ms. Heston again requested a 1:1 paraprofessional for A.H. with adequate training to accommodate A.H.'s unique needs." (SAC, ¶ 60).*
- "On or about May 29, 2015, also during A.H.'s 6th grade year, A.H. attempted to hurt himself again by wrapping a cord around his neck. Ms. Heston reported it to Ms. Roby,

and again requested more supervision and adequate training of the Aide's [sic] for A.H." (SAC ¶ 62).*

- "Ms. Heston specifically asked Ms. Roby, to replace A.H's current Aide, Jennifer Hardison, as she 'did not feel A.H. was safe with her.' She also asked that Hardison should  never be left alone with A.H. AISD Staff failed to respond to the mother's requests." (SAC ¶ 63)*

- "Throughout the 2015-2016 school year, Ms. Heston repeatedly requested that A.H. receive more support and assistance to ensure his safety at school." (SAC, ¶ 65).*

- "On or about March 24, 2016, Ms. Heston called a meeting with Dr. Lepine, Mr. Johnson, and Ms. Hulsey, to discuss the relationship between Jennifer Hardison and A.H. Ms. Heston specifically complained about Ms. Hardison and asked she be removed (sic). Nevertheless, she was told by staff there was no one else available to support A.H." (SAC ¶¶ 70-71).*

- "Unfortunately, Jennifer Hardison had not been correctly trained and supervised as to A.H.'s unique and individualized needs." (SAC, ¶ 72).*

- Nor was Hardison correctly supervised by other staff as to how to accommodate A.H.'s disabling conditions. (SAC ¶ 73).

- "Instead of providing the correct accommodations to A.H. Jennifer Hardison physically and verbally abused the child. In fact, she threw a trash can at him hitting him in the face." (SAC, ¶¶ 75-76).*

- The School District failed to hire qualified staff for A.H. pursuant to their duties under Section 504; failed to hire competent staff; failed to train sufficiently staff; failed to supervise staff; failed to remove Hardison once the mother complained. (SAC, ¶¶ 97-99).*

- "The School District failed to convene a meeting to address the physical assault." (SAC ¶ 103).*

- "The school failed to address the impact of the physical assault on A.H. both in terms of medical needs as well as emotional needs." (SAC ¶ 105).*

- "Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 and its implementing regulations require that each state that receives disbursements, including the state's political subdivisions such as local school districts, must ensure all students with disabilities are given appropriate and necessary accommodations, pursuant to federal law and rules. To the degree that a policy or practice hinders honest consideration of a disabled students unique and individualized needs, and fails to accommodate that child's disability and keep the student safe, it violates Section 504." (SAC, ¶ 138).*

- "Furthermore, and likewise in addition and in the alternative, the acts and the omissions of the School District rose to the level of a gross deviation of professional standards of care." (SAC, ¶ 144).*

- "A.H. all1eges that the School District failed and refused to reasonably accommodate and modify its programs and services, so as to provide him educational services to the same extent as his non-disabled peers." (SAC, ¶ 153).*

- Moreover, A.H. was not accommodated with staff who had the necessary and appropriate

- background to serve him; was not accommodated with trained staff; was not accommodated with staff who were correctly supervised; and Moreover, A.H. was not accommodated with a safe and non-hostile educational environment. (SAC, ¶ 154-157).

- "A.H. has suffered injuries and damages, . . . , including but not limited to the following:

a. A deprivation of educational opportunities in the past and future." (SAC, ¶ 165).

In this case AISD addressed A.H.'s unique and individualized needs as a special education student through an IEP developed under the IDEA. In an attempt to avoid the exhaustion requirement and the release issue, Plaintiffs have chosen to refer to the requirements as accommodations because that nomenclature aligns with Section 504 and the ADA. However, as Plaintiffs' previous complaints and their request for due process hearing (Exhibit 1) make clear, these accommodations are all related to the provision of a free appropriate public education.[6] Plaintiffs acknowledge that "[t]he main accommodation A.H. received is called Special Education services." (SAC, ¶ 46). The alleged failures of the District to provide him with accommodations he allegedly required as a special education student are allegations relating to *the adequacy, provision, or delivery of a student's special education program or the denial of a FAPE.* These allegations are nothing if not claims that the District failed to provide a FAPE. Moreover, the very first element of damages claimed by Plaintiff in this matter still is: "A deprivation of educational opportunities in the past and future." (SAC, ¶ 165.a.). For a special education student, such as A.H., the loss of educational opportunities is synonymous with declaring that the student has been denied a FAPE, as required by the IDEA.

The fact that A.H. is identified as a student with Autism also is significant because it further supports the District's position that the accommodations referenced by Plaintiffs are tied to FAPE and, thus, related claims are required to be exhausted. Specifically, the Texas Commissioner of Education's Rules regarding the content of an Individualized Education Program ("IEP") state:

---

[6] It is worth noting that the *Fry* case was a case where the plaintiffs were claiming denial of an accommodation, specifically, the use of a service dog. *See* 137 S. Ct. at 754. Thus, it should be clear that simply choosing to refer to accommodations, rather than FAPE, does not remove a claim from the exhaustion requirements.

> For students eligible under §89.1040(c)(1) of this title [the definition of autism](relating to Eligibility Criteria), the strategies described in this subsection must be considered, based on peer-reviewed, research-based educational programming practices to the extent practicable and, when needed, addressed in the IEP:
>
> …
>
> (7) suitable **staff-to-student ratio** appropriate to identified activities and as needed to achieve social/behavioral progress . . .;
>
> (10) professional educator/staff support (for example: **training provided to personnel who work with the student to assure the correct implementation of techniques and strategies described in the IEP**); …

19 Tex. Admin. Code § 89.1055(e)(emphasis added).

Therefore, Plaintiffs' complaints about the adequacy of supervision and staff training, although now couched as failures to accommodate, are complaints about items directly related to the provision of FAPE under the IDEA. Special education hearing officers in Texas routinely hear and decide issues of the adequacy of staff training. *See, e.g., Student b/n/f Parent v. Galveston Ind. Sch. Dist.*, Docket No. 163-SE-0215, p. 24 (SEA TX 2015); *Student b/n/f Parents v. Liberty Hill Ind. Sch. Dist.*, Docket No. 287-SE-0808, pp. 10-11 (SEA TX 2008)(both attached as Exhibit 4).  Indeed, federal courts recognize that failure to provide adequate training is a claim of denial of FAPE. *See E.R. v. Spring Branch Indep. Sch. Dist.*, 4:16-CV-0058, 2017 WL 3017282, at *10 (S.D. Tex. June 15, 2017), *report and recommendation adopted sub nom. E. R.; bnf R. v. Spring Branch Indep. Sch. Dist.*, 4:16-CV-0058, 2017 WL 3016952 (S.D. Tex. July 14, 2017)(district court affirmed hearing officer's findings that parents' claim that the district staff was not properly trained was without merit); *Marc V. v. N. E. Indep. Sch. Dist.*, 455 F. Supp. 2d 577, 596 (W.D. Tex. 2006), a*ff'd sub nom. Marc V ex rel. Eugene V v. N. E. Indep. Sch. Dist.*, 242 Fed. Appx. 271 (5th Cir. 2007)(district court affirmed hearing officer's findings that district staff was adequately certified and trained to meet student's needs).

The substance of Plaintiff's SAC leaves little doubt that Plaintiff is alleging denial of a FAPE.  After applying the "Two Question Test" adopted by the Supreme Court, however, even the smallest doubt as to the gravamen of the SAC is removed.  The exhaustion requirements pursuant to 20 U.S.C. §1415(l) should be applied to Plaintiff's claims.

### c.   Application of the *Fry* Court's "Two Question Test"

Again, the first question to be posed is "could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school-say, a public theater or library?  And second, could an *adult* at the school-say, an employee or visitor-have pressed essentially the same grievance?" *Fry*, 137 S.Ct. at 756 (emphasis in original).

Applying these two questions to Plaintiffs' Section 504, ADA, and Constitutional claims, specifically the type of claims that Plaintiffs are asserting, the answer to both questions is clearly "no." First, Plaintiffs could not assert their claims if the alleged conduct occurred at a public theater or library; they are uniquely related to the sufficiency of educational services available and provided only at school.  As to the second question, whether someone other than a student could press essentially the same claims, the answer to that question is "no" as well.

In answering the second question, it is important to recognize the specific types of claims that Plaintiffs are asserting.

Paragraph 138, of the SAC speaks to failure to accommodate A.H.'s unique and/or individualized needs, which is the hallmark of a FAPE claim.

Paragraphs 142 and 157 attempt to state Section 504 and ADA claims related to an alleged hostile education environment created by a teacher against a student, with specific protections that are available only to students. *See, e.g., Estate of Lance v. Lewisville Indep. Sch.*

- 17 -

*Dist.,* 743 F.3d 982 (5th Cir. 2014); it is not a generalized claim of exclusion from a federal program.

Paragraph 143 attempts to state a claim for violation of Section 504 regulations, which appears to be an attempt to hold the District liable for failure to provide notice of procedural rights (see SAC ¶¶ 40, 69, 92-96). The District does not agree that Plaintiffs have a private right of action for violation of Section 504 regulations that relate to procedural safeguards, as alleged in paragraph 143.[7]  Even if a private right of action exists, though, such a claim was required to be exhausted, as well, because the Section 504 regulation that requires procedural safeguards states:

> A recipient that operates a public elementary or secondary education program or activity shall establish and implement, with respect to actions regarding the identification, evaluation, or educational placement of persons who, because of handicap, need or are believed to need special instruction or related services, a system of procedural safeguards that includes notice, an opportunity for the parents or guardian of the person to examine relevant records, an impartial hearing with opportunity for participation by the person's parents or guardian and representation by counsel, and a review procedure. **Compliance with the procedural safeguards of section 615 of the Education of the Handicapped Act [now IDEA] is one means of meeting this requirement.**

34 C.F.R. § 104.36 (emphasis added).

As a special education student, A.H.'s procedural safeguards would be handled under IDEA and its regulations, specifically, 34 C.F.R. § 300.504, and a violation of those safeguards is a claim under IDEA that must be exhausted. *C.f.  El Paso Indep. Sch. Dist. v. Richard R.*, 567

---

[7] *See H. v. Montgomery Cnty. Bd. of Educ.,* 784 F.Supp.2d 1247, 1264 (M.D.Ala.2011) (noting that "the weight of authority holds that there is no private right of action to enforce § 504's special education regulations, to the extent these regulations create any duties separate and apart from the statutory text," but ultimately not deciding whether, for purposes of this specific case, there was a private right of action as to any particular regulation)(citing *e.g., Power ex rel. Power v. Sch. Bd. of Va. Beach,* 276 F.Supp.2d 515, 519 (E.D.Va.2003) ("[N]o private cause of action exists to enforce this regulatory due process provision."); *A.W. by Ms. C. v. Marlborough Co.,* 25 F.Supp.2d 27, 31 (D.Conn.1998) ("A procedural error, by itself, is insufficient to warrant the protections of the Rehabilitation Act."); *Brennan v. Reg'l Sch. Dist. No. Bd. of Educ.,* 531 F.Supp.2d 245, 278 (D.Conn.2008) ("A violation of these regulations, solely in themselves, does not give rise to a private right of action under the Rehabilitation Act.")); *see also Guckenberger v. Boston Univ.,* 974 F. Supp. 106 (D. Mass. 1997) (finding that there is no private cause of action to enforce 34 C.F.R. § 104.7).

F. Supp. 2d 918, 938 & 947-949 (W.D. Tex. 2008)(district court found student adequately exhausted administrative remedies and hearing officer properly found that district failed to provide procedure safeguards and notice of its refusal to evaluate). Even if IDEA were not directly implicated, if a private right of action exists, it will only be because the court finds the regulation is necessary to ensure meaningful access to an appropriate education,[8] which brings the issue right back to the type of FAPE claim that must be exhausted under *Fry*.

Paragraph 144 attempts to state a claim under Section 504 by referencing a gross deviation of professional standards of care. Plaintiffs' factual assertions make clear that this relates to standards of care for professionals in the *education setting*, not public institutions, generally. All of these claims, therefore, are barred by the failure to exhaust.

In addition, the claims under the ADA are also all about educational services, though Plaintiffs attempt to disguise that fact.  Although Plaintiffs revised their allegations from their FAC to the SAC to state in paragraph 153 that "the School District failed and refused to reasonably accommodate and modify its programs and services, so as to provide him ~~educational services~~ publically (sic) provided services to the same extent as his non-disabled peers" (*Compare* Doc. # 11, ¶ 111 with SAC, ¶ 153), the supporting factual allegations are all related to services that were available to Plaintiff as a result of his status as a special education student under IDEA. Specifically, Paragraphs 154-157 refer back to the requirement that A.H. needed to be supervised by staff specially trained to support his unique educational needs. (*See also* SAC ¶¶ 29-36). In other words, Plaintiffs' ADA claims are not the type of ADA claim, such as an architectural barriers claim, that would be available to a disabled member of the general public

---

[8] *See Stephen C. by Frank C. v. Bureau of Indian Educ.*, CV-17-08004-PCT-SPL, 2018 WL 1871457, at *7 (D. Ariz. Mar. 29, 2018).

who might enter a school. Rather, Plaintiffs are claiming A.H. was denied accommodations that were available to him only by virtue of being a *student* with disabilities.

As to the constitutional claims, although Plaintiffs use a formulaic recitation of the elements of Fourth and Fourteenth Amendment claims, the underlying factual bases of these claims are still all related to the District's alleged failures in its provision of education services. Thus, exhaustion was required.

Under the Two Question Analysis created in *Fry*, it is clear that Plaintiff is seeking recovery for IDEA-based claims, and that exhaustion is required.

**5.   Requiring exhaustion is consistent with Post-*Fry* Jurisprudence.**

Since the *Fry* case, courts have had the opportunity to apply the principles enunciated and, in cases similar to the one at bar, have found that a plaintiff cannot circumvent the administrative exhaustion requirement by simply repackaging IDEA claims under other statutes without exhausting administrative remedies under the IDEA.

For example, in *Wellman v. Butler Area Sch. Dist.*, 877 F.3d 125 (3rd Cir. 2017), the court recently required exhaustion of a high school student's ADA, Section 504, and Constitutional claims related to his allegations that he sustained a concussion and experienced post-concussive syndrome, and alleging that school failed to accommodate his disabilities. The court stated that a review of the student's complaint shows that his "grievances all stem from the alleged failure to accommodate his condition and fulfill his educational needs…"  *Id.* at 133. The court further stated: "A review of his detailed factual allegations shows that the conduct about which he complains would not have occurred outside the school setting and that a nonstudent could not (and would not) have 'pressed essentially the same grievance.'" *Id.* (quoting *Fry*, 137 S.Ct. at 756).

In another case, *J.M. v. Francis Howell Sch. Dist.*, 850 F3d 944 (8th Cir. 2017), the court held that a complaint about improper discipline techniques was a FAPE claim, requiring exhaustion under the IDEA. The court stated: "In *Fry*, the Supreme Court declined to address whether exhaustion is required 'when the plaintiff complains of the denial of a FAPE, but the specific remedy she requests—here, money damages for emotional distress—is not one' the IDEA provides." 850 F.3d at 950 (quoting *Fry*, 137 S.Ct. at 752 n.4). However, the court stated that it has noted that the IDEA's exhaustion requirement remains the general rule, regardless of whether the administrative process offers the particular type of relief that is being sought. *Id.* Thus, even though the plaintiff sought compensatory and punitive damages, the court nevertheless required exhaustion. *Id.*

Another court has also debunked the notion that simply seeking a certain type of damages can enable a plaintiff to avoid IDEA exhaustion in a post-*Fry* era. In *J.L. v. Wyoming Valley West Sch. Dist.*, No. 16-3727, 2018 WL 798581 (3rd Cir. Feb. 9, 2018), the court found the plaintiff was required to exhaust administrative remedies for claims brought under Section 504 and the Constitution for physical injuries sustained by a disabled student at the hands of a van driver employed by the school district while restraining the student. *Id.* at *2. "The use of restraints would not have occurred outside the school setting and a nonstudent could not (and would not) have pressed essentially the same grievance." *Id.* (quoting *J.M.*, 850 F.3d at 133) (quoting *Fry*, 137 S.Ct. at 756) (internal quotations and alterations omitted) (other citation omitted). The court, relying on a pre-*Fry* case, stated: "Our conclusion does not change because J.L. requested money damages, which are not available under the IDEA and cannot be awarded at an administrative hearing." *Id.* at *3 (citing *Batchelor v. 'Rose Tree Media Sch. Dist.*, 759 F.3d 266, 271 (3d Cir. 2014)). The court stated that "'[t]his is not dispositive' because (1) the

complaint did not seek money damages exclusively, (2) district courts are empowered to grant relief beyond that requested, and (3) money damages may sometimes be awarded as reimbursement." *Id.* (quoting *Batchelor*, 759 F.3d at 276-77). The court noted: "The courts of appeals are in accord that a prayer for money damages does not necessarily absolve a plaintiff from exhausting administrative remedies under the IDEA." *Id.* n. 3 (citing [*J.M.*], 850 F.3d at 950; *Muskrat v. Deer Creek Pub. Sch.*, 715 F.3d 775, 785-86 (10th Cir. 2013); *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 64 (1st Cir. 2002); *Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 917 (6th Cir. 2000); *N.B. ex rel. D.G. v. Alachua Cnty. Sch. Bd.*, 84 F.3d 1376, 1379 (11th Cir. 1996)). And, again, money damages can be sought following exhaustion. *See S.D. by A.D.*, 2018 WL 636653, at *7.[9]

As with the Third Circuit, this Court has found pre-*Fry* that, even though a plaintiff seeks compensatory damages under the IDEA and monetary damages under Section 504, they still may be required to exhaust administrative remedies depending on the theory behind the grievance. *Reyes*, 2016 WL 1601219, at *3. The decision in *Fry* reinforces that the theory of the grievance is what counts, so there is no need to abandon this principle. The court should follow *J.M.* and *J.L.* to find that seeking compensatory damages does not excuse exhaustion.

---

[9] Of course, in this case, Plaintiffs abandoned their due process complaint, so they, in fact, will be foreclosed from recovering compensatory damages. However, that "problem" is of Plaintiffs' own making and goes to the wisdom of Plaintiffs agreeing to dismiss all claims related to educational services at that stage. As stated previously, if Plaintiffs did not believe they were made whole in that regard, they should not have abandoned the process. Plaintiffs may have thought they would be able to state Section 504 and ADA claims that were of the type the general public could bring; but it is clear they cannot. Frankly, that is exactly why the District was willing to carve out non-educational Section 504 and ADA claims: it did not believe such a claim existed under existing law and the facts of the matter. So, dismissal of the types of claims Plaintiffs keep pressing is one of the benefits of the bargain the District made in Exhibit 2.

In the instant action, Plaintiffs have not exhausted their administrative remedies, and as a result Plaintiffs' claims must be dismissed.[10]

**B.   In the alternative, Plaintiffs have failed to state a claim under Section 504 and the ADA.**

Even if some claims are not barred by the failure to exhaust administrative remedies, Plaintiffs' claims must be dismissed on the alternative basis that they fail to state a claim under Section 504 or the ADA for disability discrimination. "Because this court has equated liability standards under § 504 and the ADA, we evaluate D.A.'s claims under the statutes together." *D.A. v. Houston Indep. Sch. Dist.,* 629 F.3d 450, 453 (5th Cir.2010).

**1.   Failure to Accommodate**

In paragraphs 138 and 153-157 of the SAC, Plaintiffs attempt to state a failure to accommodate claim. It is well established that to recover monetary damages for disability discrimination, a plaintiff must prove that the discrimination was intentional. *Delano–Pyle v. Victoria County,* 302 F.3d 567, 574 (5th Cir. 2002). In determining whether plaintiffs have met this burden, the Fifth Circuit applies the "bad faith or gross misjudgment" standard in the educational context. *D.A.*, 629 F.3d at 454. The court in *D.A.* pointed out that Section 504 does not create "general tort liability for educational malpractice." *Id.* (quoting *Monahan v. State of Neb.*, 687 F.2d 1164, 1170 (8th Cir. 1982)). The court stated: "So long as state officials involved have exercised professional judgment, in such a way as not to depart grossly from accepted standards among educational professionals, we cannot believe that Congress intended to create liability under § 504." *Id.* at 454–55. Plaintiffs' assertions of gross misjudgment and intentional discrimination (SAC ¶¶ 144-145) are conclusory, formulaic recitations of elements not sufficient

---

[10] Because Plaintiffs entered into a settlement agreement resolving "all disputes related to the appropriateness of educational services and resources" even if the claims were not required to be exhausted, they would be waived under the terms of Exhibit 2. The District will seek dismissal on that basis in the alternative.

to withstand a motion to dismiss. None of the factual assertions incorporated through paragraph 137 rise to the level required.

### 2.      Hostile Environment

In paragraph 142 of the SAC, Plaintiffs claim the District "failed to keep A.H. safe from harm, and failed to provide him an environment that was not hostile," and violated his rights "by not keeping him as safe as his non-disabled peers." These assertions are insufficient to state a claim for a violation of Section 504. Claims of a hostile environment in the education setting are generally analyzed using the same framework whether they have their origin in Title IX (gender) or Section 504 (disability). *See Estate of Lance v. Lewisville Indep. Sch. Dist.,* 743 F.3d 982, 995-96 (5th Cir. 2014); *A.N. v. Mart Indep. Sch. Dist.*, W-13-CV-002, 2013 WL 11762157, at *8 (W.D. Tex. Dec. 23, 2013), *aff'd sub nom. Nevills v. Mart Indep. Sch. Dist.*, 608 Fed. Appx. 217 (5th Cir. 2015). Although *Estate of Lance* and *A.N.* were both student-student harassment cases, the Fifth Circuit recently confirmed that teacher-student claims are likewise analyzed using the same framework, which developed beginning with the Supreme Court's decision in *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998). *See Salazar v. S. San Antonio Indep. Sch. Dist.*, 690 Fed. Appx. 853, 864 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 369 (2017). In addressing the issue of when a school district can be held liable in damages in cases involving a teacher's harassment of a student, the *Gebser* Court stated that "'damages may not be recovered in those circumstances unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's conduct.'" *Id.* (quoting *Gebser*, 524 U.S. at 277).

Thus, for Plaintiffs to state a claim for a hostile education environment based on disability under Section 504, they would have to allege that a school official had actual notice of

Hardison's conduct and was deliberately indifferent to it. S*ee Estate of Lance,* 743 F.3d at 996; *A.N.*, 2013 WL 11762157, at *8 ((quoting *S.S. v. E. Kentucky Univ.*, 532 F.3d 445, 454 (6th Cir. 2008) (citing *Werth v. Bd. of Directors of the Pub. Sch. of Milwaukee*, 472 F.Supp.2d 1113, 1127 (E.D. Wis. 2007)). Although Plaintiffs have made a general statement of deliberate indifference (SAC ¶ 146), they have not and cannot make the requisite allegations regarding knowledge; therefore, their claims under Section 504 must be dismissed.

### 3.      Violation of Section 504 Regulations

In paragraph 143, Plaintiffs claim they have a private cause of action for the violation of Section 504 regulations. According to the authorities discussed *supra* at n. 7, there is no private right of action for violation of the regulations that are implicated by the factual allegations Plaintiffs have made, which are all related to alleged procedural violations. Therefore, such claim should be dismissed.

## C.      In the alternative, Plaintiffs have failed to state a claim under 42 U.S.C. § 1983.

Plaintiffs also claim constitutional violations under the Fourth Amendment, and the due process and equal protection clauses of the Fourteenth Amendment, brought via Section 1983. (SAC ¶¶ 121-125).

"Section 1983 provides a private right of action against parties acting 'under color of any statute, ordinance, regulation, custom, or usage, of any State' to redress the deprivation of rights secured by the United States Constitution or federal law." *Bauer v. Tex.*, 341 F.3d 352, 357 (5th Cir. 2003) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988)). "Section 1983 is not itself a source of substantive rights; it merely provides a method for vindicating already conferred federal rights." *Id.* (citing *Albright v. Oliver*, 510 U.S. 266 (1994)). "To prevail on a section 1983 claim, the plaintiff must show that: 1) the offending conduct was committed by a

person acting under color of state law; and 2) the conduct deprived the plaintiff of rights secured by the Constitution or federal law." *Id.* (citing *Parratt v. Taylor*, 451 U.S. 527 (1981)).

In addition, governmental entities are not liable under Section 1983 on a respondeat superior liability theory. *See Jett v. Dallas Independent School District*, 91 U.S. 701 (1989); *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). In *Monell*, the Supreme Court held:

> [T]he language of § 1983, read against the background of [its] legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable *solely* because it employs a tort-feasor —or, in other words, a municipality cannot be held liable under section 1983 on a *respondeat superior* theory.

*Id.* at 691 (italics in original). Thus, liability under Section 1983 comes only when a constitutional injury is caused by an "official policy" of the District. Specifically, "[m]unicipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose moving force is the policy or custom." *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 166 (5th Cir. 2010), *cert. denied*, 131 S.Ct. 3059 (2011) (citation omitted).

Texas law is clear that final policymaking authority in an independent school district rests with the district's board of trustees. *See Jett v. Dallas Independent School Dist.*, 7 F.3d 1241, 1245 (5th Cir. 1993); *see also Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247–48 (5th Cir. 2003) (distinguishing between "decision-making authority," which may be delegated to school administrators, and "policymaking authority," which "lies exclusively with the Board [of Trustees]" under Texas law); *see also* TEX. EDUC. CODE § 11.151(b) ("The trustees as a body corporate have the exclusive power and duty to govern and oversee the management of the public schools of the district.").

The Fifth Circuit has defined "official policy" to be:

1.  A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by [the local government unit]'s lawmaking officers or by an official to whom the lawmakers have delegated policymaking authority; or

2.  A persistent widespread practice of [the local government unit's] officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents [the local government's] policy.

*Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc), *cited in Zarnow*, 614 F.3d at 166.

Just as with any other type of claim, to survive a motion to dismiss for failure to state a claim, these elements of a *Monell* claim must be pleaded with more than labels and conclusions. As the Court in *Iqbal* stated, "Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." 556 U.S. at 678-79. Hence, in that case, allegations that defendants "knew of, condoned, and willfully and maliciously agreed to subject [him]" to harsh conditions of confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest," that a defendant was the "principal architect" of such an invidious policy and that another defendant was "instrumental" in adopting and executing it were seen as bare assertions, amounting to nothing more than a "formulaic recitation of the elements" of a constitutional discrimination claim. *Id.* at 680-81. As such, the allegations were conclusory and were not entitled to be assumed true. *Id.*

Similarly, in this case Plaintiffs have utterly failed to state a claim of *Monell* liability against AISD. Plaintiffs have not and cannot point to any policymaking action by the AISD Board of Trustees in support of their claims brought under Section 1983. In addition, Plaintiffs have not and cannot point to an official policy of AISD that would meet the second element of a

*Monell* claim.  In an apparent attempt to track what is required by *Monell*, Plaintiffs reference the District's alleged failure to have policies, procedures, practices and customs in place to correctly hire, train, and supervise employees so as to protect Plaintiffs from a known and inherent dangerous situation.[11] However, this formulaic recitation is not sufficient.

"To serve as a basis for § 1983 liability, the failure to promulgate municipal policy must amount to 'an intentional choice, not merely an unintentionally negligent oversight.'" *Evans v. City of Marlin,* 986 F.2d 104, 108 (5th Cir.1993) (quoting *Rhyne v. Henderson Cnty.,* 973 F.2d 386, 392 (5th Cir.1992)).  Liability for failure to promulgate policy and failure to train or supervise both require that the defendant have acted with deliberate indifference. *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) "A failure to adopt a policy rises to the level of deliberate indifference 'when it is obvious that the likely consequences of not adopting a policy will be a deprivation of civil rights.'" *Evans,* 986 F.2d at 108 (quoting *Rhyne,* 973 F.2d at 392).

> "'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson,* 131 S.Ct. 1350, 1360 (quoting *Bd. of Cnty. Comm'rs v. Brown,* 520 U.S. 397, 409, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)). To establish that a state actor disregarded a known or obvious consequence of his actions, there must be "actual or constructive notice" "that a particular omission in their training program causes ... employees to violate citizens' constitutional rights" and the actor nevertheless "choose[s] to retain that program." *Id.* (citing *Bryan Cnty.,* 520 U.S. at 407, 117 S.Ct. 1382). **A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference," because "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."** *Id.* Without cabining failure-to-train claims in this manner (or, logically, failure-to-promulgate-policy claims), a standard "less stringent" than deliberate indifference would be employed, and "a failure-to-train claim 'would result in *de facto respondeat superior* liability.'" *Id.* (quoting *City of Canton v. Harris,* 489 U.S. 378, 392, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

---

[11]   In other portions of the SAC, Plaintiffs admit that the school board had policies that provided for correct interventions, investigations, and services for students with disabilities. (SAC, ¶¶ 37-43, 67, 69, 91, 93-95, 104) and take issue with staff for allegedly failing to follow policies.

*Porter*, 659 F.3d at 446–47 (cleaned up)(emphasis added).

Here, although Plaintiffs make a recitation that the District's acts and omissions rise to the level of deliberate indifference (SAC ¶ 125), they do not and cannot specifically allege that the District's policymaker, the School Board, acted with "deliberate indifference" leading to the violation of A.H.'s constitutional rights. The allegations that failure to have policies, procedures, practices and customs in place to correctly hire, train, and supervise employees so as to protect Plaintiffs from a known and inherent dangerous situation do not meet Plaintiffs' burden of asserting deliberate indifference. Even if this were the standard for deliberate indifference, Plaintiffs fail to allege facts that would render these assertions plausible. There are no factual allegations, for example, suggesting that other violations were known to a policymaker and went overlooked. Pleadings that "are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. Thus, Plaintiffs' SAC does not sufficiently allege that the District failed to adopt a policy based on the deliberate indifference of a District policymaker.

In short, Plaintiffs are not able to identify a policymaker and official policy; therefore, they cannot state a claim under *Monell*. Plaintiffs' constitutional claims against the District must be dismissed.

**D.     The parents should be dismissed as individual Plaintiffs.**

In the SAC, Plaintiffs are identified as "Nidia Heston and Adrian Heston IV, Natural Parents, and Next Friends of A.H" and they refer to themselves in the plural form. However, there are no allegations of conduct directed toward the parents. In seeking damages, paragraph 165 of the SAC, focuses on damages suffered by A.H. However, paragraph 166 refers to damages suffered by "Plaintiffs." To the extent the parents seek to bring individual claims for damages suffered on their behalf, they should be dismissed. *See Rideau v. Keller Indep. Sch.*

*Dist.*, 819 F.3d 155, 169 (5th Cir. 2016) (motion to dismiss under Rule 12(b)(6) should have been granted as to parents' claims for mental anguish damages based on mistreatment of their disabled son because neither the ADA nor the Rehabilitation Act authorizes such claims); *Hooker v. Dallas Indep. Sch. Dist.*, 3:09-CV-1289-D, 2010 WL 4025877, at *5 (N.D. Tex. Oct. 13, 2010) (parents only have standing to pursue claims under Section 1983 if they assert deprivation of their own constitutional rights).

**E.     Claims for punitive damages must be dismissed.**

In paragraph 166 of their SAC, Plaintiffs also seek to recover punitive damages; however, such damages are not recoverable in this case. *See Barnes v. Gorman*, 536 U.S. 181, 189 (2002) (no punitive damages for claims under Section 504 or Title II of the ADA); *City of Newport v. Fact Concerts Inc.*, 453 U.S. 247, 271 (1981) (no punitive damages against governmental entities under 1983 claims). Any claim for punitive damages should be dismissed.

WHEREFORE, the District respectfully request that this Court dismiss Plaintiffs' claims pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) with prejudice and award any additional relief that the Court deems appropriate.

Respectfully submitted,

EICHELBAUM WARDELL
HANSEN POWELL & MEHL, P.C.

By:     _____
Jennifer A. Powell
State Bar No. 00783554
Holly B. Wardell
State Bar No. 00797627
4201 W. Parmer Lane, Suite A100
Austin, TX  78727
jpowell@edlaw.com
hwardell@edlaw.com
(512) 476-9944
(512) 472-2599
*Counsel for Austin Independent School District*

## **CERTIFICATE OF SERVICE**

  The undersigned hereby certifies that a true and correct copy of the foregoing document has been sent in the matter set forth below on May 31, 2018, to the following:

via court-generated means:
Martin J. Cirkiel
Dominique L. Augustus
1901 E. Palm Valley Boulevard
Round Rock, Texas 78664
marty@cirkielaw.com
dominique@cirkielaw.com

via court-generated means:
Mr. Alonzo Campos
The Law Office of Alonzo Campos
1524 S. IH 35, Suite 200
Austin, Texas
alonzo@acamposlaw.com

via certified mail:
Jennifer Hardison, *Pro se*
14610 Varrelman Street
Austin, Texas 78725

Jennifer A. Powell

EXHIBIT 1

# CUDDY LAW FIRM, PLLC
## SPECIAL EDUCATION AND SPECIAL NEEDS PLANNING ATTORNEYS

**AUSTIN OFFICE**

ELIZABETH ANGELONE*, MANAGING ATTORNEY
EANGELONE@CUDDYLAWFIRM.COM

SONJA D. KERR**, DIRECTOR OF IMPACT LITIGATION
SKERR@CUDDYLAWFIRM.COM

FERNANDO SALCEDO*, ASSOCIATE ATTORNEY
FSALCEDO@CUDDYLAWFIRM.COM

CANDACE KINSER, PARALEGAL
CKINSER@CUDDYLAWFIRM.COM

LISA GREGG, PARALEGAL
LGREGG@CUDDYLAWFIRM.COM

**November 3, 2016**

**First Amendment to Complaint of August 15, 2016**

**Student's Full Name:**                                   D.O.B.

**Parents of Student:**                                    Nidia and Adrian Heston

**Parents & Student's Address:**

                                                           Austin, Texas 78748

**Relevant School District Information:**                  Austin Independent School District

**Student attends:**                                       Clint Small Middle School

---

Consistent with the requirements of the Individuals with Disabilities Education Act, 20 U.S.C. §1400, et seq., related federal regulations at 34 C.F.R. Chapter 300, TEX. EDUC. CODE §29.001 and 19 TEX. ADMIN. CODE §89.1001-.1195, Petitioners Nidia and Adrian Heston (Petitioner Parents[1]) bring this due process hearing request on behalf of themselves and their son, Adrian (     Heston ("        against Austin Independent School District ("AISD"). Petitioner Parents assert as follows:

## I.   CURRENT EDUCATIONAL SITUATION

1.                        is an 8th Grader who attends Clint Small Middle School.        is a special education student, identified as having autism, emotional disorders and other health impairment. On March 30th, 2016,        was injured by his paraprofessional at school who threw a trash can at him, breaking his tooth and traumatizing him. Criminal charges are

---

[1] Reference is to Petitioner Parents; in some cases, one parent was present and not the other.

**PHYSICAL ADDRESS:** 8723 SHOAL CREEK BLVD., AUSTIN, TEXAS 78735
**MAILING ADDRESS:** 9600 ESCARPMENT BLVD., SUITE 745-53, AUSTIN, TEXAS 78749
**TELEPHONE:** (512) 649-3191      **FAX:** (512) 649-1217
**PRINCIPAL OFFICE:** AUBURN, NEW YORK
*ELIZABETH ANGELONE AND FERNANDO SALCEDO ARE LICENSED IN TEXAS.
**SONJA KERR IS LICENSED IN TEXAS, INDIANA, ALASKA, PENNSYLVANIA, AND MINNESOTA (INACTIVE BY CHOICE).

pending against the paraprofessional and notice of a civil personal injury claim has been given to AISD by a personal injury lawyer. Both prior to and after that significant event, Petitioner Parent has been requesting the AISD to provide staff with explicit and appropriate training to work with

## II.    Educational History

1.        has received special education services since he was a preschooler.

2.    Although        has had speech therapy services in the past and there are references in evaluations concerning his hearing, it currently appears he has adequate hearing and language skills for his age.

3.    In elementary school,        was always assigned to SCORES, an autism support unit. Academically, his assignments were shortened and he received help from the teachers in SCORES to complete and understand the work.

4.    In fifth grade,        was kept in a resource classroom at times for assistance (although he apparently never qualified for resource).

5.        intelligence is within the average range, he struggles with autism and behavioral needs.

6.    In October of 2012,        was evaluated by Dr. Kelly Ahr. Dr. Ahr identified        as having Bipolar (Provisional due to age). She also identified a possible learning disability based on an extremely low spelling score.

7.    The last FIE by Austin ISD is dated September 14, 2013. At that time the AISD identified        as having an Emotional Disorder, Autism and Other Health Impairment ("OHI").

8.    AISD has never identified        as having any academic problems, but rather documentation simply asserts that he is "at grade level" in all academic areas.

9.    ARD/IEPs for        have generally included only one goal which is: "        will improve appropriate reactions to frustrating events by determining the size of a problem and then modifying his behavior to responding appropriately with 80% mastery." This goal has been on ARD/IEPs since at least January 23, 2015.

PHYSICAL ADDRESS: 8723 SHOAL CREEK BLVD., AUSTIN, TEXAS 78735
MAILING ADDRESS: 9600 ESCARPMENT BLVD., SUITE 745-53, AUSTIN, TEXAS 78749
TELEPHONE: (512) 649-3191     FAX: (512) 649-1217
PRINCIPAL OFFICE: AUBURN, NEW YORK
*ELIZABETH ANGELONE AND FERNANDO SALCEDO ARE LICENSED IN TEXAS.
**SONJA KERR IS LICENSED IN TEXAS, INDIANA, ALASKA, PENNSYLVANIA, AND MINNESOTA (INACTIVE BY CHOICE).

10. It does not appear that       met this goal prior to the beginning of his seventh grade year 2015-2016.

11.       has a history of Bipolar Cycling mood swings and difficulties which appear primarily in the fall and spring and which last 6-8 weeks. During these times, becomes even more irritable and more easily agitated.

12. During his fourth (2012-2013) and fifth grade (2013-2014) school years, experienced repeated restraints at school.

13.       has never been offered Extended School Year (ESY) services.

14.       has never received Assistive Technology Services.

15.       has had paraprofessionals assisting him throughout his school career. Petitioner Parent has repeatedly expressed concern about their training and skills to meet unique educational needs.

16. Petitioner Parents have ensured that       has received outside therapy for counseling as well as speech therapy.

17. During the 2013-2014 school year, when       was in fifth grade,       attempted to hurt himself while at school; Petitioner Parents brought this to the AISD's attention and asked for more supervision and assistance.

18. During the 2014-2015 school year, when       was in sixth grade, Petitioner Parents reported to AISD that       had had three suicide ideations during the school year as of January 2015.

19. At the time of the January 23, 2015 ARDC/IEP meeting, Petitioner Parents specifically requested that       have a 1:1 para with significant training to meet       s unique needs. Ex. A, pg. 1. AISD's response was that the school had requested an aide but same had not yet been identified for

20. In the spring of       6th grade year, on or about May 29, 2015,       attempted to hurt himself by wrapping a cord around his neck. This was brought to the AISD's attention by Petitioner Parents again requested more supervision and assistance and training for staff. She specifically asked Ms. Roby, assistant principal, to replace aide Jennifer Hardison stating, "I did not feel       was safe with her." Ms. Roby refused.

PHYSICAL ADDRESS: 8723 SHOAL CREEK BLVD., AUSTIN, TEXAS 78735
MAILING ADDRESS: 9600 ESCARPMENT BLVD., SUITE 745-53, AUSTIN, TEXAS 78749
TELEPHONE: (512) 649-3191     FAX: (512) 649-1217
PRINCIPAL OFFICE: AUBURN, NEW YORK
*ELIZABETH ANGELONE AND FERNANDO SALCEDO ARE LICENSED IN TEXAS.
**SONJA KERR IS LICENSED IN TEXAS, INDIANA, ALASKA, PENNSYLVANIA, AND MINNESOTA (INACTIVE BY CHOICE).

3

### III.   2015-2016 School Year (Grade 7 – Austin ISD)

1.      attended Small Middle School for the 2015-2016 school year for his seventh grade year.

2. He was assigned to a general education classroom, with 3.45 hours of special education services outside the general education classroom and was to receive 15 hours of special education services within the general education classroom.

3. The IEP in place for      as he began seventh grade for the 2015-2016 school year is dated January 23, 2015 and was developed when he was in the sixth grade, carrying over into his 7th grade year. **Ex. 1.**[2]

4. The January 23, 2015 IEP, used during the 2015-2016 school year, includes just one goal which is to improve      behavior. The goal states: "      will improve reactions to frustrating events by determining the size of a problem and then modifying his behavior to respond appropriately with 80% mastery." **Ex. 1.**, pg. 13. No specific baseline is listed and it is unknown what progress level      reached during the 2015-2016 school year on this goal or the four objectives. Petitioner Parent received a progress report January 14, 2016 on the goal and the objectives during the 2015-2016 school year.

5. The January 23, 2015 IEP, used during the 2015-2016 school year, includes a Behavior Intervention Plan and includes the use of SAMA techniques (restraint). **Ex. 1**, pg. 14.        IEP permitted the use of restraints during the 2015-2016 school year. Petitioner Parent is uncertain if restraints were used with      during the 2015-2016 school year. The Petitioner Parent does not want      to be restrained but she is fearful that if she contests restraints, the AISD will involve police instead. Petitioner Parent received no notification of use of any restraints during the 2015-2016 school year.

6. A nursing assessment was completed in January of 2015 and reported in the January 14, 2015 ARDC/IEP meeting. This assessment found that      needed personal care services "continuously throughout the entire day" to ensure that he would not engage in behaviors that would be dangerous to himself or others. **Ex. 1**, pg. 2.

7. The January 23, 2015 IEP, used during the 2015-2016 school year, indicates that      is "on grade level" as far as academic skills; however, it also indicates he was struggling in math. At the time the IEP was written,      was in the middle of his 6th grade year but teachers reported he was working at the 4th and 5th grade level in math. **Ex. 1**, pg. 11. Petitioner Parent requested assistance for math, and asked about evaluating for a specific learning disability but the AISD staff told her it was not necessary.

---

[2] Exhibits to the initial complaint are not reproduced as the entire initial Complaint is incorporated herein.

PHYSICAL ADDRESS: 8723 SHOAL CREEK BLVD., AUSTIN, TEXAS 78735
MAILING ADDRESS: 9600 ESCARPMENT BLVD., SUITE 745-53, AUSTIN, TEXAS 78749
TELEPHONE: (512) 649-3191    FAX: (512) 649-1217
PRINCIPAL OFFICE: AUBURN, NEW YORK
*ELIZABETH ANGELONE AND FERNANDO SALCEDO ARE LICENSED IN TEXAS.
**SONJA KERR IS LICENSED IN TEXAS, INDIANA, ALASKA, PENNSYLVANIA, AND MINNESOTA (INACTIVE BY CHOICE).

8.      ARDC/IEP team met again on January 14, 2016 to update his IEP. The IEP included and repeated <u>exactly</u> the same goal as the prior year's IEP; " will improve appropriate reactions to frustrating events by determining the size of a problem and then modifying his behavior to responding appropriately with 80% mastery." **Ex. 2,** pg. 15. Staff again reported that     was "at grade level" on his academic skills.

9.   At the January 14, 2016 ARD/IEP meeting, Petitioner Parent requested more support for        This IEP provides for the same level of support as the prior one, with the addition of a single hour of counseling services at the beginning of each semester.

10.  A nursing assessment was completed in February of 2015 and is reported in the January 14, 2016 ARDC/IEP meeting. This assessment again found that     needed personal care services "continuously throughout the entire day" to ensure that he would not engage in behaviors that would be dangerous to himself or others. **Ex. 2,** pg. 5.

11.  Throughout the 2015-2016 school year, Petitioner Parent repeatedly requested that     have "more support" and assistance to ensure his safety at school.

12.  On March 30, 2016, Jennifer Hardison,     paraprofessional was supervising        Hardison became upset with     and threw a trash can at     such that     was injured.     physical injuries included a one-inch scratch on his right cheekbone, a one inch bleeding cut on the right side of his lip and a chipped right central incisor tooth. **Ex. 3.** (School Nursing Report and Picture).

13.  Hardison resigned from her position and is facing criminal charges. Unbeknown to Petitioner Parent at the time, Hardison had apparently been previously charged with assault <u>prior</u> to her employment at AISD.

14.  On April 29, 2016,     was evaluated by Dr. Whitenack, Specialty Clinic of Austin for a trauma screening. He diagnosed     with Post Traumatic Stress Disorder.

15.  As a result of Ms. Hardison's assault,     was afraid to return to school. He has also developed a fear of all trash cans. Although the AISD did attempt a re-entry plan, it was not fully successful.

16.  On May 2, 2016, Petitioner Parent requested an emergency ARDC/IEP team meeting to assist     She requested at least some services for him in a home setting; AISD refused this service. AISD instead agreed that     would only attend school for half-days through the remainder of the school year.     attending time was just 3.5 hours a day for the remainder of the school year, from 9:30 a.m. to 1:00 p.m.

17.  AISD eventually replaced Jennifer Hardison with a different aide. Petitioner Parent has no assurance that this aide is more qualified than Hardison.

**PHYSICAL ADDRESS:** 8723 Shoal Creek Blvd., Austin, Texas 78735
**MAILING ADDRESS:** 9600 Escarpment Blvd., Suite 745-53, Austin, Texas 78749
**TELEPHONE:** (512) 649-3191     **FAX:** (512) 649-1217
**PRINCIPAL OFFICE:** Auburn, New York
*Elizabeth Angelone and Fernando Salcedo are licensed in Texas.
**Sonja Kerr is licensed in Texas, Indiana, Alaska, Pennsylvania, and Minnesota (inactive by choice).

5

18. On May 9, 2016, a revised ARDC/IEP was completed for        This IEP includes a skeletal version of an autism supplement. However, the IEP again also continues the exact same singular goal for behavior that        has had since at least January of 2015 and the same mastery level; that is, "        will improve appropriate reactions to frustrating events by determining the size of a problem and then modifying his behavior to responding appropriately with 80% mastery." **Ex. 4.**, pg. 16. This IEP appears to leave        in the half-day program without any additional services when school begins in the fall of 2016. This program also provides        just *one hour* of counseling services at the beginning of the fall term. **Ex. 4.**, pg. 26.

19. It does not appear that AISD did not provide Prior Written Notice to the parent with the revised ARDC/IEP of May 9, 2016; parent recalls getting an email about the date and time of the meeting.

20. AISD provided Petitioner Parent with progress reports on January 14, 2016 and June 3, 2015.

21. Although        has had the goal of improving appropriate reactions to frustrating events since at least March 4, 2015, his progress has varied and he has never reached the expected mastery level of 80%. His progress has been rated as follows:

| Date | Level |
|---|---|
| 3/4/15 | 50% |
| 06/01/15 | 45% |
| 10/07/15 | 50% |
| 11/11/15 | 60% |
| 01/14/16 | 50% |
| | |

22. It does not appear that AISD took steps to change        services to help him meet his goal. It is unknown what percentage level        had on his goal between January 14, 2016 and the end of the 2015-2016 school year.

23. It does not appear that AISD objectively determined that        should not receive Extended School Year services for summer 2016.

## IV.   2016-2017 School Year (Grade 8 – Austin ISD)

24. On July 8, 2016, Petitioner Parent requested the AISD evaluate        for Post-Traumatic Stress Disorder.

PHYSICAL ADDRESS: 8723 SHOAL CREEK BLVD., AUSTIN, TEXAS 78735
MAILING ADDRESS: 9600 ESCARPMENT BLVD., SUITE 745-53, AUSTIN, TEXAS 78749
TELEPHONE: (512) 649-3191      FAX: (512) 649-1217
PRINCIPAL OFFICE: AUBURN, NEW YORK
*ELIZABETH ANGELONE AND FERNANDO SALCEDO ARE LICENSED IN TEXAS.
**SONJA KERR IS LICENSED IN TEXAS, INDIANA, ALASKA, PENNSYLVANIA, AND MINNESOTA (INACTIVE BY CHOICE).

6

25. On August 16, 2016, Petitioner Parents contacted Principal Matthew Nelson to ask who TA would be and to confirm his schedule and ask to meet before the school year began.

26. After emails back and forth, on August 18, 2016, AISD responded that there could be a meeting but not an ARD.

27. On August 25, 2016, emails were exchanged about who would serve as         case manager this year.

28. On September 2, 2016, the parties participated in a prehearing conference.

29. On September 9, 2016, the parties participated in mediation.

30. Petitioner Parents received an email on September 9, 2016 from the AISD stating that         was being "talked to" by three staff about his behavior and told he had to comply with the AISD's traditional behavioral policy or risk the Behavior Management Center or ISS.

31. On September 12, 2016, the parties participated in a prehearing conference.

32. On September 20, 2016, the Petitioner Parents learned that         had been placed on an "alternate schedule" for throwing a water bottle.

33. On September 23, 2016, Petitioner Parents requested written notice of any misbehaviors and or discipline matters.

34. On September 29, 2016, AISD staff indicated that they were "concerned" about absences.

35. In response to the AISD's question about absences, Petitioner Parents indicated that some absences were medical, some were for additional services not offered by the AISD. Petitioner Parents also stated they did not want         pulled from Choir to receive assistance.

36. On October 3, 2016, Petitioner Parent Nidia Heston had a meeting with Mr. Nelson about         Petitioner Parent again asked for written reports of any incidents at school and data about         behavior. Petitioner Parent was told         threw a recycling bin during a class in which he was told that his seating arrangement would be changed. Petitioner Parent tried to stress that change in routine is difficult for         She also noted that he was beginning with his bipolar cycle. There was discussion about whether         needed to be cleared due to "self-Harm" or have a mental health evaluation but Petitioner Parent was not asked to sign consent for any evaluation during this meeting.

PHYSICAL ADDRESS: 8723 SHOAL CREEK BLVD., AUSTIN, TEXAS 78735
MAILING ADDRESS: 9600 ESCARPMENT BLVD., SUITE 745-53, AUSTIN, TEXAS 78749
TELEPHONE: (512) 649-3191     FAX: (512) 649-1217
PRINCIPAL OFFICE: AUBURN, NEW YORK
*ELIZABETH ANGELONE AND FERNANDO SALCEDO ARE LICENSED IN TEXAS.
**SONJA KERR IS LICENSED IN TEXAS, INDIANA, ALASKA, PENNSYLVANIA, AND MINNESOTA (INACTIVE BY CHOICE).

7

37. On October 4, 2016, Petitioner Parents sent an email and clarified the parents wanted written accounts of any incidents at school, that they were confused about a referral for mental health and asked that the AISD develop a better program for           instead of sending him home due to behavioral issues.

38. On October 8th, 2016,        was suspended for three days because of misbehavior, with the ability to return October 13th.

39. AISD sent notice of an ARD on October 12, 2016 to be held on October 21, 2016.

40. On October 21, 2016, a prehearing conference was held.

41. On October 21, 2016, the parties attended an ARD meeting. The meeting time was limited to one hour by the AISD. Both sides had counsel. Petitioner Parents sought a solution for suspension and behavioral needs. AISD confirmed it has no BCBA and that no new FBA had been done since 2014. It was confirmed that since the start of this school year, A.H. had been sent home one time and had been suspended for three full days. The AISD confirmed that A.H. was not being provided counseling and said that was because they needed to do a counseling evaluation. The parties agreed to reconvene on October 31, 2016.

42. On October 31, 2016, the parties attended another ARD meeting. At this meeting, Petitioner Parents sought data for behavioral issues, including intensity, frequency and duration. It was confirmed that A.H. had only one hour of counseling this year. Petitioner Parent Nidia Heston learned – for the first time – that one of the TAs had been changed and that such change occurred around the time that A.H. had more behavioral issues. Petitioner Parent asked why she couldn't be told about a change in personnel. No answer was given. The parties agreed to reconvene on November 7, 2016 at 2:00 p.m.

43. Petitioner Parents reserve the right to further amend this First Amended Complaint and to introduce evidence at hearing as to events unfolding after the filing of this First Amended Complaint.

## V.   REQUEST FOR EDUCATIONAL RECORDS.

1.      Petitioner Parents continue to request all of        educational records, including all behavioral data; see attached request which is incorporated herein.

## VI.   LEGAL ISSUES (IDEA CLAIM)

1.      Did the Austin ISD fail to ensure that        received a free and appropriate public education designed to meet his unique needs in a safe environment during the 2015-2016 school year?

PHYSICAL ADDRESS: 8723 SHOAL CREEK BLVD., AUSTIN, TEXAS 78735
MAILING ADDRESS: 9600 ESCARPMENT BLVD., SUITE 745-53, AUSTIN, TEXAS 78749
TELEPHONE: (512) 649-3191     FAX: (512) 649-1217
PRINCIPAL OFFICE: AUBURN, NEW YORK
*ELIZABETH ANGELONE AND FERNANDO SALCEDO ARE LICENSED IN TEXAS.
**SONJA KERR IS LICENSED IN TEXAS, INDIANA, ALASKA, PENNSYLVANIA, AND MINNESOTA (INACTIVE BY CHOICE).

8

2.    Was        deprived of full-day (commensurate) programming from March 30, 2016 through the end of the 2015-2016 school year?

3.    Did the Austin ISD fail to ensure that        had sufficient supervision by and from a trained paraprofessional during the 2015-2016 school year?

4.    Did the AISD fail to properly write Present Levels of Performance and goals and objectives in meaningful and measureable ways, including baselines, to accurately track progress during the 2015-2016 school year?

5.    Did the AISD fail to routinely, completely and objectively track        progress and take steps to improve his progress on his one goal and four objectives during the 2015-2016 school year and/or did the AISD fail to provide Petitioner Parents with regular progress reports on the one goal and four objectives and provide him different and/or improved services to help him meet the one goal?

6.    Did the AISD fail to develop other goals and objectives for        to meet his unique needs during the 2015-2016 school year?

7.    Did the AISD fail to provide        with appropriate individualized program of education that permitted him to receive meaningful benefit during the 2015-2016 school year, rather than *de minimus* or trivial educational advancement?

8.    Did the AISD fail and is it continuing to fail to comply with all procedural requirements of the IDEA and Texas law including provision of Prior Written Notice, and by doing so has the Austin ISD impeded        right to a FAPE, significantly impeded Petitioner Parents' opportunity to meaningfully participate in the decision-making process regarding the provision of a FAPE to        or impeded or caused a deprivation of educational benefit to        during the 2015-2016, 2016-2017 school years?

9.    Did the AISD fail and is it continuing to fail to ensure that        had an individualized program, provided in the least restrictive environment, that was provided in a coordinated and collaborative manner by key stakeholders and that resulted in his receipt of both academic and non-academic progress during the 2015-2016 school year according to the factors enunciated in *Cypress Fairbanks ISD v. Michael F.*, 118 F. 3d 245 (5th Cir. 1997) and consistent with the standards set forth in the IDEA statute itself at 20 U.S.C. §1414(d) and 20 U.S.C. §1415 and  has the AISD failed and is it continuing to fail the *Michael F.* and IDEA standards during the 2016-2017 school year?

PHYSICAL ADDRESS: 8723 SHOAL CREEK BLVD., AUSTIN, TEXAS 78735
MAILING ADDRESS: 9600 ESCARPMENT BLVD., SUITE 745-53, AUSTIN, TEXAS 78749
TELEPHONE: (512) 649-3191      FAX: (512) 649-1217
PRINCIPAL OFFICE: AUBURN, NEW YORK
*ELIZABETH ANGELONE AND FERNANDO SALCEDO ARE LICENSED IN TEXAS.
**SONJA KERR IS LICENSED IN TEXAS, INDIANA, ALASKA, PENNSYLVANIA, AND MINNESOTA (INACTIVE BY CHOICE).

9

10.    Did the AISD fail and is it continuing to fail to use positive behavioral support programming for        and instead use other inappropriate approaches including restraint during the 2015-2016 and 2016-2017 school years?

11.    In using any restraint techniques, did the AISD comply and is it complying currently with the requirements of Tex. Code §89.1053 during the 2015-2016 and 2016-2017 school year?

12.    Did the AISD fail and is it continuing to fail to provide        with strategies including those based on peer-reviewed, research based educational programming practices for a child with autism [the "Texas autism supplement" found at Tex. Code 89.1055(e)] in his IEP during the 2015-2016 school year that included the Texas Autism Supplement until at least the May 9, 2016 IEP, and is the May 9, 2016 IEP's autism supplement deficient, and is that failure continuing during the 2016-2017 school year?

13.    Has the AISD failed and is it continuing to fail to provide        with a free appropriate public education during the 2016-2017 school year?

14.    Did the AISD fail to provide        any ESY during summer 2016 and thus deny him a FAPE?

15.    Has the AISD failed and is it continuing to fail to provide Petitioner Parents with timely, and consistent written and oral information about        progress and behavioral difficulties at school during the 2016-2017 school year?

16.    Has the AISD failed and does it continue to fail to develop an appropriate positive behavioral support plan for        during the 2016-2017 school year?

17.    Must the AISD develop an appropriate program for        including a fully trained dedicated full-time 1:1 paraprofessional/aide, and services in the general education classroom program with support and without the use of removal/restraint and do so in a manner that ensures        safety at school during the 2016-2017 school year and continuing?

18.    Should the AISD re-evaluate        and identify        as currently experiencing other disabilities, including Post Traumatic Stress Disorder as a result of his assault at school and a Specific Learning Disability?

19.    Must the AISD provide a written assurance to Petitioner Parent for all staff hired to work with        from this point forward that staff have no prior criminal arrests, and have been fully

PHYSICAL ADDRESS: 8723 SHOAL CREEK BLVD., AUSTIN, TEXAS 78735
MAILING ADDRESS: 9600 ESCARPMENT BLVD., SUITE 745-53, AUSTIN, TEXAS 78749
TELEPHONE: (512) 649-3191      FAX: (512) 649-1217
PRINCIPAL OFFICE: AUBURN, NEW YORK
*ELIZABETH ANGELONE AND FERNANDO SALCEDO ARE LICENSED IN TEXAS.
**SONJA KERR IS LICENSED IN TEXAS, INDIANA, ALASKA, PENNSYLVANIA, AND MINNESOTA (INACTIVE BY CHOICE).

10

trained to work with a student with Bipolar, including Bipolar cycling, Autism and ADHD, and PTSD/trauma?

20.     Must the AISD complete and include within a revised IEP an Autism supplement that is more individualized for        needs as required by Tex. Code. 89.1055(c) for the 2016-2017 school year and continuing?

21.     Must the AISD provide        with the services of a counselor/psychiatrically trained counselor that is available to him throughout the day and provides him at least one hour of regularly scheduled therapy every day for the 2016-2017 school year and continuing?

22.     Must the AISD provide        with Extended School Year services for summer 2017?

23.     Must the AISD provide        with placement at a non-public school that is designed to meet his unique individual needs for the remainder of the 2016-2017 school year and as his stay-put placement, including the costs of tuition and transportation?

## VII.    REQUEST FOR ALL APPROPRIATE RELIEF PURSUANT TO THE IDEA.

Petitioners request that the Hearing Officer assume jurisdiction of this case and:

1.  Order that the AISD has denied        a free appropriate public education during the 2015-2016 school year.

2.  Order that the AISD has denied        a free appropriate public education during summer 2016.

3.  Order that the AISD has denied        a free appropriate public education to date during the 2016-2017 school year.

4.  Order that the AISD is continuing to deny        a FAPE during the timeframe of this complaint and the decision due date of this case.

5.  Order that the AISD denied        free appropriate public education by its failure to ensure his safety and allowing him to be injured by Ms. Hardison.

6.  Order that the AISD hire an independent expert qualified to provide direction and guidance to        ARDC and all school staff to prepare an IEP for him that is designed to meet his unique educational needs, or in the alternative pay for him to receive a program of education from a private school or source as needed and/or some combination thereof, and that his IEP will include, at least: a) an objective manner and approach to address his behavioral needs

PHYSICAL ADDRESS: 8723 SHOAL CREEK BLVD., AUSTIN, TEXAS 78735
MAILING ADDRESS: 9600 ESCARPMENT BLVD., SUITE 745-53, AUSTIN, TEXAS 78749
TELEPHONE: (512) 649-3191     FAX: (512) 649-1217
PRINCIPAL OFFICE: AUBURN, NEW YORK
*ELIZABETH ANGELONE AND FERNANDO SALCEDO ARE LICENSED IN TEXAS.
**SONJA KERR IS LICENSED IN TEXAS, INDIANA, ALASKA, PENNSYLVANIA, AND MINNESOTA (INACTIVE BY CHOICE).

11

with positive behavior supports; b) include a meaningful autism supplement; c) address his PTSD/trauma needs; d) provide him meaningful counseling services; and e) address his academic needs.

7. Require that the AISD provide        with compensatory education services in an amount equal to the deprivation of education he has experienced, including an amount equal to 1) loss of certain educational hours from March 30, 2016 to the end of the 2015-2016 school year and 2) loss of educational benefit throughout the 2015-2016 school year given the lack of an appropriate IEP and services; 3) loss of educational benefit during summer 2016; and 4) loss of educational benefit during the 2016-2017 school year.

8. Order that the AISD provide        with Extended School Year services for summer 2017 unless it can establish by objective analysis that he is not entitled to same.

9. All other relief that may be appropriate, including, if necessary a private school placement.

## VIII.   LEGAL CLAIM – SECTION 504 and ADA CLAIMS

1.        is a qualified individual pursuant to Section 504 and the ADA with a disability of autism and bipolar and PTSD that impact his major life activities of learning, writing, and concentrating. As a qualified individual with disabilities pursuant to Section 504 and the ADA,        is entitled to the full protections and benefits of those laws, including the right to a free appropriate public education under Section 504 and the right to be free from discrimination pursuant to Section 504 and the ADA.

2. The AISD receives federal funds pursuant to the IDEA and is subject to the Americans with Disabilities Act as amended and Section 504 and all regulations related thereto that must be followed in a school setting.

3. AISD is required to provide        a "free appropriate public education" pursuant to Section 504, separate and distinct from its duties to not discriminate against him. The AISD has not provided        a free appropriate public education.

4. The AISD has discriminated against        It has denied        access to the equal educational benefit that students without disabilities enjoy. AISD has deprived        by: 1) wrongfully sending him home; 2) suspending him; and 3) limiting his access to Choir class without permission of his parents.

PHYSICAL ADDRESS: 8723 SHOAL CREEK BLVD., AUSTIN, TEXAS 78735
MAILING ADDRESS: 9600 ESCARPMENT BLVD., SUITE 745-53, AUSTIN, TEXAS 78749
TELEPHONE: (512) 649-3191      FAX: (512) 649-1217
PRINCIPAL OFFICE: AUBURN, NEW YORK
*ELIZABETH ANGELONE AND FERNANDO SALCEDO ARE LICENSED IN TEXAS.
**SONJA KERR IS LICENSED IN TEXAS, INDIANA, ALASKA, PENNSYLVANIA, AND MINNESOTA (INACTIVE BY CHOICE).

12

5.  The AISD has engaged in at least two retaliatory actions. First, on September 9, 2016, early in the morning on the same day that the parties went to mediation, the AISD staff pulled        into a meeting with three adults where he was orally threatened with various disciplinary actions and did so without telling his parents or even inviting them to the meeting. One of the AISD staff was a member of the mediation group. Second, after Petitioner Parent met with staff on October 3, 2012,        was suspended for three days for behavior which was clearly a manifestation of his disabilities.

## IX.    REQUEST FOR RELIEF PURSUANT TO SECTION 504 and ADA

1.  Petitioner Parent requests the Hearing Officer hear the intertwined claims pursuant to Section 504 and the Americans with Disabilities Act along with the IDEA. According to one hearing officer, "In Texas, there is little judicial guidance and that found is inconsistent." *J.M. v. LISD*, 267-SE-0516 (HO Broyles July 5, 2016) (Redacted copy of Order No. 8 attached). In *Wood v. Katy Indep. School Dist.*, 53 IDELR 10 (S.D. Tex. 2009) (hearing officer's decision to not consider the Section 504 claims confirmed). But, in *E.C. v. Lewisville Indep. Sch. Dist.*, 58 IDELR 219 (E.D. Tex. 2012), the Court allowed the parent's petition to submit additional evidence to support petitioner's Section 504 claims, as they were not before the hearing officer). Petitioner Parent files the Section 504 and ADA claims for the purposes of exhaustion

2.  Petitioner Parent's request is for declaratory relief and/or monetary damages for the Section 504/ADA discrimination claims and Petitioner Parent concedes the Hearing Officer may lack jurisdiction to award monetary damages.

3.  Petitioner requests that the Hearing Officer either assume jurisdiction, forward this claim to a 504 hearing officer or, since Texas Education Agency may forbid, prohibit or constrain the Hearing Officer from assuming jurisdiction over these claims, specifically indicate in any order dismissing these claims that the Hearing Officer lacks jurisdiction and that the Petitioner Parent has, therefore, exhausted the ADA and Section 504 claims.

## X.    NOTICES AND REQUESTS

Petitioner Parents hereby provide notice and requests as follows:

1.  Petitioner Parents requests a three-day hearing to be completed within the 75 calendar days contemplated by the IDEA and toward that end they request appointment of an available independent hearing officer.

PHYSICAL ADDRESS: 8723 SHOAL CREEK BLVD., AUSTIN, TEXAS 78735
MAILING ADDRESS: 9600 ESCARPMENT BLVD., SUITE 745-53, AUSTIN, TEXAS 78749
TELEPHONE: (512) 649-3191      FAX: (512) 649-1217
PRINCIPAL OFFICE: AUBURN, NEW YORK
*ELIZABETH ANGELONE AND FERNANDO SALCEDO ARE LICENSED IN TEXAS.
**SONJA KERR IS LICENSED IN TEXAS, INDIANA, ALASKA, PENNSYLVANIA, AND MINNESOTA (INACTIVE BY CHOICE).

13

2. Petitioner Parents requests that the AISD waive any resolution meeting, but will agree to mediation provided that the AISD arranges same within the 30 days allotted for resolution, and agrees in writing at the time of scheduling of mediation to provide an initial written offer 10 days prior to the mediation to expedite the process. [**Note: The parties have already attended one mediation session, and have a tentative date of November 10, 2016 to return to mediation.**]

3. Petitioner Parents have not yet decided whether the family desires a closed or open due process hearing.

4. The Petitioner Parents continue to request the Hearing Officer to issue a scheduling order and within that order to specifically identify shortened timelines for any discovery permitted by the Tex. R. of Civ. Procedure pursuant to Tex. Admin. Code. to ensure completion of this hearing within the timelines so that matters are resolved expeditiously. Specifically, Petitioner Parents request that any requests for production be forwarded and responses provided within 10 days of receipt and that any depositions or subpoenas be issued to result in completion within 20 days of today's date to ensure timely completion of this hearing pursuant to the IDEA's 75-day timeline.

5. The Petitioner Parents advise that should they prevail, they will seek reasonable attorneys' fees and recoverable costs pursuant to the IDEA and Texas law. **Petitioner Parents do not seek an award of attorneys' fees from the hearing officer because hearing officers in Texas have regularly determined they lack authority to order fees, and as such there is no attorneys' fee claim to be dismissed.** However, Petitioner Parents place the AISD on notice of potential fees to be fair. Specifically, Ms. Kerr's rate has been judicially determined to be as high as $600.00 per hour in the E.D. of Pa, as well as earlier decisions at $400. *See School District of Philadelphia v. Kimberly Williams*, 116 LRP 9497, 2016 WL 867130 (E.D. Pa., March 7, 2016) ($450 rate set noting impressive qualifications and indisputably highly experienced); *I.W. v. School District of Philadelphia*, 2016 WL 147148, 147149 (E.D. Pa. January 13, 2016) ($600 rate based on CLS schedule); and *G.J. by Jackson v. Lower Merion School District*, 59 IDELR 33 (E.D. Pa., June, 2012) ($400 rate). Ms. Angelone presently bills at $250.00 per hour and Mr. Salcedo at $225.00 per hour.

Dated this 3rd day of November, 2016.

_Sonja D. Kerr_

Sonja Kerr, TX SBN: 24095771
Elizabeth Angelone, TX SBN: 24077349
Fernando Salcedo, TX SBN: 24091048
8372 Shoal Creek Blvd,
Austin, Texas 78757

PHYSICAL ADDRESS: 8723 SHOAL CREEK BLVD., AUSTIN, TEXAS 78735
MAILING ADDRESS: 9600 ESCARPMENT BLVD., SUITE 745-53, AUSTIN, TEXAS 78749
TELEPHONE: (512) 649-3191    FAX: (512) 649-1217
PRINCIPAL OFFICE: AUBURN, NEW YORK
*ELIZABETH ANGELONE AND FERNANDO SALCEDO ARE LICENSED IN TEXAS.
**SONJA KERR IS LICENSED IN TEXAS, INDIANA, ALASKA, PENNSYLVANIA, AND MINNESOTA (INACTIVE BY CHOICE).

14

## CERTIFICATE OF SERVICE

I certify that on November 3, 2016 a true and correct copy of *PETITIONERS' FIRST AMENDED COMPLAINT* was served upon counsel for Respondent, as indicated below:

Ann Vevier Lockwood, Special Education Hearing Officer
P. O. Box 164291
Austin, TX 78716
Telephone: (512) 327-6169
Facsimile: (512) 327-6797
Email: avlockwood@gmail.com

Holly B. Wardell
Eichelbaum, Wardell, Hansen, Powell & Mehl, P.C.
4201 West Parmer Lane, Suite A-100
Austin, TX 78727
Telephone: (512) 476-9944
Facsimile: (512) 472-2599
Email: hwardell@edlaw.com

## ATTORNEYS FOR RESPONDENT

Alonzo Campos
Attorney At Law
The Law Office of Alonzo Campos
1524 South Interstate 35, Suite 200
Austin, Texas 78704
Telephone: 512-554-5976
Facsimile: 512-532-6810
Email:  alonzo@acamposlaw.com

## PERSONAL INJURY ATTORNEY FOR PETITIONER PARENTS AND STUDENT

By:    _____

Sonja D. Kerr
State Bar No. 24095771
Attorney for Petitioner

PHYSICAL ADDRESS: 8723 SHOAL CREEK BLVD., AUSTIN, TEXAS 78735
MAILING ADDRESS: 9600 ESCARPMENT BLVD., SUITE 745-53, AUSTIN, TEXAS 78749
TELEPHONE: (512) 649-3191     FAX: (512) 649-1217
PRINCIPAL OFFICE: AUBURN, NEW YORK
*ELIZABETH ANGELONE AND FERNANDO SALCEDO ARE LICENSED IN TEXAS.
**SONJA KERR IS LICENSED IN TEXAS, INDIANA, ALASKA, PENNSYLVANIA, AND MINNESOTA (INACTIVE BY CHOICE).

15

**EXHIBIT 2**

## COMPROMISE SETTLEMENT AGREEMENT

This Agreement is by and between Nidia and Adrian Heston as next friends, parents, and lawful guardians of                              ("Student"), hereinafter referred to as "Claimants" or "Parents" and the Austin Independent School District, hereinafter referred to as "AISD" or "District."

Bona fide disputes and controversies exist between the parties to this Agreement, both as to fact and extent of liability, if any. By reason of such disputes and controversies, the parties to this Agreement desire to resolve prior to trial the administrative proceeding filed pursuant to the Individuals with Disabilities Education Act, docketed and styled as *Adrian H. b/n/f Nidia H. v. Austin Independent School District*, Docket No. 326-SE-0816, (hereinafter referred to as the "litigation"). By making this Agreement, the District does not in any manner admit any liability, and it respectively denies same. The District enters into this agreement as a matter of compromise to avoid the expense, risk, and inconvenience of trial, and no other intention should be inferred.

A. In consideration of mutual promises and agreements herein contained, including the recitals set forth below, the parties agree as follows:

   1. The District agrees to pay up to $50,000[1] for Student to attend a private school of the Parents' unilateral selection. Parents agree to pursue available non-District funding sources offered through the private school to reduce the Student's tuition and costs. Payment for the private school will be made to the private school. The Parents will provide receipts or invoices to the Department of Special Education, Julie Caglarcan, or her designee, at 1111 W 6th Street, Suite A-300, Austin, Texas 78703, email Julie.caglarcan@austinisd.org. Reimbursement will be made only for invoices received on or before June 20, 2019. Failure to use the entire amount on or before June 20, 2019, will constitute a waiver of the

---

[1] This amount includes one payment up to $2,000 for an Independent Educational Evaluation (IEE) if necessary to obtain initial admission to the private school.

remaining amount.  The District does not concede that private school is necessary for Student to receive a free appropriate public education (FAPE).

2.  The District agrees to receive copies of Student's report cards during his private placement and to visit the school chosen by Parents one time each school year; however, the parties otherwise agree that the District has no obligation to provide Student FAPE while Student is attending the private school.  It is the intention of the parties that, in light of this private services arrangement and so long as funds from the amount described in paragraph A.1. remain to cover tuition in subsequent school years, Student will not attend District schools or programs during the 2016-17, 2017-18, and 2018-19 school years.  The parties agree that Student will not be enrolled in AISD schools or programs for the remainder of the 2016-17 school year once he enrolls in private school or as of January 1, 2017, whichever occurs first.  If it subsequently becomes necessary for Student to re-enroll in AISD prior to the 2019-20 school year, the District agrees that the remainder of the private school funding will be available for the Student to obtain additional educational services (e.g., tutoring, counseling, summer services).  If Student re-enrolls in AISD prior to the 2019-20 school year and disputes arise between the parties pertaining to the appropriateness of Student's IEP, the Parents may, but are not required to, use the remainder of the private school funding to obtain disputed services.  The Parties agree that this is for educational services and is in no way compensation for claims arising in C.2. below.  Parents agree not to request a Section 504 hearing or file a complaint with the Office for Civil Rights with respect to actions occurring before the effective date of this agreement.  Parents otherwise expressly retain those rights for future disputes.

3.  If Parents intend to have Student return to an AISD school at any time in the future, the Parents agree to provide the District with 30 days' prior notice, if possible, and copies of private school information (e.g., progress

Page 2 of 7

reports, data) to ensure appropriate programming by the District.  Upon
return, the Parents hereby agree to cooperate and collaborate with Student's
Admission, Review, and Dismissal (ARD) committee to develop an
individual education plan (IEP) to be implemented on a District campus,
subject to Claimants' rights and procedural safeguards under the IDEA.

4.  The District will reimburse the parent's attorney fees of $18,900 in full
and final settlement of attorney fees or expenses related to the pending
special education due process hearing.  Attorney fees will be paid to Cuddy
Law Firm within 30 business days upon presentment of an invoice and a
completed W-9 form to the District's legal counsel.

5.  The Parent will request that the pending special education due process
hearing be immediately dismissed with prejudice within one business day of
this Agreement being executed by the District.

6.  The Parent agrees to meet with the Executive Director of Special
Education before filing any future complaint or request for hearing from the
Texas Education Agency (TEA) or the Office for Civil Rights (OCR).

B.  The Parties agree that all discussions that occurred during the mediation process
will remain confidential and may not be used as evidence in any subsequent due
process hearing or civil proceeding, except as a historical record or in case of
enforcement.  The Parties further agree that this Agreement, the terms thereof,
and the allegations released thereby shall remain confidential as a student
record to the extent permitted by law.  In consideration of the aforesaid
offerings, Claimant agrees not to reveal, discuss with others, or otherwise
publicize the Agreement, its terms, or the allegations released thereby.
Claimant understands and agrees that such publicity will constitute a violation
of the Agreement and breach of contract, the damages for which will be
nullification of this Agreement and restitution to the District of the amount the

District incurs in meeting its obligations under this Agreement. (See paragraph A.)

C.1. In consideration for the amounts stated in paragraph A and subject to the explicit reservations noted below, Claimants and Claimants' representative hereby release, acquit, and forever discharge AISD, its past, present, and future agents, employees, representatives, attorneys, insurers, and Trustees, of and from any and all claims, demands, damages, causes of action, liabilities or controversies of any kind whatsoever, whether known or unknown, now existing or that might arise hereafter, which arise out of, or in any manner pertain to claims based upon violations of the Individuals with Disabilities Education Act (IDEA); Chapter 34 of the Code of Federal Regulations; Chapter 29 of the Texas Education Code; and Chapter 19 of the Texas Administrative Code, Sections 89.001 *et seq.*

C.2. Claimants reserve the right to file federal, state, and local claims against the District that are not identified in C.1., including claims that have arisen under Texas Education Code §22.0511, including the right to exhaust the pending local grievance filed pursuant to District policy FNG(LOCAL), and claims pursuant to 42 U.S.C. Section 1983, Section 504 of the 1973 Rehabilitation Act (as amended) and its regulations, and the Americans with Disabilities Act (as amended) and its regulations. Also reserved is any requirement to file a complaint with TEA pursuant Education Code 22.0511. The Parents agree to dispose of all disputes related to the appropriateness of educational services and resources for Student, but the Parents are reserving their right to pursue personal injury claims related to an alleged incident involving a prior District employee, Jennifer Hardison, that occurred on March 30, 2016, at Small Middle School.

C.3. Unless expressly provided herein, Claimants and Claimants' counsel waive and release the District from any claim Claimant and/or Claimant's

counsel might otherwise hold for costs, attorney's fees, or any and all other expenses in relation to, or arising from the above-referenced litigation. Each party will bear his/her own costs, if not otherwise provided in this Agreement.

D. It is understood and agreed that this is a compromise of the above-referenced dispute and nothing contained herein shall be construed as an admission of liability, said alleged liability being hereby expressly denied.

E. Any suit arising from a breach of any provision of this Agreement shall be brought within one year of the date that the party knew or should have known of the alleged injury giving rise to the claim. Claimants further agree to provide written notice to the District within 90 days of becoming aware of a breach of the Agreement by sending a letter to the Executive Director of Special Education, via certified mail return receipt requested, attaching a copy of this Agreement and reasonably describing the breach.

F. It is understood and agreed that this Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of Texas. This Agreement is enforceable in state or federal court pursuant to 20 U.S.C. 1415(f)(B)(iii)(II). The language of all parts of this Agreement shall in all cases be construed as a whole, according to the fair meaning, and not strictly for or against either party.

G. It is understood and agreed that this Agreement shall be in effect through August of 2019. Any notice requirement contained in this Agreement shall survive the termination of this Agreement.

H. Each party to this Agreement acknowledges and certifies that he or she has carefully read this instrument and that each party has executed this Agreement freely and of his or her own accord.

Page 5 of 7

I.  It is understood and agreed that this Agreement is executed in multiple originals, each of which shall be deemed an original for all purposes.

J.  It is understood and agreed that rights to relief sought by Claimants and/or Claimants' Counsel through the litigation for which relief is not expressly provided in the Agreement are waived by Claimants and/or Claimants' Counsel.

K.  It is understood and agreed that this Agreement constitutes the entire substance of the Agreement reached by the parties with regard to the above-referenced claims and controversies.

**CLAIMANTS**

_____        12·9·16
Nidia Heston, Individually and On Behalf        Date
of

_____        _____
Adrian Heston, Individually and On Behalf        Date
of

_____        12-12-16
Sonja Kerr, Counsel for Claimants        Date

_____        12-12-16
Alonzo Campos, Counsel for Claimants        Date

**AUSTIN INDEPENDENT SCHOOL DISTRICT**

_____        12/12/16
Paul Cruz, Ph.D., Superintendent        Date

_____        12-12-16
Dr. Jean Bahney, Executive        Date

Page 6 of 7

Director for Special Education

Ylise Janssen, General Counsel
Approved as to Legal Form

12/12/2016
Date

Holly B. Wardell, Counsel for District

12/12/2016
Date

**EXHIBIT 3**

**DOCKET NO. 326-SE-0816**

| | | |
|---|---|---|
| **ADRIAN H., BNF NIDIA H.,** | § | **BEFORE A SPECIAL EDUCATION** |
| **Petitioner** | § | |
| | § | |
| **v.** | § | **HEARING OFFICER FOR** |
| | § | |
| **AUSTIN INDEPENDENT SCHOOL** | § | |
| **DISTRICT,** | § | |
| **Respondent** | § | **THE STATE OF TEXAS** |

**ORDER OF DISMISSAL WITH PREJUDICE**

The due process hearing in this case is currently set for January 23-24, 2017. The parties have engaged in informal settlement negotiations since the inception of this litigation and convened several mediation sessions since September 2015. On December 7, 2016 the parties reported they were very close to a final settlement in this case through these ongoing efforts. On December 13, 2016 Petitioner filed a Motion to Dismiss With Prejudice seeking a dismissal of Petitioner's request for a due process hearing with prejudice.

Because it appears that all matters in controversy have been resolved between the parties through informal settlement and mediation and that Petitioner no longer wishes to pursue his request for a due process hearing it is therefore **ORDERED** that this cause is hereby **DISMISSED WITH PREJUDICE.**

SIGNED December 14, 2016.

**Ann Vevier Lockwood**
**Special Education Hearing Officer**
**For the State of Texas**

# STATE OFFICE OF ADMINISTRATIVE HEARINGS
## WILLIAM P. CLEMENTS BUILDING
**300 West 15th Street**
**Austin, Texas 78701**
**Phone (512) 475-4993**
**Facsimile (512) 475-4994**

# SERVICE LIST

AGENCY:              **TEXAS EDUCATION AGENCY**

STYLE/CASE:          **326-SE-0816 (AUSTIN ISD)**

| STATE OFFICE OF ADMINISTRATIVE HEARINGS (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.IDEA) | ANN VEVIER LOCKWOOD ADMINISTRATIVE LAW JUDGE/HEARING OFFICER |
|---|---|

**PARTIES**                          **REPRESENTATIVE/ADDRESS**

| PETITIONER | SONJA D. KERR ATTORNEY AT LAW CUDDY LAW FIRM, P.C. 9600 ESCARPMENT BLVD., SUITE 745-53 AUSTIN, TEXAS 78749 PHONE: (512) 649-3191 FAX: (512) 649-1217 skerr@cuddylawfirm.com |
|---|---|
| RESPONDENT AUSTIN ISD | HOLLY B. WARDELL EICHELBAUM WARDELL HANSEN POWELL & MEHL 4201 W. PARMER LANE, SUITE 100 AUSTIN, TX 78727 PHONE: (512) 476-9944 FAX: (512) 472-2599 hwardell@edlaw.com |
| COURT REPORTER | MILO REPORTING POC: MICHAEL & LOIS NAEGELE P.O. BOX 728 CIBOLO, TX 78108 PHONE: (210) 659-6303 FAX: (888) 674-7107 mcnaegele@satx.rr.com |

cc: Brittney Salaiz, Special Education DPH Docket Clerk, TEA Division of Legal Services – <u>VIA EMAIL</u>

BEFORE A SPECIAL EDUCATION HEARING OFFICER
STATE OF TEXAS

| | | |
|---|---|---|
| STUDENT, | | |
| bnf PARENT, | § | |
|     Petitioner, | § | |
| | § | |
| v. | § | DOCKET NO. 163-SE-0215 |
| | § | |
| GALVESTON INDEPENDENT | § | |
| SCHOOL DISTRICT, | § | |
|     Respondent. | § | |

## DECISION OF THE HEARING OFFICER

### Introduction

Petitioner, STUDENT bnf PARENT ("Petitioner" or "the Student") brings this action against the Respondent Galveston Independent School District ("Respondent," or "the school district") under the Individuals with Disabilities Education Improvement Act, as amended, 20 U.S.C. § 1401 et. seq. (IDEA) and its implementing state and federal regulations.

### Party Representatives

Petitioner was represented by Petitioner's legal counsel Dorene Philpot of The Philpot Law Office, P.C. Respondent was represented by its legal counsel Amy Tucker with the law firm of Rogers, Morris & Grover, L.L.P.

### Resolution Session and Mediation

The parties convened a Resolution Session on February 16, 2015 but it was not successful in reaching a settlement. The parties also attempted mediation on April 20, 2015 but it was not successful either.

### Due Process Hearing

This case was continued once in order to allow the parties an opportunity to attempt informal settlement and mediation before proceeding with further litigation. The decision due date was extended three times at the school district's request; first, to accommodate new hearing dates and mediation and twice more to provide the parties with an opportunity to submit written closing briefs with access to the hearing transcript and time for the hearing officer to review and consider the briefs in preparing the Decision.

The due process hearing was conducted on April 29-30 and May 1, 2015. Petitioner continued to be represented by Petitioner's attorney Dorene Philpot, assisted at the hearing by her co-counsel Deborah Heaton McElvaney of the DHM Law Firm. Student's mother, ***, and ***, ***, also attended the hearing. Respondent continued to be represented by its attorney Amy Tucker. In addition Dr. ***, Director of Special Education for the school district, attended the hearing as the school district's party representative. The hearing was recorded and transcribed by a certified court reporter. The parties requested an opportunity to submit written closing arguments. Both parties timely filed their respective written closing arguments on or before June 19, 2015. The decision of the hearing officer was extended to July 10, 2015 at school district request.

### Petitioner's Issues

Student submitted a broad issue for resolution in this case: i.e., whether the school district failed to provide Student with a free, appropriate public education (FAPE) beginning in April 2009 up through the present within the meaning

of the IDEA. Sub-issues to support Student's FAPE claim include:

1. Whether the school district failed to comply with its "Child Find" obligations under the IDEA by failing to timely evaluate Student and to identify Student as a student with a disability eligible for special education services and by failing to maintain and then dismiss Student from special education without explanation or prior written notice;

2. Whether the school district failed to devise appropriate Individualized Educational Plans (IEPs) for Student during the relevant time period;

3. Whether the school district failed to comply with procedural rights of both Student and Student's parents – for example: by failing to give an explanation for Student's exit from special education, failing to conduct an exit evaluation first, failing to give Notice of Procedural Safeguards beginning in ***, failing to respond properly to parental requests for Student's educational records, and failing to provide prior written notice at all appropriate junctures; and,

4. Whether the school district violated Student and/or parental rights under other causes of exhaustion (brought for purposes of exhaustion) including, for example, claims arising under Section 504 of the Rehabilitation Act of 1973, the Americans with Disabilities Act, the Family Educational Rights & Privacy Act, and the other laws and statutory references noted on pages 12-13 of Student's Complaint.

<u>Petitioner's Requested Relief</u>

Petitioner requests the following items of relief:

1. The school district identify Student as a student with a disability eligible for special education services under the IDEA and specifically as a student with an emotional disability, a learning disability, and, other health impairment;

2. The school district provide Student with a residential placement at school district expense, or in the alternative, reimburse Student's parents for the cost of a private placement;

3. The school district reimburse Student's parents for the costs of private services, the cost of mileage for private placement and private services, and reimbursement for the cost of the independent evaluation by Dr. ***;

4. Order the school district to comply with all procedural and substantive requirements of the IDEA;

5. Any other relief the hearing officer deems appropriate.

Student also puts the school district on notice that Student intends to seek attorney's fees, expert witness fees, and other litigation costs but acknowledges the hearing officer does not have the authority to award these forms of relief.

<u>Respondent's Legal Position and Issues</u>

The school district confirmed the following additional issues for resolution in this case:

1. Whether Student's claims under the IDEA are ripe for consideration or whether they should be dismissed; the school district contends Student withdrew on *** returning to the school district in *** – Student was not referred for a special education evaluation upon Student's return;

2. Whether Student's claims are limited by the one year statute of limitations rule applied in Texas;

3. Whether Student's claims arising under any law other than the IDEA should be dismissed as outside the hearing officer's jurisdiction; and,

4. Whether Student is entitled to the independent evaluation conducted by Dr. *** at school district expense.

Respondent requests dismissal of all of Petitioner's claims.

## Findings of Fact

1. Student has a long history of behavioral issues beginning ***. Student had screaming fits from *** years of age when frustrated or angry and screamed until Student ***; Student *** when sent to Student's room; Student ***. (Petitioner's Exhibit 6, pp. 302-303)(referred to hereafter as "P. Ex. ___-___"). Student had trouble interacting appropriately with peers from an early age. (P. Ex. 1-2).

2. Student's ***. ***. Student's parents ***. *** Student lived with Student's *** Student's *** who have been actively involved in Student's care. (P. Ex. 1-2)(P. Ex. 6-301, 6-302)(P. Ex. 8-175).

3. Student has a lengthy history of psychiatric diagnoses and treatment since age ***. Student was dismissed from *** different *** programs for repeated physical aggression towards peers. Student continued aggressive behavior towards peers in *** school. (P. Ex. 8-175). Over the years Student displayed very odd behaviors including ***. (P. Ex. 6-166, 6-173).

4. Student attended ***. While in *** Student was evaluated for ADHD and prescribed *** to address difficulty acquiring basic skills. (P. Ex. 1-5). Student was an angry child who had difficulty expressing ***self. Student tended to be argumentative and noncompliant. Student had very few friends and was generally unable to respond to social overtures. However, Student displayed a talent for ***. By age *** Student's mood was more stable under a medication regime ***. (P. Ex. 1-2)(P. Ex. 8-175).

5. Student attended *** grade in the school district beginning in the *** school year. Student continued to exhibit difficulty interacting appropriately with peers. Student repeated *** grade due to difficulties in reading and behavior. In *** grade Student continued to struggle with phonics and exhibited anger issues. Student's psychiatrist recommended Student be tested for dyslexia. (P. Ex. 1-5).

6. In August *** Student was reportedly touching other students and talking when Student should be quiet. By September *** Student was having difficulty staying organized and following teacher directions. Student began copying answers from classmates. Student required frequent reinforcement along with praise and support for the development of coping skills. At that point Student was referred for a special education evaluation. (P. Ex. 1-5).

7. The school district conducted a Full Individual Evaluation (FIE) in September *** and determined Student was eligible for special education services as a student with a learning disability. (Joint Exhibit 1, p. 1)(referred to hereafter as "J. Ex. ___-___")(Respondent's Exhibit 18, p. 23)(referred to hereafter as "R. Ex. ___-___"). The FIE included a speech/language assessment and a psychological. Student did not qualify for speech/language services but met criteria as a student with a pervasive developmental disorder (PDD) and Asperger's. (J. Ex. 1-1)(R. Ex. 18-3, 18-12).

8. An Admission, Review & Dismissal Committee (ARD) met on *** and identified Student as eligible for special education services as a student with autism and a learning disability. (J. Ex. 1- 1) (P. Ex. 1-5) (R. Ex. 18). A set of accommodations and a behavior management plan were components of Student's IEP. (P. Ex. 1-5, 1-6).

3

9. A Notice of Procedural Safeguards and explanation of parental rights was provided to Student's mother at the *** ARD and at subsequent annual ARD meetings in October ***, October ***, October ***, March ***, May ***, and June ***. (R. Ex. 11-15, 11-16)(R. Ex. 12-28, 12-47)(R. Ex. 13-42, 13-47, 13-48)(R. Ex. 14-57, 14-60, 14-63, 14-64)(R. Ex. 15-34, 15-36, 15-38, 15-39, 15-42)(R. Ex. 16-50, 16-54, 16-55)(R. Ex. 17-43, 17-45, 17-49)(R. Ex. 18-73, 18-75)(Transcript Vol. II, pp. 485-486)(referred to hereafter as "Tr. Vol. __ p. __"). Student's mother *** participated in every ARD during this time period. (R. Ex. 11 to R. Ex. 18). Student's *** often communicated with the school district when Student's mother -- *** -- was working. (Tr. Vol. II, pp. 419-420).

10. The November *** ARD designed an IEP to address problems with reading and peer interactions. A behavior intervention plan (BIP) was developed to target behaviors such as: taking things without permission, decreasing self-injurious behaviors, and increasing time on task. Student was scheduled to receive 30 minutes of resource language arts four days/week -- the remainder of instruction provided in the regular education classroom. A set of accommodations was also included in the IEP. (P. Ex. 1-5).

11. Student's eligibility for special education services continued in *** grade year during the *** school year and in *** grade during the *** school year. (J. Ex. 1, p. 1)(R. Ex. 17). Student began exhibiting ***. At the time Student was ***. (P. Ex. 8-175)(Tr. Vol. II. p. 444).

12. A central auditory processing evaluation was conducted at age ***. The auditory processing evaluation suggested it may be difficult for Student to process information when presented too rapidly. Electrophysiological testing showed normal development of the central auditory nervous system but other findings suggested a delayed and incomplete neuro-maturation at the midbrain and auditory cortex. (P. Ex. 1-4, 1-5).

13. In *** grade, a review of existing educational data (REED) was conducted at an ARD meeting on ***. An updated FIE, including a psychological, was completed on ***. The psychological concluded Student no longer met the eligibility criteria as a student with autism but continued to meet eligibility criteria for special education as a student with a learning disability in basic reading, reading comprehension, written expression, math calculation and math reasoning. (J. Ex. 1-1)(R. Ex. 14-2)(R. Ex. 15).

14. The psychological also concluded Student now met criteria as a student with an emotional disability based on: (i) Student's inability to build or maintain satisfactory interpersonal relationships with peers and teachers and (ii) inappropriate types of behaviors or feelings under normal circumstances. (J. Ex. 1-1)(R. Ex. 14-16).

15. An ARD met on ***, reviewed the assessment data, and determined Student no longer met eligibility for special education as a student with autism, added eligibility as a student with an emotional disturbance, and confirmed continued eligibility as a student with a learning disability. (J. Ex. 1, p. 1)(R. Ex. 14, pp 13-14).

16. On *** Student engaged ***. That same month Student ***. (J. Ex. 1-1)(P. Ex. 6-303)(R. Ex. 13-42)(R. Ex. 21-93). A manifestation determination ARD (MDR) was conducted on ***. (R. Ex. 12)(R. Ex. 13-42). Student's family notified the school district they were beginning to search for a residential placement due to ***. (R. Ex. 21-93)(R. Ex. 13-42).

17. A disciplinary placement was recommended by the ARD with Student's return to the regular campus contingent upon mastering certain criteria established at the disciplinary placement. The ARD determined Student would benefit from the disciplinary placement because it provided more individual and small group instruction for areas of identified weakness and to improve Student's social skills. (R. Ex. 13-42).

18. Another ARD met at the end of *** grade on ***. Attorneys for both parties were in attendance. (J. Ex. 1-2) (P. Ex. 39)(R. Ex. 12-1, 12-27 to 12-28). Another ARD was conducted on ***. (J. Ex. 1-2)(R. Ex. 11-1).

Student was referred to *** for an evaluation in the *** by both parent and the school district. (P. Ex. 1-3). The *** evaluation included a home visit interview, psychological testing, a review of school records, and medical assessments. (P. Ex. 1-3, 1-9).

19. *** issued a cytogenetics report on ***. (P. Ex. 8-778). Genetic testing revealed the presence of ***. (P. Ex. 1-3) (Tr. Vol. I., pp. 191-192).  *** been associated with a variety of cognitive and behavioral problems. Both brain architecture and function may be affected. (P. Ex. 1-3).

20. Individuals with *** most commonly exhibit processing deficits that affect speech, language and reading development. Many individuals with *** also have difficulty with visual working memory, attention, and concentration, and -- for individuals with more severe manifestations of the *** -- deficits with mental flexibility and inhibition. Those deficits tend to be associated with thought problems, aggression, and rule breaking behavior. (P. Ex. 12)(Tr. Vol. I., p. 192).  *** was identified as Student's primary diagnosis – i.e., a mental disorder due to a general medical condition. (P. Ex. 6-250, 6-253)(P. Ex. 8-154 to 8-155).

21. Student exhibits the manifestations of ***. (Tr. Vol. I. pp. 192-193). Student's *** contributes significantly to Student's behavioral presentations – the *** is the root of Student's difficulties. (Tr. Vol. I., p. 193).  The patterns of behaviors in a person with *** may be similar to those observed in persons with autism but there are differences in the underlying processing deficits. (P. Ex. 1-3).  Student also has a history of *** also associated with ***. (P. Ex. 8-26, 8-733)(Tr. Vol. II, pp. 445-446).

22. *** prepared a psychological report on ***. (J. Ex. 1-2). (P. Ex. 23)(P. Ex. 6-301). The report referenced Student's ***. Student continued to engage in maladaptive behaviors such as ***." Student did not appear to understand the significance of Student's behavior. (P. Ex. 6-303). Student was diagnosed with ADHD and depressive disorder.  A behavior plan was put in place for the following school year to address *** and lack of boundaries respecting the personal space of others. (P. Ex. 1-6).

23. After Student *** the family withdrew Student from the school district on ***. (J. Ex. 1-1) (P. Ex. 8-175) (R. Ex. 9) (Tr. Vol II, p. 434).    Student continued to receive counseling services on a regular basis for approximately one year from a school district counselor.  (J. Ex. 1-2) (R. Ex. 21- 77) (Tr. Vol. II, pp. 424-425). Student began ***. (J. Ex. 1-2). Student's *** was primarily responsible for Student's instruction. (P. Ex. 1-7) (Tr. Vol. II, p. 406).

24. An occupational therapy assessment was conducted by *** and a report issued on ***. (J. Ex. 1-2)(P. Ex. 1-4)(P. Ex. 24).  Student presented with flat affect but was cooperative during the assessment.  Gross motor skills were within normal limits.  Student reported it was difficult to concentrate when sitting for a long time in class and Student tended to be distracted by noise in the learning environment. (P. Ex. 1-4).

25. At age *** Student spent approximately ***. Student was *** during this time. (J. Ex. 1- 2)(R. Ex. 21-64, 12-68). ***. (P. Ex. 8-175)(R. Ex. 21-64, 12-66).

26. Upon Student's *** Student's behavior and relationships with family members improved.  Student was feeling positive about Student's life.  There were less angry outbursts and Student did not engage in stealing, running away, ***, or physical aggression.  Despite *** Student began volunteering at ***-- an emotionally rewarding experience for Student.  ***.  Student speaks of becoming ***.  (P. Ex. 6-218, 6-266, 6-267)(R. Ex. 21-54, 21-57, 21-60, 21-61, 21-63)(Tr. Vol. III, p. 842).

27. On *** Student's *** attended the school district's private school consultation meeting. (R. Ex. 20)(Tr. Vol. II, p. 422)(Tr. Vol. III, pp. 859-860). Student's *** met the Special Education Director at the meeting. Special education referral information was provided to all attendees at the meeting. Student's *** was provided with information on how to initiate a request for a special education referral and evaluation. The family did not seek an evaluation at that time. (R. Ex. 20-2)(Tr. Vol. II, pp. 487-489, 661)(Tr. Vol. III, pp. 860-861).

28. With the exception of angry aggressive behavior during *** Student seemed to be doing fairly well at home, helping around the house, ***, making progress in Student's *** program, and *** (R. Ex. 21-40, 21-43, 21-44, 21-47). At age *** in December *** the family learned Student ***. ***. (P. Ex. 8-295)(Tr. Vol. II, pp. 455-456). ***. (R. Ex. 21-38)(Tr. Vol. III, p. 906).

29. By February *** Student began to exhibit defiant behavior towards Student's mother and procrastinated in completing lessons in Student's *** program. (R. Ex. 21-33, 21-34). At that point the family decided Student needed more socialization and selected the school district's *** as a suitable educational placement. (Tr. Vol. II, p. 526). ***. (Tr. Vol. II, p. 740). *** differs from the school district's *** school campus. Instruction is provided in a much smaller setting -- which is beneficial to Student. (Tr. Vol. II, pp. 603, 691).

30. The total student population at ***– at the ***. (Tr. Vol. II, p. 691). The smaller setting allows teachers to provide students more one-on-one attention with the flexibility to pull students for tutoring or individualized instruction. The teachers at *** are closer to the administration so it is easier to get schedules changed. Teachers at *** are responsible for a much smaller number of students than at ***. (Tr. Vol. II, pp. 604-606).

31. Student submitted an application to ***. (P. Ex. 16). Prior to enrollment at *** Student was receiving individual counseling and medication management services from ***. Student received services from *** from ***. (P. Ex. 1-9)(P. Ex. 6-267 to 6-297). Student continued *** at this time and under close family supervision. Student was being punished for ***. Student's ***. These steps were taken in response to Student's on-going acting out ***. (P. Ex. 8-126).

32. The *** application indicated Student previously received special education and dyslexia services from the school district. (J. Ex. 1- 2)(R. Ex. 7). Student ultimately enrolled at *** in August *** for the *** school year. (J. Ex. 1-2) (R. Ex. 7, p. 2)(Tr. Vol. III, p. 806). Again, upon enrollment, the family informed the school district Student received special education services from the school district in the past and was never dismissed from special education. (Tr. Vol. II, p. 489)(Tr. Vol III, pp. 809 877). However, the school district's database did not identify Student as a special education student. (Tr. Vol. III, p. 812).

33. The school district informed the family there were no records of Student's special education status or participation in any special education program. (Tr. Vol. II, p. 430). Student's records cannot be located at the school district's off-site storage facility ***. Student's records were either mistakenly destroyed or lost. (Tr. Vol. I., pp. 73-74)(Tr. Vol. II, p. 430)(Tr. Vol III, pp. 886-888). School district staff concluded Student was dismissed from special education after reviewing the records on hand. (R. Ex. 27-4)(Tr. Vol. III, pp. 875-876). However, there were no records available to establish an exit ARD from special education to support this conclusion. (Tr. Vol. III, pp. 876-877).

34. In September, ***. With parental agreement Student was suspended for *** days and placed in the school district's disciplinary alternative educational placement (DAEP) from ***. (J. Ex. 1-1)(P. Ex. 1-7)(P. Ex. 6-97)(P. Ex. 9-28)(P. Ex. 13-16 to 13-19)(R. Ex. 8).

35. Student was then referred for services under 504 in November ***. A 504 Committee met on ***. (J. Ex. 1-2)(R. Ex. 2). The 504 Committee relied on a select set of prior evaluations to confirm student's eligibility under 504. (R. Ex. 2-32, 2-33, 2-36, 2-54, 2-56). The 504 Committee reviewed the *** psychological, audiological, and OT evaluation. (R. Ex. 2-7, 2-32 to 2-55). A written statement from Student's treating psychiatrist confirmed diagnoses of ***, PTSD, ADHD and depressive disorders. (R. Ex.2-32). Teachers expressed some concerns about Student to the 504 Committee. (P. Ex. 30-22 to 3-23)(P. Ex. 32-26, 32-37- to 32-37). At the time of the 504 referral Student was failing ***. (P. Ex. 30-10).

36. The 504 Committee determined Student was eligible for accommodations under 504 on the basis of PTSD, ADHD, and obsessive compulsive disorder (OCD). (J. Ex. 1-3) (P. Ex. 29-1)(R. Ex. 2-3) (Tr. Vol. II, p. 430).

Student's mother consented to 504 services on ***. (J. Ex. 1-3). The 504 plan was provided to school district staff in mid-December ***. (R. Ex. 30-1). Although Student's teachers were aware of the plan they were unaware of the nature or extent of Student's disabilities and received no training in that regard. (Tr. Vol. II, pp. 629, 646, 694, 747). The set of 504 accommodations included: additional time to complete assignments, reminders to stay on task, "chunking" material, a quiet place to work, and, small group testing. (R. Ex. 2-3). No behavior plan was designed or implemented as a result of the 504 meeting. (J. Ex. 1-3).

37. Student received counseling services from *** in the *** grades while attending ***. (P. Ex. 6-11 to 6-125). *** is located at ***. (J. Ex. 1- 2)(P. Ex. 26). However, *** is not a school district program -- instead, *** to facilitate services to *** students. *** operates independently from the school district. (Tr. Vol. I, p. 87). Student's mother and *** were under the mistaken impression that the school district knew Student was receiving counseling and medical services from ***. (Tr. Vol. II, p. 418).

38. By the end of the *** fall semester Student completed five classes and earned the following grades: *** (R. Ex. 4-4). By the end of the *** spring semester Student completed seven classes and earned the following grades: ***. (R. Ex. 4-3)(Tr. Vol. II, p. 648).

39. By the end of *** Student ***. (R. Ex. 4-1, 4-2)(Tr. Vol. II, p. 345).  ***. (R. Ex. 4-2).  Student was academically successful Student's ***. (R. Ex. 4-3)(Tr. Vol. III, p. 853).

40. In *** grade in November *** conducted a psychosocial evaluation at parental request over concerns about Student's lack of focus and attention span. Dr. *** conducted the assessment. (J. Ex. 1- 2)(P. Ex. 6)(P. Ex. 26)(P. Ex. 6-258). Dr. *** confirmed Student's ADHD and recommended "pharmacological intervention with a behavioral modification approach for both school and home environment." He also recommended supportive psychotherapy to "help school performance." (P. Ex. 6-261, 6-262). Dr. *** assessed Student's reading and math skills as well below grade level. (P. Ex. 26).

41. Student also met with Dr. *** a psychiatrist at the *** following Dr. ***'s assessment. Student's mother and *** continued to express concerns over *** and subsequent disciplinary placement in the fall of ***. (P. Ex. 6-80). They reported Student's long history of difficult behaviors, including bizarre, oppositional, angry, and antisocial behaviors. Problems with ***, failure to empathize with others, and stealing were also reported. (P. Ex. 6-80, 6-81).

42. Dr. *** diagnosed Student with Oppositional Defiant Disorder; ***; Mood Disorder NOS; Attention Deficit/Hyperactivity Disorder - Impulsive Type; Posttraumatic Stress Disorder; Learning Disorders NOS; Mathematics Disorders; Disorder of Written Expression; Child or Adolescent Antisocial Behavior; and *** (*** )(P. Ex. 6-82).

43. Student was prescribed a number of medications. Student also began working with ***. Student continued to receive individual counseling from the *** to address organization and *** and participated in a weekly ***'s group to address self-esteem issues. A program to help Student's mother and *** set expectations and develop the use of consistent and meaningful consequences and rewards for Student's behavior was also recommended. (P. Ex. 6-12)(P. Ex. 6-82).

44. Dr. *** also referred Student to *** for services. (P. Ex. 7-11). The reason for the referral were continued family concerns about Student's ***. (P. Ex. 7-19 to 7-38). An initial action plan was designed with the following goals: continue to establish appropriate boundaries with peers and eliminate inappropriate ***. (P. Ex. 7-38). *** began providing family and individual counseling on *** and continued to provide those services while this litigation was pending. (P. Ex. 7- 39 to 7-114)(Tr. Vol. II, pp. 437-438).

45. On *** Dr. *** recommended long term residential treatment -- in her opinion Student was not progressing

7

to independence and the family was in difficulty despite medication and a series of therapists and therapies. (P. Ex. 6-168), 6-166, 6-173, 6-191, 6-200). An application for residential treatment was submitted to *** - - the family's medical insurance provider on ***. (P. Ex. 6-165)(P. Ex. 8-84).

46. At the time of the *** application Student was living with Student's mother *** and receiving extensive support from Student's ***. Student had no social life due to the constant, 24-hour supervision by Student's family. Despite these efforts the family felt unable to provide Student with the emotional support and physical supervision Student needed to stay safe. (P. Ex. 6-167, 6-173)(Tr. Vol. II, p. 456).

47. Although Student's relationship with Student's mother and *** is "very good" there is also conflict over setting boundaries, rules, safety issues, and Student's ***. Student's *** provides only limited support and has a poor understanding of Student's functional level. (P. Ex. 6-167, 6-173). The insurance company denied the application for residential treatment because Student had not attempted suicide or expressed suicidal ideation. (P. Ex. 8-85, 8-105, 8-126, 8-133) (Tr. Vol. II, pp. 428, 449-450).

48. Another 504 Plan meeting was conducted on ***. (J. Ex. 1-3)(R. Ex. 1). Extended time and small group testing accommodations were added to the 504 plan. (R. Ex. 1-2, 1-3). Other accommodations included: extended time and small group for testing, preferential seating, extended time for completing assignments, reminders to stay on task, presentation of information in small chunks, and small group setting for instruction. (P. Ex. 1-7)(Tr. Vol. II, pp. 643, 683). On *** Student was promoted to *** grade with an overall GPA of *** (J. Ex. 1-3)(R. Ex. 3-1). Student's *** completed the re-enrollment form for *** the next day. (R. Ex. 7-3).

49. In July *** Student was seen for *** appointment. Student's *** reported Student recently *** individuals Student does not know well. At the time Student was taking several psychiatric medications and getting weekly therapy from ***. (P. Ex. 8-83).

50. Student began *** grade at *** in August ***. Much of Student's instruction was provided via a self-paced computer-based program. Student's classroom is an "accelerated instructional model" where Student is expected to work independently through lessons at Student's own pace with assistance from teaching staff as needed. Student attended an English class after Student had difficulty *** on the computer program and responded well to the 504 accommodations in English class. (P. Ex. 1-11) (Tr. Vol. II, pp. 660, 678, 722, 740).

51. Student requires a good deal of one-on-one attention from the teachers and works slowly. (Tr. Vol. II, pp. 598-599, 600, 641, 643-645, 681)(Tr. Vol. II, pp. 784, 879). Student has difficulty retaining information and needs re-teaching. (Tr. Vol. II, pp. 620-621, 641-642, 700, 722). Student needs frequent reminders to stay on task and can become easily distracted in class. (Tr. Vol. III, p. 785). Student is more successful with direct instruction than working independently in the self-directed computer lab. (Tr. Vol. III, pp. 741, 792).

52. By *** grade it was clear Student was not responding well to the level of autonomy and self-direction required for success in the *** program. Student's productivity dropped. (P. Ex. 1-18)(Tr. Vol. II, pp. 745-747). Student lacked initiative and appeared apathetic. (Tr. Vol. III, pp. 785-786). Student was struggling. (Tr. Vol. III, p. 853). In *** grade Student needed more adult supervision and direct instruction to meet Student's needs. (P. Ex. 1-18). Student did not spend enough time working on Student's lessons. (P. Ex. 45).

53. ***. (J. Ex. 1-3)(P. Ex. 6-21)(P. Ex. 6-129)(R. Ex. 23-8).

54. The family *** Student in response to these behaviors ***. (J. Ex. 1-3)(P. Ex. 6-24, 6-129)(P. Ex. 12-44)(R Ex. 23-7, 23-8)(Tr. Vol. II, p. 472). Student was diagnosed with a mood disorder, ADHD, trauma: ***. (P. Ex. 6-129). Student's medications were changed ***. After *** Student reported feeling drowsy and had

difficulty doing schoolwork. (R. Ex. 24-4, 24-29, 24-30)(Tr. Vol. II, pp. 698-699). A meeting with Dr. ***, the family, and a counselor was hosted by the *** principal although the principal did not take an active part in the discussions. (J. Ex. 1- 3)(R. Ex. 23-8)(Tr. Vol. II., pp. 310, 312). Information about Student's *** were shared with the school. (P. Ex. 28-1).

55. Student's teachers view Student as above average in following both oral and written directions, working cooperatively with others, and superior with regard to interacting with staff and in cooperation and compliance with teacher requests. (R. Ex. 1-9 to 1-12). Student is very respectful, listens when spoken to, and responds politely. (Tr. Vol. I. pp. 295-296)(Tr. Vol. II, pp. 596-597, 599-600, 643, 684, 724)(Tr. Vol. II, p. 785). Student was ***. Student is not a viewed by school staff as a disciplinary problem. (Tr. Vol. I, p. 343)(Tr. Vol. II, pp. 596, 641, 681, 719).

56. However, Student needs adult supervision to assist Student in keeping on task and moving forward. Student is not capable of working on Student's own and needs frequent one on one teacher attention to make academic progress. (Tr. Vo. II, pp. 724, 732). Student requires a significant amount of one on one instruction and support from teachers. (P. Ex. 32-35)(Tr. Vol. II, pp. 724-725, 738-739, 741).

57. Despite frequent reminders to log in and begin work Student continued to demonstrate poor attention and concentration, excessively low/high activity level, difficulty following directions, and difficulty staying on task. (P. Ex. 10)(P. Ex. 32-35). The school district's program at *** during the past school year has not been particularly successful academically for Student. (Tr. Vol. I., p. 145).

58. By the end of the *** grade in January *** Student earned only *** class and a language arts class. Students are expected to earn ***. (J. Ex. 1- 3)(R. Ex. 3-1, 3-3)(Tr. Vol. II, pp. 609, 727-728). Student was working at an extremely slow pace. (Tr. Vol. II, p. 686). Student's English teacher was very concerned about Student's lack of progress. (Tr. Vol. III, pp. 786-787).

59. Student's performance on state-mandated assessments has routinely been below the established expectations for Student's grade placement in English, reading and writing. Student did pass *** in the fall ***. However, on the *** Student fell in the *** percentile *** percentile for math, and at the *** percentile for writing. (P. Ex. 1-7).

60. The school district requested a conference with the family and also a 504 meeting to review Student's progress. (P. Ex. 33-1)(R. Ex. 3-1). The family rejected the offer to meet in a conference or to attend the 504 meeting and notified the school district they were now represented by legal counsel and planned to file a request for a due process hearing. (Tr. Vol. II., p. 342). A notice of a 504 meeting was issued on *** setting the meeting for ***. (J. Ex. 1-3)(P. Ex. 33-1). Student filed the request for due process hearing on February 9, 2015. (Petitioner's Request for Hearing).

61. When Student ***. ***." (P. Ex. 2). *** Student eloped from school ***. Student returned to school ***. (J. Ex. 1-3)(P. Ex. 8-385)(P. Ex. 18-36 to 18-37)(R. Ex. 21-4)(Tr. Vol. I., p. 303)(Tr. Vol. II, pp. 303-305).

62. As an outcome of the Resolution Session in this case Student's mother consented to a Full Individual Evaluation (FIE) and signed the requisite forms on ***. (P. Ex. 17-53). The school district completed the FIE in April ***. (R. Ex. 27). The school district's evaluation did not include a *** assessment or a formal AT evaluation. The school district's evaluation did not assess Student's OT/sensory needs, or needs in the following: in-home training, parent training, ***, or speech/pragmatic language. (R. Ex. 27)(Tr. Vol. III, pp. 869, 869, 917). At the time of the due process hearing the school district was in the process of completing a ***. (Tr. Vol. III, pp. 866-867).

63. The school district's evaluation concluded Student met eligibility criteria for special education services as a

student with an emotional disturbance based on Student's intermittent demonstrations of maladaptive behaviors that affected Student's ability to consistently access the educational setting. Student expressed feelings of worthlessness and having little or no control over Student's environment or ability to make good rather than "bad" decisions. (R. Ex. 27-31)(Tr. Vol. III, p. 903).

64. The FIE characterized Student with very poor self esteem and a limited belief that Student has the power to demonstrate enough appropriate behavior to be seen as anything other than "bad." (R. Ex. 27-34)(Tr. Vol. III, p. 903). The school district also concluded Student met eligibility criteria as a student with a learning disability in the areas of basic reading, math calculation, and written expression. (R. Ex. 27-33). The FIE identified processing speed as very slow and in the extremely low range. (Tr. Vol. III, p. 846).

65. The FIE included a list of recommendations capable of being implemented in the regular classroom with supplemental special education support. (R. Ex. 27-33 to 27-35)(Tr. Vol. IIII, pp. 852, 907-908). Student needs pull out and/or individualized instructional assistance. (Tr. Vol. III, p. 852). Student also needs counseling, social skills training, involvement in age appropriate social activities, and *** development. (R. Ex. 27-32, 27-35)(Tr. Vol. III., p. 904).

66. Student's ***. (Tr. Vol. III, pp. 916-917). Student has unresolved anger issues towards Student's ***. (Tr. Vol. III, p. 906). Student does not have any real friends although Student tries hard to establish friendships *** that are inappropriate and ineffective. (Tr. Vol. II, pp. 454-455). The function of this behavior is associated with Student's desire to escape feelings of loneliness and social isolation. (R. Ex. 27-32).

67. While this litigation was pending Student's family secured an independent educational evaluation (IEE) from Dr. ***, a neuropsychologist and school psychologist. Dr. *** prepared a report of the IEE on ***. (P. Ex. 1)(Tr. Vol. I., p. 189). The purpose of the IEE was to determine Student's cognitive, academic, and behavioral status and to generate recommendations for Student's educational program. (Tr. Vol. I., p. 189)(P. Ex. 1-1). The school district did not agree to fund the IEE. (Tr. Vol. III, p. 841). Student's medical providers, therapist, and Dr. *** all recommend a residential placement. (P. Ex. 1-18)(P. Ex. 6-34, 6-35)(P. Ex. 6-200)(P. Ex. 7-102).

68. The parties have different views about Student's ability to live independently. The school district sees Student with better developed adaptive skills, better ability for self-care, socialization, and self-advocacy skills than Student's family does. (Tr. Vol. III, pp. 901-902, 911). Student feels Student is a disappointment to Student's family. (Tr. Vol. III, pp. 912-913). Teachers report no significant behavioral or school performance deficits while Student's mother reports profound dysfunction and maladaptive behavior. (R. Ex. 27-27).

69. *** (***) is a residential and treatment center and day school serving children with behavior problems. It is located in ***. (P. Ex. 3-8, 3-38). *** (P. Ex. 4-1, 4-3)(Tr. Vol. I, p. 359). Student's family completed the admission process for *** and Student has been accepted for placement there. (P. Ex. 3-2, 3-44 to 3-87)(Tr. Vol. I., pp. 369-370).

70. *** maintains a school campus in addition to its residential component. Students transition back home once they make sufficient progress under the *** treatment program. (P. Ex. 3-9). The length of stay at *** varies depending on the specific needs of the student. *** offers short-term intensive treatment that can last a couple of months or longer-term that can last for a year or two. (P. Ex. 3-9). *** offers students opportunities to work with ***. (P. 3-3, 3-4, 3-5, 3-14, 3-15).

71. The residentially-based services include intensive, highly structured 24-hour supervision, behavioral therapy, educational, ***, social and recreational training, parent training, related services (such as psychiatric, psychological and speech therapy services) and, transition services to ensure a successful transition from residential placement back to the home and community -- including parent and in-home training, classroom

support, and teacher training. (P. Ex. 3-33). *** has counselors with experience providing counseling services to students ***. (Tr. Vol. I., p. 384).

72. The environment at *** is highly structured. The behavioral programming is preventative and proactive in nature. The goal at *** is to create interventions and environments that prevent problem behaviors from occurring rather than reliance on reactive punishment-based models. (P. Ex. 3-20). Higher functioning students are taught to take responsibility for their behaviors and ultimately in control of their own destiny instead of blaming others or operating from a helpless, hopeless, victim-mentality. (P. Ex. 3-20). Many students at *** come with a past history of failure in school leading to a belief that misbehaving is the only thing they can do well. (P. Ex. 3-36).

## Discussion

### Statute of Limitations Issue

A parent may file a due process complaint on any matter relating to the identification, evaluation, or educational placement of a child with a disability or the provision of a free, appropriate public education (FAPE) to the child within two years from the date the parent knew or should have known about the alleged action that forms the basis of the complaint. *20 U.S.C. § 1415 (b)(6)(f)(3)(C); 34 C.F.R. §§ 300.503 (a)(1)(2); 300.507 (a)(1)(2).*

The two year limitations period may be more or less if the state has an explicit time limitation for requesting a due process hearing under IDEA. In that case the state timelines apply. *20 U.S.C. §1415 (f) (3) (C); 34 C.F.R. § 300.507 (a) (2).* Texas has an explicit statute of limitations rule. In Texas a parent must file a request for a due process hearing within one year of the date he or she knew or should have known about the alleged action that serves as the basis for the hearing request. *19 Tex. Admin. Code § 89.1151 (c).* Petitioner filed Petitioner's request for a due process hearing on February 9, 2015. Petitioner alleged claims arising as far back as April 2009.

### Exceptions to the One Year Statute of Limitations Rule

The one year statute of limitations rule will not apply in Texas if the parent was prevented from requesting a due process hearing due to either:

- Specific misrepresentations by the school district that it had resolved the problem that forms the basis of the due process hearing request; or

- The school district withheld information from the parent that it was required to provide under IDEA. *20 U.S.C. § 1415 (f) (3) (D); 34 C.F.R. § 300.511 (f) (1) (2)*

### Accrual of Petitioner's Claims

Petitioner's cause of action accrued when Student's parent knew or had reason to know of the injury that forms the basis of the hearing request. *See, Doe v. Westerville City Sch. Dist., 50 IDELR, 132, pp 5-6 (D.C. Ohio 2008) (holding cause of action for failure to provide FAPE when student first diagnosed with a learning disability).*

In making the determination as to whether the exceptions should apply in this case, I must calculate the limitations period as one year from the date Student's parent knew or should have known of the complained of actions of the school districts and *not* one year from the date Student's parent learned from their attorney that school district actions were wrong. *Bell v. Bd. of Educ. Albuquerque Pub. Sch., 50 IDELER 285, pp 8-9, 15-15 (D.C. N.M. 2008)(holding IDEA claims that student was misidentified as MR rather than LD and thus denied FAPE were limited to two year SOL period).*

11

## Misrepresentation Exception

Neither the IDEA nor its related regulations clarify the scope of what constitutes a "misrepresentation" under the first exception. The United States Department of Education left it to hearing officers to decide on a case by case basis the factors that establish whether a parent knew or should have known about the action that is the basis of the hearing request. *71 Fed. Reg. 46540, 46706 (Aug. 14, 2006).*    Case law provides some guidance in making that determination.

The alleged misrepresentation must be intentional or flagrant.  Petitioner must establish not that the school district's provision of FAPE was objectively inappropriate but instead that the school district subjectively determined Student was not receiving FAPE and intentionally and knowingly misrepresented that fact to Student's family. *D.K. v. Abington Sch. Dist., 2012 U.S. App. LEXIS 21060 (3d Cir. 2012)(student could not show misrepresentations caused failure to request a hearing or file a complaint on time – teachers did not intentionally or knowingly mislead parents about extent of academic and behavioral issues or efficacy of solutions and programs attempted). See, also, Evan H. v. Unionville-Chadds Ford Sch. Dist., 2008 U.S. Dist. LEXIS 91442, pp. 4-5 (D.C. Pa. 2008).*

Furthermore, not just any misrepresentation will trigger the exception but instead the misrepresentation must be such that it prevents the parent from requesting a due process hearing regarding claims that would otherwise be time-barred. *C.H. v. Northwest Ind. Sch. Dist., 815 F. Supp 2d 977, 984 (E.D. Tex. 2011); G.I. v. Lewisville Ind. Sch. Dist., 2013 U.S. Dist. LEXIS 120156 (E.D. Tex. 2013)(Magistrate's Report and Recommendation).*

Petitioner contends Petitioner's family repeatedly expressed concerns about Petitioner's educational progress and behavior over the years. Petitioner contends the family was not advised by school district personnel they could pursue claims in a due process hearing and that the school district failed to provide Petitioner with an appropriate program and placement. However, to read the term "misrepresentation" to include actions by a school district anytime it fails to remedy an educational problem encountered by a student is too broad. Such an interpretation would "swallow the rule established by the limitation period." *Evan H. v. Unionville-Chadds Ford Sch. Dist. 2008 U.S. Dist. LEXIS 91442 at p. 5, n. 3.*

This reasoning was applied in a case where the parent alleged the school district repeatedly misrepresented that the student was doing well and making significant progress in all areas including reading. The parents alleged the school district misled them by withholding information about the student's standardized test scores. *Sch. Dist. of Philadelphia v. Deborah A., 2009 U.S. Dist. LEXIS 24505, pp. 3-4(D.C. Pa. 2009).* The federal court found that at most the parent merely demonstrated the student's IEPs were deficient. The court reasoned the exception would swallow the rule if all that was required was merely a showing that IEP's were inadequate to meet a student's needs. In hindsight, parents may consider the school district's assessment of a student's progress to be wrong, but that does not rise to a specific misrepresentation for statute of limitation purposes. *Id.*

I conclude that the record on file in this case does not support a finding that the school district's actions beginning in April *** rose to the level of flagrant, intentional misrepresentation required by the first exception to the statute of limitations rule.  In order to apply this exception Petitioner had to establish that the school district knew that it was not providing Student with FAPE and intentionally misled Student's family into believing otherwise.  I find insufficient support for such a conclusion in the record. *D.K. v. Abington Sch. Dist., supra; See, Evan H. v. Unionville Chadds Ford Sch. Dist., 2008 U.S. Dist. LEXIS 91441 at p. 5 (D.C. Pa. 2008).*

## Withholding Information/Prior Notice

The second exception to the application of the one year statute of limitations rule requires a determination that Student's family was prevented from requesting a due process hearing because the school district withheld information from the family it was otherwise obligated to provide under prior notice provisions of the IDEA. *20 U.S.C. § 1415 (f (3) (D).*

Petitioner contends the school district did not fulfill IDEA notice obligations when it failed to provide or explain the procedural rights to Student's parent, failed to provide prior written notice when Student was "dismissed" from special education, when the school district failed to conduct an evaluation during the ***, and, when it ceased providing student with counseling as a related service ***.

The information that a school district must provide to parents under IDEA for statute of limitations purposes is specific and includes:

- Notice of evaluation procedures the school district proposes to use;
- Notice that the school district has determined no further evaluation is necessary and that parents may then seek an IEE;
- Notice of procedural safeguards; and,
- Prior notice any time the school district proposes to initiate or change the identification, evaluation or educational placement of the child or the provision of FAPE or refuses to change the identification, evaluation, or educational placement of the child or the provision of FAPE.

*20 U.S.C. § 1415 (b) (6) (A) (B) (c); 34 C.F.R. § 300.511 (f).*

When a school district delivers a copy of IDEA procedural safeguards to parents the statute of limitations period for IDEA violations begins regardless of whether parents later examine the text to acquire actual knowledge of procedural rights – the simple act of delivering the procedural safeguards notice suffices to impute constructive knowledge of parental rights under IDEA. *El Paso Ind. Sch. Dist. v. Richard R., 567 F. Supp. 2d 918, 945 (D.C. Tex. 2008), aff'd in part and vacated on o.g. 591 F. 3d 417 (5th Cir. 2009); C.P. v. Krum Ind. Sch. Dist., 2014 U.S. Dist. LEXIS 131098 (E.D. Tex. 2014)(one year SOL applied to limit IDEA claims where school district gave parents copies of procedural safeguards on numerous occasions).* The record on file in this case supports the conclusion that Student's parent received the requisite notice of procedural safeguards.

While Student's family may have expressed concerns about Student's educational progress and behavior over time, the record on file demonstrates that Student's family was provided with the requisite notice of procedural safeguards by the school district time and time again. In doing so, Student's parent had either actual or constructive knowledge of the parental right to file a due process hearing at any point along the way whether the family knew their concerns were actionable or not. *Deborah A., 2009 U.S. Dist. LEXIS 24505 at pp. 4-5; 19 Tex. Admin. Code § 89.1151 (c).*

The record on file clearly establishes that Student's mother and *** participated in any number of ARD meetings. The allegations that the school district intentionally misled Student's parent and failed to inform the family of the parental right to a due process hearing is simply not supported by the record on file in this case. *Fern v. Rockwood R-VI Sch. Dist., 48 IDELER 35, pp. 3-4(D.C. Mo. 2007)(holding neither of the exceptions applied where record showed parents fully participated in IEP process, met with district representatives, and were continuously advised of the status of child's program).*

Furthermore, the one year statute of limitations contemplates parental exercise of reasonable diligence to discover facts that give rise to an IDEA claim. The one year time frame is consistent with the legislative intent that special education disputes should be resolved in an expeditious manner. *See, Mandy S. v. Fulton Cnty. Sch. Dist., 31 IDELR 79 (D.C. Ga. 1999)(interest of student best served by prompt resolution of educational disputes); Hall v. Knott Cnty. Bd. of Educ., 941 F. 2d 402, 408 (6th Cir. 1991)(IDEA requires need for immediate action in resolving disputes).*

Student received special education and related services from the school district for a period of over five years before Student's family withdrew Student from public school *** Student instead. The evidence shows that at multiple junctures and at every ARD meeting from November *** through June *** the school district provided Student's parent with either Notice of Procedural Safeguards and/or explained the procedural rights in effect at the time to the parent. In at least one ARD meeting the family was also accompanied and advised by legal counsel. Student's ***

attended a private school consultation meeting in *** where information about making a special education referral was distributed. Nevertheless Student's family did not request a due process hearing to resolve any concerns they had about Student's educational services or placement while Student was enrolled or after Student withdrew and ***.

Student also argues the school district should have continued to provide Student with related services over the course of Student's *** and failed to provide the requisite notice when it decided to terminate those services. The evidence showed the school district continued to provide counseling services *** but ceased those services thereafter. I agree with the school district this complaint is a challenge to an alleged lack of proportionate share of services. *See, 34 C.F.R. § 300.133 (a)(1).*

In Texas, children *** are considered to be parentally-placed private school children within the meaning of the IDEA. *34 C.F.R. § 300.130; 19 Tex. Admin. Code § 89.1096 (a).* Disagreements over proportionate share services are not subject to resolution in a due process hearing but instead are limited to State complaint procedures. *34 C.F.R. § 300.140; Student bnf Parents v. McKinney Ind. Sch. Dist., TEA Dkt. No. 107-SE-0110.*

Therefore I conclude the one year statute of limitations rule applies to any and all of Student's claims that arose prior to February 9, 2014. Student's parent either knew or should have known a claim under the IDEA could be asserted in a due process hearing. Therefore, Student's claims regarding a failure to provide FAPE, failure to provide prior written notice, and failure to provide related services during the *** shall be dismissed as outside the one year limitations period. *19 Tex. Admin. Code § 89.1151 (c).*

### Child Find: The General Rule

The school district has a duty under the IDEA to identify, locate, and evaluate students with disabilities who are in need of special education and related services. This duty is known as "Child Find." *34 C.F.R. § 300.111 (a) (1) (i).* The Child Find duty includes children suspected of having a disability and in need of special education even though they are advancing from grade to grade. *34 C.F.R. § 300.111 (c) (1).* The Child Find duty includes students who are defined as parentally-placed private school students. *34 C.F.R. § 300.131.* ***.

### Failure to Evaluate During ***

The statute of limitations analysis above also applies to any claims that the school district failed to re-evaluate Student during the ***. The record shows Student's parent knew or should have known she could have challenged the school district's failure to conduct the re-evaluation when it became due in October ***. Furthermore, the school district convened a private school consultation meeting in May *** which Student's *** attended. The evidence shows information about special education and the referral process was provided to the attendees but Student's parent took no steps to initiate a request for a re-evaluation or challenge the school district's failure to do so. Therefore, the one year statute of limitations bars the Child Find claim with regard to the failure to evaluate Student during Student's ***. *19 Tex. Admin. Code § 89.1151 (c).*

### Continuing Child Find Duty

I must next consider whether the school district should have evaluated and identified Student as a student with a disability when Student returned to the public school district and enrolled in ***. The evidence showed the school district failed to maintain Student's records properly. Had the school district's electronic database included the appropriate information the first prong of the Child Find duty would have been triggered, i.e., there was a reason to suspect the student had a disability. The evidence also showed the application for enrollment at *** included a statement that Student received special education services in the past. That information also triggered the first prong of the Child Find inquiry. Instead, the school district either disregarded the information on the application or simply did not attend to it. The school district does not dispute Student received special education services in the past.

The evidence showed the school district's special education records were maintained through an arrangement with

***. The school district speculates *** misplaced Student's records.  The misplacement or destruction of Student's special education records was, at best, a serious mistake.  It is the school district, not the Student or Student's family, who bears the legal responsibility for maintaining Student's records and providing parental access to inspect and review those records.  *34 C.F.R. §§ 300.611, 300.300.612(a)(3), 300.613, 300.614, 300.616, 300.623.*  The school district is required to inform parents when personally identifiable information collected, maintained, or used is no longer needed to provide educational services to the student.  The information may only be destroyed at the request of the parents.  *34 C.F.R. §300.624.*

In Texas the school district is also required to maintain an "eligibility folder" for each student receiving special education services in addition to the student's cumulative folder.  The eligibility folder must include, at a minimum, copies of referral data, documentation of notices and consents, evaluation reports and supporting data, ARD reports, and the student's IEPs.  *19 Tex. Admin. Code § 89.1075 (a).*

The school district must also protect the confidentiality of personally identifiable information at the collection, storage, disclosure, and destruction stages. At least one school district official must assume responsibility for ensuring the confidentiality of the personally identifiable records, and all persons who collect or use the personally identifiable information must receive training or instructions regarding state policies and procedures in compliance with the Family Educational Rights & Privacy Act (FERPA).  *34 C.F.R. §§600.611 (b); 300.623.*

Had the school district properly maintained student's eligibility folder and other educational records the information in those records would have been available to the principal and staff at *** when Student returned to the school district as a *** grader in the fall of *** and certainly by February 2014.  The information in the records would have alerted the staff at *** that Student was previously identified as a student with a disability and received special education services from the district.

The rationale for requiring the school district to maintain this kind of information is to prevent precisely what occurred here – i.e., that the school district made decisions about student's educational needs and programming without consideration of highly relevant and useful information regarding Student's eligibility for special education and the provision of services in the past.

The IDEA does not require a parent to use "magic words" to specifically request a special education evaluation or special education services.  It is the school district's duty to locate and identify children who are suspected of having a disability not the parent's duty.  *34 C.F.R. § 300.111.*  The statute ultimately lays the responsibility for identifying students with disabilities at the school district's door-step.  *34 C.F.R. § 300.301 (b).*

Student was ***.  The evidence shows Student's re-evaluation was overdue upon Student's initial re-enrollment. *See, 34 C.F.R. § 300.303 (b)(2)* .  Had the school district properly maintained Student's records it would have suspected Student was a student with a disability and needed an updated evaluation.  An updated evaluation would have confirmed Student's disabilities and need for special education services – as the school district's FIE conducted in April 2015 ultimately did.  Instead, school staff erroneously concluded Student had been dismissed from special education – there is no evidence in the record that was true.

The school district decided to serve Student under 504 beginning in November ***.  This was a curious choice given the school district's access to the *** evaluations and the psychiatrist's letter confirming Student's myriad of diagnoses and that Student was receiving psychiatric treatment.  While a medical diagnosis alone may not be sufficient for eligibility purposes the list of conditions provided by the psychiatrist was reason enough for the school district to suspect Student had a disability that warranted further inquiry.

The school district does not now dispute Student's identification as a student with a disability or that Student needs special education.  Instead, the school district argues it had no duty to conduct such an evaluation until the spring semester of Student's *** grade year when Student began to struggle with Student's academics. I disagree.  The

delay in evaluating Student was a direct result of the school district's failure to maintain Student's records and review Student's *** application more carefully – either one of which would have triggered a re-evaluation.

Instead, the re-evaluation did not occur until this litigation was filed. The school district's Child Find duty carried over each semester and continued within the one year statute of limitations period – i.e. beginning on February 9, 2014. Under Texas law special education referral is required as part of the school district's overall regular education referral or screening system for students experiencing difficulty in the regular classroom. *19 Tex. Admin. Code § 89.1011.* It was clear by the end of the first semester of *** grade Student was experiencing academic difficulty at ***.

I agree with the school district that the one year statute of limitations period bars any claims the school district failed to fulfill its Child Find Duty when Student first enrolled in August *** and during the fall semester of *** grade. However, the failure in maintaining accurate educational records was a continuing violation and the school district had a continuing Child Find Duty into the spring semester of 2014 – at least beginning on or after February 9, 2014. The evidence showed that medical information provided to the school district was also reason enough to suspect Student might be a student with a disability (even if Student was performing adequately academically) to trigger the Child Find duty.

Certainly by the fall of 2014 when Student's academic performance began to falter and Student appeared to be lethargic, apathetic, and sleepy the school district had reason to suspect a disability. In September 2014 the school district knew Student was *** when family concerns about Student's behavior were discussed in a meeting at school in the presence of the *** principal. These factors, taken together, should have prompted the school district to initiate an evaluation that fall. Instead, Student's academic slide continued until the follow spring semester in 2015 when this litigation ensued and the school district finally conducted an FIE.

I conclude the school district failed in its Child Find Duty beginning in the spring semester of 2014 and through most of the 2014-2015 school year until April 2015 when the FIE was completed. This is the type of procedural violation that caused a substantive educational harm and impeded Student's right to a free, appropriate public education. *34 C.F.R. § 300.513 (a)(2).*

<u>Eligibility as a Student with an Emotional Disturbance.</u>

An emotional disturbance under the IDEA is defined as a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects the student's educational performance:

- An inability to learn that cannot be explained by intellectual, sensory, or health factors;
- An inability to build or maintain satisfactory interpersonal relationships with peers and teachers;
- Inappropriate types of behavior or feelings under normal circumstances;
- A general pervasive mood of unhappiness or depression; and
- A tendency to develop physical symptoms or fears associated with personal or school problems. *34 C.F.R. § 300.8(c)(4).*

The preponderance of the evidence supports the conclusion that student meets the criteria as a student with an emotional disturbance – indeed the school district's own evaluation completed while this litigation was pending confirms this conclusion. Furthermore, the extensive set of medical and counseling records from a variety of sources and the school district's own ARD documents and prior evaluations confirm Student exhibits inappropriate types of behavior and feelings under normal circumstances (for example Student's impulsivity and ***) and an inability to build or maintain satisfactory interpersonal relationships with peers and teachers.

16

## Eligibility as a Student with Other Health Impairment

Other Health Impairment under the IDEA means having limited strength, vitality or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment that (i) is due to chronic or acute health problems – including attention deficit hyperactivity disorder – and (ii) adversely affects the student's educational performance. *34 C.F.R. § 300.8 (c)(9).* The preponderance of the evidence also supports the conclusion that student meets the criteria for OHI as well.

Student's diagnosis of *** and Attention Deficit Hyperactivity Disorder over the years confirms Student is often distracted and unable to concentrate or focus on academics due to these chronic health problems. The educational and medical records also confirm Student's history of ***, attentional deficits, and impulsive behavior that was inappropriate and interfered with Student's ability to make and keep friends.

## Eligibility as a Student with Specific Learning Disabilities

A specific learning disability means a disorder in one or more the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations, including conditions such as perceptual disabilities and dyslexia. A specific learning disability does not include learning problems that are the result of visual, hearing, motor disabilities, mental retardation, or an emotional disturbance or of environmental, cultural or economic disadvantage. *34 C.F.R. § 300.8 (c)(10).*

Although there is some evidence that Student's inability to think clearly is related to Student's *** and Student meets criteria as a student with an emotional disturbance there is also complementary evidence that Student exhibits perceptual deficits (i.e., that Student processes information at a much slower rate than peers) and that Student was identified with dyslexia and received dyslexia services at an early age. The evidence also shows that Student has a history of difficulty reading and writing, failed those portions of state mandated assessments, and certainly at *** struggled to process and absorb material even with additional accommodations and teacher support. The school district's FIE also confirmed Student meets eligibility as a student with a learning disability, specifically in the areas of basic reading, math calculation and written expression. There is no real dispute that Student is eligible for special education as a student with a learning disability.

## Failure to Devise Appropriate IEPs

Student argues the school district's failure to meet its Child Find duty resulted in an educational harm to Student; i.e., the school district did not devise or implement an appropriate Individualized Educational Plan (IEP) for Student during the *** grade (*** and *** school years). I agree. *See, Brock v. New York City Dept. of Educ., 2015 U.S. Dist. LEXIS 44254(S.D. N.Y. 2015)(school district's failure to evaluate student for six years meant there was a lack of substantive evaluative material to form a basis for proposed placement back at the public school from the small private school student previously attended; failure to timely evaluate impeded student's right to a FAPE and denied student educational benefit).*

The school district did not timely evaluate Student for special education beginning in February 2014. Instead, it was not until this litigation was filed and Student was not progressing well academically in *** grade that the school district conducted an evaluation. Although there was evidence that Student made some meaningful educational progress during Student's first year at *** the preponderance of the evidence showed that any educational benefit Student received from the *** program began to unravel the more time Student spent at *** without the instructional and behavioral supports Student needed.

There was credible evidence Student ***. It is reasonable to conclude Student was not monitored as closely as Student needed to be. The evidence clearly demonstrates that at least by the end of the first semester of *** grade

17

Student struggled academically and was not well suited for the self paced computer based instructional program at ***. Instead, the evidence showed Student needed small group instruction, face to face instruction, and one-on-one attention by teachers in order to learn.

Residential Placement

In this jurisdiction a residential placement under the IDEA is appropriate when it is (i) essential in order for the student with a disability to receive a meaningful educational benefit; and (ii) primarily oriented toward enabling the student to obtain an education. *Richardson Ind. Sch. Dist. v. Michael Z., 58 F. 3d 286, 300 (5th Cir. 2009).* This two part test includes consideration of two factors: first, whether the student was placed at the private facility for educational reasons and second whether the student's progress at the private facility is primarily judged by educational achievement. *Richardson Ind. Sch. Dist. v. Michael Z., 58 F. 3d at 301.*

Furthermore, when an educational benefit is merely incidental to a private placement made primarily for medical reasons the first prong of the test is not met. *See, Fort Bend Ind. Sch. Dist. v. Douglas A., 65 IDELR 1 (5th Cir. 2015)(school district not required to reimburse placement at a mental health facility where primary goal of facility was to treat children with reactive attachment disorder – unilateral private placement by parents made for emotional and mental health reasons and not educational purpose).*

In this case Student seeks prospective placement at *** at school district expense. Therefore, in applying the two part test established in *Michael Z.*, I must consider whether the evidence supports the reasonable conclusion that placement at *** would be essential in order for Student to receive a meaningful educational benefit and second, would the *** placement be primarily oriented toward enabling Student to obtain an education.

Least Restrictive Environment

Before reaching those questions I must also consider whether residential placement, even if beneficial and appropriate for Student, would nevertheless meet the IDEA's requirement of placement in the least restrictive environment. The IDEA requires the school district ensure, to the maximum extent appropriate, students with disabilities are educated with their non-disabled peers. Special classes, separate schooling or removal of students with disabilities from the regular education environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. *34 C.F.R. § 300.114 (a)(2).*

In addition, the school district must ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services. The continuum must include instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions. Supplementary services such as resource room or itinerant instruction provided in conjunction with regular class placement is also required. *34 C.F.R. § 300.115.*

A residential placement, with the exception of placement in a juvenile detention facility or a state supported living center, is the most restrictive instructional setting along the continuum of alternative placements. *See, 19 Tex. Admin. Code §89.63(c).* State law places additional requirements on the use of state and federal funding for a residential placement. No state funding will be provided if the placement is due primarily to the student's medical problems or primarily to problems in the student's home. Funding is also denied if the school district did not first attempt to implement less restrictive placements prior to the residential placement (except in an emergency documented by the ARD) or when residential placement is not cost effective when compared with other alternative placements. *19 Tex. Admin. Code §89.61(b).*

I do not doubt placement at *** would be beneficial for Student. The record shows it certainly offers a comprehensive set of services that meet Student's needs. However, I agree with the school district that no intermediate interventions have yet been attempted with Student. There are a number of less restrictive alternatives available before a residential

18

placement is appropriate for educational purposes under the IDEA. *See, Bristol Twnshp. Sch. Dist., 38 IDELR 86 (SEA Pa. 2002)(IHO erred by failing to explore less restrictive alternatives before ordering out of state residential placement).* Furthermore, the evidence shows that although Student is struggling academically and has problems with attention, focus, processing, and concentration, the serious behaviors that worry Student's family are not as problematic in the school environment. There were only a limited number of serious behavioral incidents over the \*\*\* year period at \*\*\*.

Following the conclusion of the hearing Petitioner notified the hearing officer and the school district that Student \*\*\*. I am to infer \*\*\* is further support for Student's need for residential placement. That may be \*\*\* but based on the evidence and record in this case I cannot conclude that a residential placement is the least restrictive environment for Student at this time.

Instead, the law requires the school district address Student's academic and behavioral needs in the regular school environment with appropriate supports, accommodations, and related services to the maximum extent appropriate. *34 C.F.R. § 300.114 (a)(2).* However, I do agree with Petitioner that any educational program provided by the school district must address Student's behavioral, personal care, emotional, and \*\*\* needs. The need for special education services is not strictly limited to academics but also includes behavioral progress and the acquisition of appropriate social skills as well as academic achievement. *Venus Ind. Sch. Dist. v. Daniel S. 2002 U.S. Dist. LEXIS 6247 (N.D. Tex. 2002).*

Because I conclude a residential placement is not the least restrictive environment for Student's educational placement at this time I need not determine whether placement at \*\*\* would be either essential or primarily oriented towards enabling Student to receive an education. *Richardson Ind. Sch. Dist. v. Michael Z., supra.* Even if such an analysis is required I would still conclude residential placement under the IDEA would not be appropriate at this time.

<u>Residential Placement Would Be Primarily Medical Not Educational</u>

Where placement in a residential treatment facility is primarily medical rather than educational a school district is not responsible for the placement under the IDEA. *Richardson Ind. Sch. Dist. v. Michael Z., supra; Fort Bend Ind. Sch. Dist. v. Douglas A., supra (parents made unilateral residential placement due to concerns student would make another suicide attempt and because of student's on-going drug problem).*

In this case the evidence shows that the primary motivation for residential placement is to relieve the family's significant distress coping with Student's behavior at home and in the community. Certainly there is evidence the family is deeply concerned about Student's behavior – they felt compelled to monitor Student 24 hours a day and Student's independence was strictly limited. These constraints and fears placed a huge burden on the entire family. Although a residential placement would provide Student's family with relief the evidence shows it is premature to conclude residential placement is necessary in order for Student to receive a meaningful educational benefit within the meaning of the IDEA.

Student's defiant and difficult behaviors \*\*\* at home and in the community are not seen in the school environment to the same degree. I do not minimize the serious nature of Student's inappropriate, \*\*\*. The interplay between the manifestation of Student's medical conditions (i.e., \*\*\* and ADHD) as well as the psychological consequences of Student's \*\*\* must be addressed and recognized in any educational program.

However, the preponderance of the evidence shows that Student's behavior overall at \*\*\* is fairly good – Student is respectful, polite, compliant, tries hard, and is easily re-directed. While there is also evidence that Student's needs include improving \*\*\* and developing appropriate social skills that do not include \*\*\* I am not persuaded those needs could not be adequately addressed in the school setting through a behavior plan, counseling and psychological services, and social skills training. These are at least intermediate steps that the school district should be allowed to

19

attempt before considering residential placement for an educational purpose. *Richardson Ind. Sch. Dist. v. Michael Z., supra; 34 C.F.R. § 300.114 (a)(2).*

## Procedural Rights

I have already concluded that any claims the school district failed to comply with the procedural rights of both Student and Student's parent are barred by the one statute of limitations rule applied in Texas. *34 C.F.R. §300.507; 19 Tex. Admin. Code § 89.1151(c).*

## Right to Independent Educational Evaluation

A parent has a right to an independent educational evaluation at school district expense if the parent disagrees with the results or recommendations of the school district's own evaluation. *34 C.F.R. §300.502 (b)(1).* In this case the parent secured an IEE from Dr. \*\*\* in preparation for the due process hearing and before the school district could complete its own FIE. I agree with the school district's argument that under these circumstances Petitioner is not entitled to an IEE at school district expense.

The request for an IEE is premature to the extent it was completed before the school district conducted its own FIE – there was no school district evaluation to disagree with under the unique circumstances of this case. *Id.; See, T.P. v. Bryan Cnty. Sch. Dist., 2015 U.S. App. LEXIS 11439 (11ᵗʰ Cir. 2015).*

## Other Claims

The jurisdiction of a special education hearing officer in Texas is strictly limited to the issues identified as subject to a due process hearing under the IDEA. Any claims arising under any law other than the IDEA are outside my jurisdiction and shall be dismissed. *34 C.F.R. §§ 300.503; 300.507.*

## Student's Need for an IEP

By failing to evaluate Student in a timely manner under Child Find duty the school district deprived Student of the benefit of an IEP beginning in February 2014 up through April 2015 when Student was finally evaluated. *34 C.F.R. § 300.101.* Student has a right to an IEP. *34 C.F.R. § 300.322 (a)(c).* By failing to conduct an FIE by February 2014 and thereafter (under its on-going Child Find duty) the school district also deprived Student of the supplementary aids and services, \*\*\*, and related services Student needs in order to receive a meaningful educational benefit from Student's program and placement at \*\*\*. *Bd. of Educ. Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 201, 203(1982).*

### *ARD Meeting*

Under the IDEA the school district has the obligation to convene an ARD no later than 30 days from the determination the student needs special education. *34 C.F.R. § 300.323 (c)(1).* The record shows the school district's FIE was completed on \*\*\*, 2015. It is unclear from the record whether an ARD has already been convened. If not, now that Student has been identified as a student with a disability and eligible for special education, an ARD Committee must meet to design an IEP with measureable goals and objectives that address each area of need. The school district must then immediately implement the IEP.

If an ARD has been convened and an IEP designed, another ARD must convene to ensure the IEP includes *all* the recommendations stated in the school district's FIE including the recommendations for development of replacement behaviors (stated on page 32 of 36 of the FIE) *and* the recommendations to address processing deficits and behavioral accommodations (stated on pages 34-35 of 36 of the FIE).

*Additional Services*

Supplementary aids and services mean aids, services and other supports provided in regular education classes, other education-related settings, and in extracurricular and nonacademic settings to enable a student with a disability to be educated with nondisabled peers to the maximum extent appropriate. *34 C.F.R. §§ 300.42; 300.114.* The ARD must also consider and select the aids, services and supports Student needs in regular education classes, extracurricular activities, and in nonacademic settings.

Related services mean whatever support services the student needs to assist the student in benefitting from the educational program. Related services can include counseling services, occupational therapy, parent counseling and training (to assist parents in understanding the special needs of their child, providing information about child development, and helping parents acquire social skills to support implementation of the student's IEP); psychological services, therapeutic recreation services; school health services, social work services, and transportation. *34 C.F.R. §300.34.*

The school district has already concluded Student needs counseling services. However, parent counseling and training are also warranted where, as here, the family is having great difficulty coping with Student's behavior at home and in the community. School health services, social work services, and transportation may also be required in order to support Student in the school environment.

\*\*\*

The school district's own FIE recommends the development of \*\*\*. The record shows the school district began \*\*\* assessment after the FIE was completed – it is not clear whether the school district completed that assessment. In any event, it must complete the \*\*\* assessment so the ARD may review the results and recommendations and incorporate those into Student's IEP.

The record also demonstrates Student is receiving outside counseling and other related medical services that need to be better understood and coordinated with the school district. Communication needs to be improved between family and the school district as well. Therefore, parental consent to allow qualified school district staff to communicate directly with Student's medical and therapeutic providers is critical to improve communication and understanding of Student's psychological and medical needs at school. Furthermore, a mechanism for improving communication between family and school is also required as an aspect of Student's IEP such as designating a school staff member to serve as a communication liaison and/or use of a weekly journal or email.

## Compensatory Services and Equitable Relief

It has long been the rule that compensatory education is a proper method for providing a free, appropriate public education to students with disabilities who have been improperly denied that right. An impartial hearing officer has the authority to grant all relief deemed necessary, including compensatory education, to ensure the student receives the requisite educational benefit denied by the school district's failure to comply with the IDEA. *Letter to Kohn, 17 IDELR 522 (OSERS 1991).*

Compensatory education imposes liability on the school district to pay for services it was required to pay all along and failed to do so. *See, Meiner v. Missouri, 800 F. 2d 749, 753 (8th Cir. 1986); D.A. v. Houston Ind. Sch. Dist., 716 F. Supp 2d 603, 612 (S.D. Tex. 2009), aff'd 629 F. 3d 450 (5th Cir. 2010)(upholding HO's decision that student failed to prove amount of compensatory reimbursement student entitled to for school district's failure to timely evaluate).*

Compensatory education may be awarded by a hearing officer after finding a violation of the IDEA. It constitutes an award of services to be provided prospectively in order to compensate the student for a deficient educational program provided in the past (or in this case the complete absence of an educational program). *G. ex. Rel RG v. Fort*

21

*Bragg Dependent Schools, 343 F. 3d 295 (4th Cir. 2003).*   Hearing officers have broad equitable powers, as courts do, to fashion appropriate relief where there has been a violation of the IDEA. *Burlington Sch. Comm. v. Dept. of Educ., 471 U.S. 35, 374 (1996); Harris v. Dist. of Columbia, 19 IDELR 105 (D.C.D.C. 1992).* The trend in the case law is to utilize a qualitative, rather than quantitative, standard in fashioning appropriate compensatory and equitable relief. *Reid ex rel Reid v. District of Columbia, 401 F. 3d 516, 523-524 (D.C. Cir. 2005).*

The evidence showed that although the school district conducted an FIE it did not include evaluations for parent training, ***, or an assessment of Student's sensory needs. Because the family's distress is related in large part to concerns and anxiety over Student's inappropriate social behaviors Student would benefit from the support of parent training – i.e., training and education for Student's mother and *** to learn effective behavioral strategies when interacting with Student in setting boundaries and ensuring Student's safety and acquisition of appropriate social skills. Therefore the school district must conduct a parent training assessment and provide the family with the training and counseling they need to effectively address Student's behavioral needs identified by the assessment.

The evidence also showed that *** develop appropriate social skills. The school district needs to complete the *** assessment it began and provide Student with compensatory *** either as a component of Student's school day during the upcoming 2015-2016 school year or during the summer of 2016 – whichever the ARD concludes fits Student's schedule best. *** arrangement as a component of Student's educational program is appropriate compensatory relief.

The ARD Committee must meet to determine the nature and scope of *** services based on the assessment and should include Student's interest and ***. ***

Finally, the evidence showed Student's teachers had virtually no understanding of the nature of Student's disabilities. In order to implement Student's IEP and BIP Student's teachers, and any other school district staff who interact with Student (including counselors, administrators and/or paraprofessionals) need training on the provisions of the IEP and BIP and on the nature and extent of Student's disabilities.

<u>Conclusions of Law</u>

1. Petitioner is eligible as a student with a disability for special education and related services under the Individuals with Disabilities Act as a student with an emotional disturbance, specific learning disabilities, and other health impairment. 34 C.F.R. §§ 300.8 (c)(4)(8)(9).

2. Petitioner's claims arising before February 9, 2014 are barred by the one year statute of limitations rule as applied in Texas. *34 C.F.R. § 300.507(a)(2); 19 Tex. Admin. Code §89.1151 (c);* Petitioner did not meet Petitioner's burden of proving the exceptions to the rule should apply. *34 C.F.R. §300.511 (f)(1)(2); G.I. v. Lewisville Ind. Sch. Dist., 2013 U.S. Dist. LEXIS 120156 (E.D. Tex. 2013).*

3. Respondent failed to fulfill its Child Find duty in a timely manner when it failed to maintain Petitioner's educational records properly or consider relevant information from Petitioner's family that would otherwise have led Respondent to suspect Student was a student with a disability in need of special education thereby triggering a Full Individual Evaluation.
   Respondent's Child Find duty was on-going and Respondent failed to conduct the requisite evaluation beginning on February 9, 2014 and thereafter; the evaluation conducted in April 2015 was therefore untimely. *34 C.F.R. §§300.111 (a)(c); 300.611-300.614; 300.616; 300.623; 19 Tex. Admin. Code § 89.1075 (a).*

4. Respondent's failure to fulfill its Child Find duty in a timely manner caused a deprivation of educational benefit and impeded Petitioner's right to a free, appropriate public education. *34 C.F.R. § 300.513 (a)(2).*

5. Petitioner is not entitled to an Independent Educational Evaluation at school district expense. *34 C.F.R. § 300.502 (b)(1).*

6.  Petitioner did not meet Petitioner's burden of proving the need for residential placement for educational purposes. Residential placement is not the least restrictive environment for Petitioner at this time. *34 C.F.R. § 300.114 (a); 19 Tex. Admin. Code § 89.61; Richardson Ind. Sch. Dist. v. Michael Z., 58 F. 3d 286, 300-301(5th Cir. 2009).*

7.  Petitioner is entitled to equitable and compensatory relief for Respondent's failure to meet its Child Find duty in a timely manner. *34 C.F.R. §§300.111; G. ex. Rel RG v. Fort Bragg Dependent Schools, 343 F. 3d 295 (4th Cir. 2003).* The hearing officer has the authority to make an award of equitable relief and compensatory educational services. *D.A. v. Houston Ind. Sch. Dist., 716 F. Supp 2d 603, 612 (S.D. Tex. 2009); Harris v. Dist. of Columbia, 19 IDELR 105 (D.C.D.C. 1992).*

8.  Petitioner's claims that arise under any law other than the Individuals with Disabilities Education Act are dismissed as outside the hearing officer's jurisdiction. *34 C.F.R.§§ 300.503; 300.507.*

## ORDERS

Based upon the foregoing findings of fact and conclusions it is therefore ORDERED that Petitioner's requests for relief are hereby **GRANTED IN PART AND DENIED IN PART AS FOLLOWS:**

1.  The school district shall complete the *** assessments within ten school days from the date of this Decision;

2.  The school district shall conduct a parent training assessment within ten school days from the date of this Decision or by a date agreed to by the parties;

3.  Student's mother shall sign the requisite consent within seven calendar days the consent documents are received by the parent in order to permit the Director of Special Education or her designees to confer directly with Student's private therapists and physicians in order to exchange information about Student's medications, their effect on Student in the school environment, and to coordinate counseling goals and needs;

4.  The school district shall convene an ARD meeting no later than 30 calendar days from the date of this Decision and invite representatives from local and state agencies under the State's Memorandum of Understanding to the ARD for the purpose of designing a *** IEP that includes a *** for Student;

5.  The ARD committee shall design (or revise any existing IEP) to include *all* the recommendations stated in the school district's FIE of ***, 2015 including, but not limited to, measureable goals and objectives to address both behavioral and academic needs identified in the FIE including: a Behavior Intervention Plan; social skills training; parent training and counseling services; individual counseling services for Student; direct, small group instruction; and, regularly scheduled, individualized, one on one teacher support and tutoring as additional components of Student's educational program;

6.  The school district shall implement the *** as a component of Student's IEP beginning no later than the second week of school in the upcoming 2015-2016 school year or within the first week of a summer 2016 program, unless the parties agree otherwise;

7.  The school district shall conduct an assessment of Student's sensory needs within 30 school days from the first day of school including observations in various instructional settings and issue a written report that shall be provided to Student's family within five school days of the date of the report;

8.  The recommendations of the sensory needs assessment report shall be incorporated into Student's new IEP – the parties may simply amend Student's IEP without convening an ARD meeting if they so agree although either party may request an ARD meeting to discuss the sensory needs assessment and its recommendations and an ARD meeting shall then be convened on a date and at a time by mutual agreement;

9. The school district shall conduct a training session for all teachers and staff responsible for the implementation of Student's IEP and BIP, including administrators and related service staff that includes training on the provisions of the IEP and BIP, including the use of effective instructional and behavioral strategies, and on the nature and extent of Student's disabilities no later than the first day of the upcoming 2015-2016 school year; and,

10. The school district shall designate a school district staff member to serve as a communication liaison between Student's family and the school; the communication liaison shall be selected through discussion with the family during the ARD meeting; the communication liaison and the family will design a mutually agreeable communication system that may include, for example, a weekly journal, email, or periodic conferences, or any other method and on whatever schedule the parties agree on; the communication system shall begin within the first week of the upcoming 2015-2016 school year.

It is further **ORDERED** that any and all claims arising prior to February 9, 2014 are hereby **DISMISSED** as outside the one year statute of limitations rules as applied in Texas;

It is further **ORDERED** that any and all claims arising under any law other than the Individuals with Disabilities Education Act are hereby **DISMISSED** for want of jurisdiction.

All other relief not specifically stated herein is **DENIED**.

**SIGNED the 7th day of July 2015**

Ann Vevier Lockwood
Special Education Hearing Officer

**NOTICE TO THE PARTIES**

The Decision of the Hearing Officer in this cause is a final and appealable order.  Any party aggrieved by the findings and decisions made by the hearing officer may bring a civil action with respect to the issues presented at the due process hearing in any state court of competent jurisdiction or in a district court of the United States. *34 C.F.R. § 300.516; 19 Tex. Admin. Code Sec. 89.1185 (n).*

**BEFORE A SPECIAL EDUCATION HEARING OFFICER**
**STATE OF TEXAS**

| | | |
|---|---|---|
| STUDENT, | | |
| bnf PARENT, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | DOCKET NO. 163-SE-0215 |
| | § | |
| GALVESTON INDEPENDENT | § | |
| SCHOOL DISTRICT, | § | |
| Respondent. | § | |

<u>SYNOPSIS</u>

**ISSUE:**

Whether *** student with ***, ADHD, PTSD (***), and oppositional disorder should be identified as a student with an emotional disturbance, learning disability and Other Health Impairment for purposes of special education eligibility and services under the IDEA.

**HELD:**

**FOR THE STUDENT**

School district's own FIE concluded Student met criteria as student with an emotional disturbance and specific learning disability; sufficient documentation from Student's medical providers and in prior educational records to establish eligibility for OHI based on diagnosis of ADHD and Student's distractibility and lack of focus in the classroom. **34 C.F.R. §300.8 (c)(4)(8)(9)**

**ISSUE:**

Whether school district failed to identify Student in a timely manner as a student with a disability under the IDEA based on its Child Find Duty.

**HELD:**

**FOR THE STUDENT**

School district's failure to maintain Student's educational records, to act upon information stated in Student's application for enrollment in *** school, or to initiate a special education referral after review of medical records confirming various diagnoses and psychiatric treatment, led to school district's failure in meeting its Child Find duty in a timely manner under the IDEA.

Had school district properly maintained Student's educational records or investigated information on application form, school district would have had reason to suspect Student was a student with a disability -- Student formerly received special education services from the school district before a ***. Student's three year re-evaluation was overdue by date of Student's initial enrollment at the *** school.

School district's failure to meet Child Find duty was on-going violation of IDEA within the one year statute of limitations period up through the date the school district finally conducted an FIE while the litigation was pending. **34 C.F.R. § 300.111**

**ISSUE:**

Whether Student's claims that school district denied Student a FAPE, failed to comply with parental and student procedural rights by failing to give notice of Student's exit from special education, failing to conduct an exit evaluation before dismissing Student from special education, failing to provide notice that counseling services to be terminated while Student ***, and failing to provide prior written notice "at all appropriate junctures."

**HELD:**

**FOR THE SCHOOL DISTRICT**

Student's claims arising prior to one year from the date of the filing of Student's request for hearing dismissed as outside the one year statute of limitations period applied in Texas; Student did not meet burden of proving the exceptions to the rule should apply. **34 C.F.R. § 300.507; 19 Tex. Admin. Code § 89.1151**

**ISSUE:**

Whether Student needs residential placement in order to receive the requisite meaningful educational benefit from Student's educational program.

**HELD:**

**FOR THE SCHOOL DISTRICT**

Residential placement not the least restrictive environment for Student at this time; school district should have opportunity to provide Student with the supplementary and support services Student needs in order to receive education with non-disabled peers to the maximum extent appropriate; residential placement is one of the most restrictive instructional arrangements along the continuum and not appropriate when school district has not yet implemented a less restrictive setting.

Furthermore, placement at residential treatment center with focus on behavior issues made for medical reasons and based on family needs and not essential for educational purposes. **34 C.F.R. § 300.114**

**ISSUE:**

Whether Student entitled to an IEE at school district expense.

**HELD:**

**FOR THE SCHOOL DISTRICT**

IEE conducted in anticipation of litigation and not in response to disagreement of parent with school district's evaluation – school district had not yet completed an FIE before Student requested an IEE at school district expense during current school year. **34 C.F.R. § 300.502**

**ISSUE:**

Whether school district failed to provide Student with a FAPE during the relevant time period.

**HELD:**

**FOR THE STUDENT IN PART AND THE SCHOOL DISTRICT IN PART**

Student's FAPE claims outside one year statute of limitations dismissed.  School district failed to identify and evaluate Student in a timely manner within the one year statute of limitations period led to deprivation of educational benefit and impeded Student's right to a FAPE.

School district ordered to convene an ARD, design an IEP and BIP that included the recommendations stated in the school district's FIE, including supplementary aids, services, supports and related services; school district ordered to complete a \*\*\* assessment and add to IEP for \*\*\* Student; other forms of compensatory education and equitable relief also awarded for school district's failure to provide Student with a FAPE, including \*\*\*, parent training assessment and services, appointment of communication liaison, and teacher and staff training. **34 C.F.R. §§ 300.34; 300.101; 300.320; 300.322**

3

DOCKET NO. 287-SE-0808

| | | |
|---|---|---|
| STUDENT | § | BEFORE A SPECIAL EDUCATION |
| b/n/f Parents | § | |
| | § | |
| V. | § | HEARING OFFICER FOR THE |
| | § | |
| LIBERTY HILL INDEPENDENT | § | |
| SCHOOL DISTRICT | § | STATE OF TEXAS |

## DECISION OF HEARING OFFICER

STUDENT ("Student"), by next friends, Parents ("Parent" or "Petitioner"), brought this action against Respondent, Liberty Hill Independent School District ("District") under the Individuals With Disabilities Education Improvement Act, as amended, 20 U.S.C. § 1401 et. seq. ("IDEIA") and its implementing state and federal regulations. STUDENT was represented pro se by his Parent. The District was represented by Susan Graham, attorney with the law firm of Walsh, Anderson, Brown, Schulze & Aldridge, P. C.

### Procedural History

On September 4, 2008, Respondent filed its <u>Objections to the Sufficiency of the Complaint</u> which was denied by this hearing officer. On September 12, 2008, pursuant to the <u>First Scheduling Order</u>, a telephonic pre-hearing conference was held, following which, the parties filed briefs concerning exceptions to the one year limitations rule. 19 Tex. Admin. Code § 89.1151(c); 34 C.F.R. § 300.511(f)(1) and (2). The parties participated in an unsuccessful Resolution Session.

Following this hearing officer's determination that no exception to the one year limitations rule applied, the issues were refined to include only allegations that occurred after August 20, 2007, basically the 2007-2008 school year. Two issues were dismissed as outside the one year rule, specifically, an allegation that the District called the Parent to pick up the Student due to behavior problems from 2003-2005, and an allegation that the District, without notice to the Parent, failed to maintain the Student's right to confidentiality in the Spring, 2007. On September 20, 2008, an order regarding the limitations issue and refining the issues was entered,

followed by an <u>Order Correcting Issues for Due Process Hearing</u> on September 30, 2008.  The case was heard on October 6, 2008.

## Issues

The issues for decision in this case are as follows:

1. Without notice to the Parent, whether the District failed to follow the Student's Individualized Education Program ("IEP"); specifically, the District failed to use daily picture schedules during the 2007/2008 school year;

2. Whether the District allowed verbal abuse of the Student during the 2007-2008 school year;

3. Through its disciplinary actions and without documentation or notice to the Parent, whether the District failed to treat the Student with dignity and respect through emotional and sensory abuse and deprivation throughout the 2007-2008 school year in violation of the Student's IEP or Behavior Intervention Plan ("BIP"), resulting in a failure to educate the Student in the Least Restrictive Environment ("LRE") and a safety risk for the Student;

4. Whether the District failed to provide academic and behavior logs to the Parent during the 2007-2008 school year;

5. Although requested by the Parent, beginning in the Fall, 2007 through March, 2008, whether the District failed to provide advance notice of permanent staffing changes;

6. Beginning  August 20, 2007 and continuing through January, 2008, whether the District placed the Student with inadequately trained staff who used restraint with the Student and, following use of restraint, the District failed to provide training to those staff members within the required time frame;

7. With the exception of the December, 2007 goals, whether the District failed to sufficiently educate the Student to enable him to master his IEP goals during the 2007-2008 school year;

8. During the 2007-2008 school year, whether the District failed to meet the requirement of LRE by placing the Student in a Life Skills Class to accommodate staffing issues;

9. During the 2007-2008 school year, whether the District failed to provide the Student with teachers that were sufficiently trained in autism; and

10. Whether the District failed to follow the Student's BIP in that the Student's teachers did not work with the behavior specialist.

### Requested Relief

As relief, the Petitioner requested the following:

1. An order directing the District, at its expense, to place the Student in a private school or transfer to another district that has a strong autism program and to be responsible for costs of transportation and living expenses;

2. An order directing the Parent and an autism specialist to approve a picture schedule for daily use in all transitions and that quarterly updates be made, as needed;

3. An order directing the District to provide behavioral/ABA Therapy at the Parent's selecting for a minimum of 25 hours per month for two consecutive years;

4. An order directing the District to provide daily behavior and academic logs to the Parent for the 2007-2008 school year and forward, which logs should note all changes or issues regarding the Student;

5. An order directing the District to notify the Parent of permanent staffing changes that affect the Student at least one week prior to the changes, and to notify the Parent of temporary staff changes within 24 hours following such changes;

6. An order directing the District to provide an autism specialist to oversee the Student's educational progress on a weekly basis at a minimum of 10 hours per week and to provide for quarterly parent/teacher/autism specialist meetings to discuss the Student's progress and determine reasons for failure to timely master IEP and BIP goals;

7. An order directing the District to provide compensatory services in the form of private occupational therapy and speech therapy for a minimum of 25 hours monthly for two consecutive years with the choice of providers made by the Parent; and

8. An order directing the District to provide compensatory services in the form of private autism education services to the student for a minimum of 25 hours per month for two consecutive years which private provider is to be selected by the Parent.

### Findings of Fact

Based upon the evidence and argument of the parties, I make the following findings of fact and conclusions of law:

1. The Student is eligible for special education and related services as a child with autism and speech impairment. He resides within the geographical boundaries of the Liberty Hill Independent School District. The District is responsible for providing the Student with a FAPE. The Student attended Liberty Hill ** during 2007-2008, and currently attends ** grade at the District's **. [J. Ex. 4].

2. According to the District's April 15, 2008 Full Individual Evaluation ("FIE"), the Student falls within the severe range in areas of language behavior, pragmatic/social, and sensory. In the area of expressive language or spontaneous speech, the Student falls in the profound range. He uses gestures, actions, pointing, showing, or directing others to communicate, and does not engage in meaningful conversations with others. He is stronger in the area of receptive language. He understands a variety of words and sentences, and is able to follow verbal requests with prompts. The Student's intelligence scores are in the mental retardation range. [J. Ex. 8]

3. The Student has a tendency to become over stimulated by the environment and his body, and benefits from a structured, well organized schedule with opportunities for sensory breaks to help improve focus and performance. The April 15 FIE states, "[He] appears to benefit from opportunities when he can be in a quiet environment and take a break to help regroup and become organized." He is impulsive, easily distracted, and has a poor attention span. He is bothered by either the humming or brightness of fluorescent lighting. [J. Ex. 8, pg. 27; Tr. Pgs. 95, 324]

4. During the fall semester, 2006, a paraprofessional/teacher's aide worked with the Student. In January, 2007, the paraprofessional began an alternate certificate program and completed it during the following summer. Beginning with the spring semester, 2007, the Student's special education teacher was reassigned as the District's Autism Specialist ("AU Specialist"), and, at the recommendation of the AU Specialist, the paraprofessional became the Student's special education teacher (hereinafter referred to

as "Teacher" or "Student's Teacher"). He continued as such until the end of the 2007-2008 school year. From the 2007 spring semester through the 2007-2008 school year, the Teacher had one, and, at times, more than one mentor. The Teacher meets the Texas Education Agency ("TEA") standards for a highly qualified teacher. [Tr. Pgs. 71-73].

5. The Student's Teacher completed several training sessions including autism training by one of his mentors, the District's AU Specialist. Among other training, the Teacher also completed the Satori Alternatives to Managing Aggression ("SAMA"), SHARS-attendant care teacher training, and assistive technology training. The Student's other teachers received autism and other trainings. [R. Ex. 16 and Tr. Pgs. 74-77; Tr. Pgs 285-287].

6. The Student's Individualized Education Plan ("IEP") required "monitoring behavior through behavioral data sheets…" During the 2007-2008 school year, the Teacher irregularly provided academic and behavior logs to the Parent. [J. Ex. 2, 4, 6].

7. The Student's January, 2007 IEP required the use of picture schedules to assist the student with communication and movement from place to place in the school environment. The Student was assigned a 1:1 teacher, provided a self-contained special education room with inclusion, received speech therapy, occupational therapy, special education transportation, and received pre-vocational training at ** farm and community programs. [J. Ex. 1].

8. During the January 24, 2007 ARD meeting, the Parent requested advanced notice of "any changes in staff with [the Student] before any changes are made…." The December 19, 2007 annual ARD did not include the request. In approximately April, 2008, a paraprofessional who was assigned to the Student left the District. Although there was question regarding receipt of the communication, the principal testified that she sent an email to the Parent telling of the paraprofessional's pending departure and that no new staff would be added. No other staff members assigned to the Student were removed or left the District during the 2007-2008 school year. [J. Ex. 1 and 4; Tr. Pg. 272].

9. A parent-requested ARD meeting was held May 10, 2007, at which time the Parent, citing behavioral data concerns, requested that the Student not be "in the Life Skills classroom when he is not in the general ed classroom." The District complied with the Parent's request. Again, picture cues were included in the Student's IEP. [J. Ex. 2].

10. During the 2007-2008 school year during general education classes, trips to the park or ** Farm, the Student was among the Life Skills students and/or general education students. There were two to three trips to the ** Farm, a farm where students are able to work with horses. If the Student was in the park and the Life Skills students came, he was taken inside. The Student did not receive his academic program in the Life Skills classroom, but rather, had a room of his own. Although Petitioner's witness testified that the Student's behavior increased when he was only with Life Skills students, the witness did not suggest that he not ever be around them. [P. Ex. 8; Tr. Pgs. 60-61; 213; and 275].

11. At the December 19, 2007, annual ARD meeting, it was reported that the Student met most of his goals and objectives. The Student's IEP for the coming year required the use of a word daily schedule routine across all environments throughout the school day. It called for positive behavior support strategies to eliminate aggression and self injurious behavior. It required access to a less stimulating environment when the Student needed a place to calm, and, among other places, listed "a Teacher Lounge" as a place to provide 2-5 minute breaks. Goals and objectives were adopted for the coming year. The Student's program was to be administered in a special education setting with a 1:1 teacher, inclusion in general education, speech therapy ("Sp. T."), occupational therapy ("OT"), special education transportation and pre-vocational training at ** Farm & community outings. [J. Ex. 4].

12. During the 2007-2008 school year the Student had a picture or word schedule which was used regularly, but not everyday. By the end of the spring semester, 2008, the Student had memorized his schedule and only needed to refer to the picture schedule when his daily schedule was changed. [J. Ex. 1; Tr. Pgs. 23-27 and 89].

13. In prior years, physical restraint was necessary several times. During the 2007-2008 school year, the use of physical restraint was required one time. As an alternative to restraint, the Teacher requested assistance from two staff members in an attempt to move the Student to an empty room. The Teacher used physical restraint in the form of SAMA ground containment. One paraprofessional who assisted the Teacher by opening doors for him was not trained on the use of restraint. The two teachers who used restraint had undergone such training. [J. Ex. 3; Tr. Pgs. 58 and 88].

14. On one occasion, when the Student would not get off the school bus, the Teacher used a loud, harsh tone of voice to the Student. A complaint was filed by a substitute bus driver. The transportation director investigated the complaint, and the Teacher's vice- principal spoke to him regarding his conduct. [Tr. Pgs. 118-120; 134-135; 170-171; 327].

15. The May, 2007 IEP states, "The AU Specialist and Special Ed Teacher will problem solve regarding any behavioral difficulties." The testimony reflected that the two consulted about two times. [J. Ex. 2].

16. At times during the 2007-2008 school year the Student's teacher took the Student to a teacher's lounge for brief sensory breaks. This provided the Student a chance to be in a quiet environment and take a break to help him re-group and become organized. If he were really upset, the Student would go into the restroom and sit in a chair. Generally, the Student would turn off the lights. The Teacher would be outside the restroom door, and the Student could leave the restroom at his choice. The teacher would ask him if he were ready and the Student would indicate whether he was or was not ready to leave. A complaint regarding this activity was filed with the Children's Protective Services in August, 2008, and was determined to be unfounded. [J. Ex. 11; Tr. Pgs. 41-42, 45].

17. The Teacher and the Parent communicated regarding myriad subjects including the Student's behavior, progress, pending graduation from ** school, proposed ** school schedule, proposed plans for his IEP, and transition to ** school. [J. Ex. 7].

18. According to the Parent, the Student mastered most of his goals and objectives in December, 2007, made progress on his IEP goals and objectives during the 2007-2008 school year, improved in his aggression towards others at school, decreased inappropriate touching of others at school, improved in his ability to move around the school environment more independently, and was able to have more inclusion time with the general education students. The Student's behavior had improved sufficiently to allow him to participate in his class graduation ceremony. In the summer, 2008, the Student attended a five day summer camp for the first time. [Tr. Pgs. 104-105; 245; 254-255].

19. The Student's goals and objectives were written in December, 2007 and were to be for a time period of one year. Progress Reports at the end of the 2008 spring semester, half-

way through the one year, indicated that the Student was in progress on his goals and objectives. [J. Ex. 10].

20. The Student met the standard on the Texas Assessment of Knowledge and Skills-Alternate ["TAKS Alt."] given in the spring, 2008. [R. Ex. 17].

21. From December, 2007 to the time of the due process hearing, the Student made progress on his speech goals and objectives, including categorization, imitation of actions and transitioning from the activity to a corresponding picture, distinction between "same"" and different," difference between "happy" and "sad" and verbalization of the two emotions. [Tr. Pgs.297-304].

22. The Parent attended and agreed with all ARD decisions.

## Discussion

Public school districts must comply with the IDEA procedures for identifying children with disabilities who need special education, and delivering appropriate services as necessary to provide a free and appropriate public education (FAPE). 20 U.S.C. § 1412(a)(1); Board of Education of the Hendrick Hudson Central School District v. Rowley, 458 U.S. 176, 189 (1982); Cypress Fairbanks Independent School District v. Michael F., 118 F.3d 245 (5th Cir. 1997).

A petitioner who challenges the school district's eligibility determination or offer of services under the IDEA bears the burden to prove that the child has been denied FAPE. Tatro v. State of Texas, 703 F.2d 832 (5th Cir. 1983), aff'd, 468 U.S. 883 (1984); Schaffer v. Weast, 126 U. S. 528 (2005).

The IDEIA states, "A hearing officer's determination of whether a child received FAPE must be based on substantive grounds...." 34 C.F.R. §300.513(a). In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free, appropriate public education only if the procedural inadequacies impeded the child's right to FAPE, significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of FAPE to their child, or caused a deprivation of educational benefits. 34 C.F.R. §300.513(a).

In order to prevail on a claim under the IDEIA, the party challenging the implementation of an IEP must show more than a de minimis failure to implement all elements of that IEP.

Rather, the challenging party must show that substantial or significant provisions of the IEP were not implemented. Houston Independent School Dist. V. Bobby R., 200 F 3d 341 (5th Cir. 2000).

**Picture/Word Schedule**

Regarding the Student's picture/word schedule, there were times when they were not used. The evidence showed that the Student had his schedule with him, but that he had memorized his schedule so well that he demonstrated that skill to others. There was no evidence that he suffered an adverse affect from the failure to use the picture schedule. I find that the failure to use the picture/word schedule each and every day of the school year is de minimis.

**Verbal Abuse**

There is no dispute that the Teacher spoke to the Student in a loud, stern voice when the Student refused to get off the school bus  There was some testimony that the Teacher spoke too loudly or gruffly to the Student at other times, and it is understandable that a parent does not want his child to be spoken to in a rough, stern, loud voice; however, in this instance, I do not find that the loud, stern voice used by the Teacher rises to the level of verbal abuse toward this Student. The Petitioner failed to meet his burden of proof on this issue.

**Sensory Breaks**

At hearing, Petitioner argued that the District failed to properly implement the Student's IEP or BIP when the Teacher took the Student to the teacher's lounge for a sensory break where the Student spent time in the adjacent restroom an unknown number of times. The IEP listed the appropriate places for sensory breaks, among which was the teacher's lounge. The adjoining restroom was not listed. The evidence showed that the Student chose to sit in a chair, sometimes with the lights off, in the unlocked restroom in order to re-group and calm. The Teacher was on the other side of the door and checked on the Student regularly. The Teacher testified that the Student would indicate when he was ready to leave and would be able to resume his school work after having had time to settle himself. I find that the use of the teacher's lounge was not a disciplinary action, but rather constituted a sensory break. The testimony indicated general disapproval of the use of the restroom as an appropriate place for a sensory break, and I agree. I find that the use of the teachers' restroom as a sensory break violated the Student's IEP. While the Petitioner presented testimony that the Student could have delayed responses, he presented no evidence to show that the Student suffered harm from these experiences. The time spent

during the break was limited, and the Student then resumed his studies. He was not denied educational benefits. To the contrary, he had a successful school year, making strides both academically and behaviorally. Petitioner failed to meet his burden of proof that FAPE was denied as a result of the failure to implement the terms of the IEP regarding locations for sensory breaks.

**Provision of Academic and Behavior Logs to Parent**

The Student's IEP required that behavior logs be kept during the school year. The Teacher testified that he kept daily logs. Although the IEP did not require that the District send these logs home on a daily basis, there was an understanding that the Parents wanted to see the logs. The evidence showed that the Teacher irregularly sent some, but not all, of the daily behavior logs to the Parents. There was regular communication between the Teacher and the Parents, and the evidence gave no indication that either of the two was hesitant to communicate with the other, if necessary. At the end of the 2007-2008 school year the Parents offered to, and ultimately did write a letter of recommendation for the Teacher who was relocating to another part of the state. I find no failure to implement the Student's IEP regarding daily academic and behavior logs.

**Notice of Staff Changes**

The Parent requested advance notice of staff changes. The principal testified that in the Spring, 2008 she sent an email to the Parent notifying them of the departure of one of the Student's paraprofessional teachers, and that there would be no replacement. Although there was question about the receipt of the email, I do not find that the District failed to implement the IEP regarding notice to the Parent of staff changes.

**Use of Restraint/Adequacy of Staff Training**

The Student was restrained one time during the 2007-2008 school year. A Written Summary of Restraint Use was completed which indicated that a paraprofessional assisted the Teacher in moving the Student to an empty room as an **alternative to restraint**. That paraprofessional did not receive training on the use of restraint. However, the Written Summary clearly shows that the restraint used was SAMA ground containment, and the staff members that administered the restraint were the Teacher and another staff member, both of whom were trained in the use of restraint. Petitioner failed to meet his burden of proof on this issue.

**Sufficiency of Education to Enable Petitioner to master his IEP goals during the 2007-2008 school year.**

The Parent admitted that the Student mastered his December, 2007 goals. New goals and objectives were written in December, 2007, and the ARD year began at that time. The expectation was that he would master the goals and objectives by the end of his ARD year which is December, 2008. The Teacher and the Student's speech teacher both indicated that the Student made progress in the spring, 2007. Since the ARD year had not ended at the time of this hearing, it would be premature to find at this date that the District failed to sufficiently educate the Student to enable him to master his IEP goals.

**Life Skills Class**

Although the Petitioner couched his issue in terms of a failure to meet the requirement of LRE, the issue was whether the District placed the Student in the Life Skills classroom. The Parent did not want the Student placed with the Life Skills students, made such a request, and the district complied. The testimony showed that there was not a setting where the Student was specifically just with the life skills children in classes. There were occasions when the Student was with both Life Skills and general education students. There were two or three times when the Student was with the Life Skills students at the ** Farm. On occasion, while the Student was at the park, the Life Skills students were present, and the Teacher removed the Student. I do not find that the District failed to appropriately implement the Student's IEP regarding placement.

**Autism Training of Staff**

The evidence showed that the Student's teachers received several trainings in autism. The Petitioner did not meet his burden of proof on this issue.

**Work with the Autism Specialist**

The AU Specialist made occasional visits to the school that the Student attended. The Teacher contacted her on two occasions. Since there was no IEP requirement that the two communicate a specified number of times during the year, I find no failure to implement the IEP on this issue.

**FAPE**

There are four factors used to determine whether a student's special education program provides a FAPE, as follows:

1.    The program must be individualized on the basis of the student's assessment and performance;

2.    The program must be administered in the least restrictive environment;

3.    The services must be provided to the student in a coordinated and collaborative manner by the key "stakeholders;" and

4.    Positive academic and non-academic benefits must be demonstrated.

Michael F., 118 F.3d at 253.

Petitioner offered no evidence to dispute that the Student's program is individualized on the basis of his most recent FIE. Evidence was given that the goals and objectives were appropriate and in keeping with the results of the assessment.

During the 2007-2008 school year the Student was inclused with general education students more than he had been in past years. He was not placed in the Life Skills classroom at the Parent's request, and there was no evidence to show that his placement in a classroom of his own was not the LRE.

The Student's special education services were determined by the ARD committee and the Parent attended every meeting and agreed to every decision. Although delivery of behavior logs to the Parent may have been sporadic, the evidence is clear that further collaboration occurred between the Teacher and the Parent throughout the school year. The Teacher sought input from the Parent regarding the Student's IEP, and initiated and responded to the Parent's emails about a number of subjects. The Student's teachers' testimonies showed a thorough understanding of the Student and his needs.

The evidence showed that the Student progressed both academically and non-academically during the 2007-2008 school year. He improved in his aggression toward others and in inappropriate touching of others in school. His behavior improved so much so that he was able to participate successfully in the **[h] grade graduation exercises. He improved in both his academic and speech goals. He began to be able to move about the school environment with ease, and even interact with others sufficiently to demonstrate his new found independence. He initiated greetings in the hallway, and said hello to both adults and students. He successfully took the TAKS Alt. in the spring, 2008. He was able to successfully attend a five day camp during the summer, 2008. Although the Parent contended that the Student's self-injurious behavior

worsened, overall, the Student received positive academic and non-academic benefits during the 2007-2008 school year.

## Conclusions of Law

1. The Student is eligible to receive special education and related services under the IDEIA, 20 U.S.C. § 1400 *et. seq.* and its implementing regulations.

2. The District's educational program is entitled to a legal presumption of appropriateness. Tatro v. Texas, 703 F.2d 823 (5th Cir. 1983). Petitioner bears the burden of proving that the educational program is not appropriate or that the District has no complied with the procedural requirements under the IDEIA. Schaffer v. Weast, 126 S.Ct. 528 (2005); Houston Independent School Dist. V. Bobby R., 200 F 3d 341 (5th Cir. 2000); Board of Education of the Hendrick Hudson Central School District v. Rowley, 458 U.S. 176, 189 (1982); Cypress Fairbanks Independent School District v. Michael F., 118 F.3d 245 (5th Cir. 1997). Petitioner failed to meet his burden.

## Orders

Based upon a preponderance of the evidence and the forgoing findings of fact and conclusions of law, it is **ORDERED** that Petitioner's requests for relief are **DENIED.**

SIGNED on the 10th day of November, 2008.

_____
Brenda Rudd
Special Education Hearing Officer
For the State of Texas

## NOTICE TO PARTIES

**This decision is final, except that any party aggrieved by the findings and decision made by the hearing officer, or the performance thereof by any other party, may bring a civil action with respect to the issues presented at the due process hearing in any state court of competent jurisdiction or in a district court of the United States, as provided in 20 U.S.C., §1415(i)(2), and 34 C.F.R., §300.516.**

DOCKET NO. 287-SE-0808

STUDENT                          §       BEFORE A SPECIAL
EDUCATION
b/n/f Parents                §
                                 §
V.                               §       HEARING OFFICER FOR THE
                                 §
                                 §
LIBERTY HILL INDEPENDENT         §
SCHOOL DISTRICT                  §       STATE OF TEXAS

## SYNOPSIS

| | |
|---|---|
| Issue No. 1: | Without notice to the Parent, whether the District failed to follow the Student's Individualized Education Program ("IEP"); specifically, the District failed to use daily picture schedules during the 2007/2008 school year |
| Held: | For the District.  Although there were times when the picture schedules were not used, the failure was de minimis. |
| Citation: | 34 C.F.R. § 300.323; Houston Independent School Dist. V. Bobby R., 200 F 3d 341 (5th Cir. 2000) |
| | |
| Issue No. 2: | Whether the District allowed verbal abuse of the Student during the 2007-2008 school year. |
| Held: | For the District.  The Teacher's harsh tone of voice did not harm the Student or constituted verbal abuse. |
| Citation: | 34 C.F.R. § 300.513(a); Schaffer v. Weast, 126 S.Ct. 528 (2005) |
| | |
| Issue No. 3: | Through its disciplinary actions and without documentation or notice to the Parent, whether the District failed to treat the Student with dignity and respect through emotional and sensory abuse and deprivation throughout the 2007-2008 school year in violation of the Student's IEP or Behavior Intervention Plan ("BIP"), resulting in a failure to educate the Student in the Least Restrictive Environment ("LRE") and a safety risk for the Student |
| Held: | For the District.  The use of sensory breaks in a teacher's restroom contravened the Student's IEP.  There was no credible evidence that the Student was harmed or deprived of educational benefit, thus, no denial of FAPE. |
| Citation: | 34 C.F.R. § 300.323; 34 C.F.R. § 300.513(a) |
| | |
| Issue No. 4: | Whether the District failed to provide academic and behavior logs to the Parent during the 2007-2008 school year. |
| Held: | For the District. The IEP did not require that the Teacher send logs to the Parent, although the Teacher irregularly provided them to the Parent |
| Citation: | 34 C.F.R. § 300.323 |

| | |
|---|---|
| Issue No. 5: | Although requested by the Parent, beginning in the Fall 2007 through March, 2008, whether the District failed to provide advance notice of permanent staffing changes |
| Held: | For the District. The District provided advance notice of the single staff member's departure. |
| Citation: | 34 C.F.R. § 300.323; Schaffer v. Weast, 126 S.Ct. 528 (2005) |
| | |
| Issue No. 6: | Beginning August 20, 2007 and continuing through January, 2008, whether the District placed the Student with inadequately trained staff who used restraint with the Student and, following use of restraint, the District failed to provide training to those staff members within the required time frame |
| Held: | For the District. The staff members who performed the restraint were trained in restraint. |
| Citation: | TEC § 37.0021; Schaffer v. Weast, 126 S.Ct. 528 (2005) |
| | |
| Issue No. 7: | With the exception of the December, 2007 goals, whether the District failed to sufficiently educate the Student to enable him to master his IEP goals during the 2007-2008 school year. |
| Held: | For the District. The Student was progressing in the goals and objectives and, at the time of hearing, the year within which mastery should be accomplished was not completed. |
| Citation: | 34 C.F.R. § 300.324; Schaffer v. Weast, 126 S.Ct. 528 (2005) |
| | |
| Issue No. 8: | During the 2007-2008 school year whether the District failed to meet the requirement of LRE by placing the Student in a Life Skills Class to accommodate staffing issues |
| Held: | For the District. The Student was not placed in a Life Skills Class, but had occasional contact with the Life Skills students. The Parent did not complain that the Student's placement in a classroom of his own violated LRE. The District implemented the Student's placement appropriately. |
| Citation: | 34 C.F.R. § 300.323 |
| | |
| Issue No. 9: | During the 2007-2008 school year whether the District failed to provide the Student with teachers that were sufficiently trained in autism |
| Held: | For the District. The Student's teachers were qualified to teach the Student and had received training in autism. |
| Citation: | 34 C.F.R. § 156 |

| | |
|---|---|
| Issue No. 10: | Whether the District failed to follow the Student's BIP in that the Student's teachers did not work with the behavior specialist |
| Held: | For the District. There was no specified number of times that the behavior specialist and the teachers were to work together. |
| Citation: | 34 C.F.R. § 300.323 |